UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LOCUS TECHNOLOGIES,

                           Plaintiffs,

            -against-

HONEYWELL INTERNATIONAL INC.,

                        Defendants.
-------------------------------------------------------------------X

Civil Action No. 19-cv-11532
ECF case

**COMPLAINT**

**Jury Trial Demanded**

By its attorneys Michelman & Robinson, LLP, the Plaintiff Locus Technologies (hereafter, referred to as "Locus"), brings its Complaint against Defendant Honeywell International Inc. (hereafter, referred to as "Honeywell"), and alleges upon information and belief as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, account stated, and the misappropriation of confidential information arising from the use of proprietary software products owned by Locus and licensed to Honeywell.

2.      A California company located in Silicon Valley, Locus has developed unique proprietary software applications which enable the collection and management of comprehensive environmental data for property owners and site managers.

3.      Over a 16-year period detailed within this Complaint, Honeywell licensed and utilized these proprietary software products.

4.      As set forth below, Honeywell breached material terms of its 2003 Software License Agreement, the October 16, 2012 Order Form, and the 2015 Master Services License Agreement and Statement of Work (collectively, the "Contracts").  Honeywell failed to pay valid

invoices and compensate Locus for incurred expenses and engaged in unethical practices wrongfully disclosed Locus' confidential information and intellectual property in violation of the Contracts.

5.      For over 15 years, Locus and Honeywell enjoyed a business relationship involving multiple Locus products. Locus upheld its end of the bargain, building, operating, and servicing a variety of highly advanced cloud-based software products that provided substantial, long-term benefits to Honeywell.

6.      Honeywell, in comparison, had just three primary obligations: (1) pay Locus' invoices in a timely manner; (2) protect Locus' confidential information and intellectual property; and (3) generally abide by the terms of the Contracts.

7.      The Contracts stipulated how Locus would bill Honeywell for its services, the amount of time in which Honeywell had to pay said invoices, the procedures for contesting and resolving disputes, and the requirements for terminating Locus' services.

8.      Of critical importance to Locus, the Contracts required Honeywell to protect Locus' confidential information and intellectual property from improper use or disclosure in the marketplace.

9.      As set forth herein, the relationship between Locus and Honeywell was managed by Honeywell's Project Manager Chris French ("French").

10.     Soon after Locus entered into the Contracts with Honeywell, French engaged in an unethical campaign to extort expensive gifts, services, and hospitalities from Locus.

11.     As these demands became more expensive and extravagant in nature, Locus denied French's demands.

12.     As a result of these events, French engaged in a series of actions designed to cause harm to Locus and undermine Locus' otherwise successful relationship with Honeywell.

13.     In addition to these extortions, during the course of the contract term, French made arrangements for his daughter, a recent college graduate, to oversee the development of the scope of work for a sophisticated Remediation Information Management System.

14.     The technical requirements of this project were well beyond the ability of French's daughter and the Honeywell team resulting in constant revisions to the program and increased development costs which French either sought to conceal or force Locus to absorb.

15.     Honeywell wrongfully delayed or refused to pay valid invoices, improperly terminated the Contracts, and violated Locus' software licenses to avoid paying contractually-mandated data transfer fees.

16.     Honeywell also distributed in the marketplace documents that contained Locus' confidential intellectual property and business methods.

17.     As a result of its actions, Honeywell owes Locus no less than $1,456,744 for unpaid invoices and fees which are still accruing interest, is liable for all costs and attorneys' fees required to collect on this account, and has directly damaged Locus by intentionally disclosing Locus' confidential information.

## PARTIES

18.     Plaintiff Locus Technologies is a California corporation with its principal place of business located at 299 Fairchild Drive, Mountain View, California.

19.     Defendant Honeywell International Inc. is a Delaware corporation with its principal place of business located at 300 South Tryon Street, Charlotte, North Carolina.

**JURISDICTION AND VENUE**

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

21.    Venue and jurisdiction are proper in this judicial district pursuant to 28 U.S.C. § 1391 as the parties designated this venue as proper in the subject agreements.

**FACTUAL BACKGROUND**

22.    Locus was founded in 1997, and within two years launched its first cloud-based software product, Locus Environmental Information Management module ("EIM"), a data management and compliance system for the environmental industry.

23.    Locus marketed EIM and other software products as a subscription service to government agencies and companies, such as Honeywell, who required real-time, customizable software for collecting, organizing, analyzing, and reporting environmental data to comply with environmental regulations.

24.    Locus software products have been utilized successfully for Environmental Health and Safety ("EHS") compliance by many of the world's largest organizations.

**I.    Locus and Honeywell Enter Into The Contracts**

**A.    The 2003 Software License Agreement**

25.    In 2003, Locus and Honeywell first entered into a License Agreement which governed the terms and use of Locus' software products.

26.    The parties' License Agreement was memorialized in the Software License Agreement dated June 1, 2003 between Locus and Honeywell (the "License Agreement"). A true and correct copy of the License Agreement is annexed hereto as **Exhibit 1**.

27. The License Agreement granted Honeywell a non-exclusive license for access to and the use of EIM, LocusFocus Portal ("ePortal"), and other Locus products and services. *See* License Agreement, § 2.1.

28. As part of the License Agreement, Locus provided Honeywell with customized modifications to its products, as well as training and technical support. *See* License Agreement, Exhibit B.

29. The pertinent sections of the License Agreement concern the (1) duration and termination of the License Agreement; (2) timely payment of Locus' invoices; and (3) protection of Locus' intellectual property.

30. The License Agreement ran for an initial three-year term, after which it automatically renewed on a yearly basis for four successive one-year periods.

31. If neither party terminated the License Agreement within the first seven years, it would automatically renew for successive one-year periods until termination. *See* License Agreement, § 3.2.

32. Honeywell had the right to terminate the License Agreement by giving notice 60 days prior to the end of a term, or for convenience within 60 days after written notice.

33. Additionally, both Honeywell and Locus had the right to terminate for cause due to a material breach if the offending party failed to cure within 30 days written notice. *See* License Agreement, §§ 6.2, 6.3.

34. The License Agreement remained in full force and effect from its inception through 2012 when the parties modified the agreement for the same software subscription services.

35. Pursuant to the License Agreement, Locus issued monthly or bi-monthly invoices.

36.     Honeywell was required to pay all invoices within 60 days of the invoice date. *See* License Agreement, Exhibit E, § IV.

37.     If Honeywell objected to or found an error in an invoice, Honeywell had 10 days from receipt to dispute that specific invoice. *See* License Agreement, Exhibit E, § IV.

38.     Unpaid and undisputed invoices would accrue interest at a rate of 1.5% per month, starting on the 31st day.

39.     In addition, Honeywell is liable for all expenses and attorney's fees necessary to collect on an overdue account. *See* License Agreement, Exhibit E, § IV.

40.     The License Agreement broadly covered and protected all of Locus intellectual property rights, confidential information, and trade secrets. *See* License Agreement, § 1.1(a).

41.     Pursuant to the License Agreement, Honeywell was obligated to maintain the confidentiality of Locus' software and intellectual property, which constituted valuable confidential information.

42.     Specifically, §§ 2.4 and 7.3 of the License Agreement provided:

> Customer agrees to use the Locus Software in a manner that complies with all applicable laws including intellectual property and copyright laws.
>
> …
>
> Customer acknowledges Locus's claim that the Locus Software and other software installed on Locus's Application Server embodies logic, design, and coding methodology may constitute valuable confidential information that is proprietary to Locus and its licensors. Customer shall safeguard the right to access the Locus Software and other software installed on Locus's Application Server using the same standard of care, which Customer uses for its similar confidential materials, but in no event less than reasonable care.

**B.    The October 16, 2012 Order Form**

43.    In 2012, Locus and Honeywell entered into an amendment of the License Agreement.

44.    The amendment of the License Agreement became effective as of January 1, 2013 by means of a written order form dated October 16, 2012 (the "Order Form"). A true and correct copy of the Order Form is annexed hereto as **Exhibit 2**.

45.    Although the Order Form was governed by the License Agreement, it contained key modifications regarding the billing methodology, invoice frequency, costs, payment schedule, and, most importantly, the software subscription termination policy.

46.    As part of the change to the billing methodology, Locus replaced specific line items contained in Exhibit C of the License Agreement with a simplified fixed pricing structure for EIM and ePortal.

47.    These changes provided Honeywell with significant cost savings and technical improvements.

48.    The Order Form also converted the EIM and ePortal subscription licenses to annual invoicing and gave Honeywell 90 days to pay invoices via wire transfer, as compared to 60 days in the License Agreement. *See* Order Form, Terms and Conditions.

49.    Upon each renewal, Honeywell subscribed for EIM and ePortal an entire calendar year and could no longer terminate the subscription for convenience.

50.    Importantly, the Order Form stated that the subscriptions for EIM and ePortal were "noncancelable before their annual End Date."

51.    In effect, the modifications to the License Agreement provided Honeywell with pricing and payment advantages and Locus with annual revenues from the subscriptions.

52.    The Order Form required Honeywell to keep the payment terms strictly confidential. *See* Order Form, Special Terms and Notes, § 9.

53.    Finally, upon termination of EIM or ePortal, the Order Form required Honeywell to pay a stipulated transfer fee to cover the cost of transitioning and maintaining Honeywell's data. *See* Order Form, Special Terms and Notes, § 7.

54.    Honeywell and Locus continued to operate under the Order Form's terms from January 1, 2013 through the present.

55.    Pursuant to the Order Form, Locus submitted annual invoices using the Order Form's pricing structure and Honeywell paid the annual invoices in accordance with the terms of the Order Form.

**C.    The 2015 Master Services License Agreement to Development New Software Application**

56.    In 2015, Honeywell entered into a separate contract with Locus to develop a new software application known as Remediation Information Management System ("RIMS"). The RIMS application was to be designed to better manage Honeywell's environmental and remediation financial data.

57.    The software development agreement was memorialized in the Master Services License Agreement, dated January 15, 2015 (the "MSA"). A true and correct copy of the MSA is annexed hereto as **Exhibit 3**.

58.    An essential element of the development agreement is the articulation of the program design and operating parameters. These parameters were to be set forth in a document known as the Statement of Work.

59.     Nearly five months later, the parties memorialized these parameters together with development costs and schedules in the May 1, 2015 Statement of Work #01 (the "SOW").  A true and correct copy of the SOW is annexed hereto as **Exhibit 4**.

60.     The delay in establishing the elements of the SOW was caused by Honeywell's inability to direct and decide the particulars of the applications functionality.

61.     In fact, it was at this time that French hired his daughter, a recent college graduate with little or no experience in sophisticated program engineering or financial management, to participate in and oversee the development of specifications for the RIMS application.

62.     The MSA provided that Honeywell could direct changes in the SOW via a Change Request Form and Change Order Form, or a change order issued through Honeywell's purchasing system.

63.     Importantly, if these changes altered the cost or schedule of the SOW, Honeywell was required to make equitable adjustments to the SOW price and/or delivery dates.  *See* MSA § 2.1; SOW, Exhibit B.

64.     If Locus required "extra time and resources beyond the expectations established by the original project scope, Locus was entitled to charge Honeywell on Time and Material (T&M) basis through the Change Order process established in this SOW." *See* SOW, Project Plan.

65.     The SOW clearly defined several of Honeywell's responsibilities. Specifically, Honeywell's responsibilities included, but were not limited, to ensuring that:

- "one main Point of Contact (POC) is assigned as RIMS Project Manager, and is responsible for ensuring that Honeywell and Alliance partners that serve on each functional team meet their responsibilities in a timely manner";

- "[a]ll document revision cycles are considered to be a maximum of nine business day's duration with up to two iterations that can be included without schedule impact. Honeywell will either accept all deliverables within six business days of delivery or notify Locus with specific details in writing of any issues via email"; and

9

- "key personnel remain available and intact to their best of their ability to keep the approval process and project moving forward."

*See* SOW, Schedule 2.

66.     The SOW divided costs into two parts: (1) a Fixed Fee Engagement for services already negotiated and defined in the SOW, and (2) Professional Services Fees billed on a time and materials basis, which would accrue due to extra work, unanticipated costs, and/or additions requested by Honeywell to the administrative tasks, scope, or specifications not originally accounted for. *See* SOW, Schedule 9.

67.     The first stages of RIMS required a significant initial investment of time, resources, and personnel.

68.     The SOW shifted these costs from Honeywell to Locus by requiring Locus to distribute its first year of costs over four years without interest by providing that it "is understood that Locus has agreed to distribute development cost over a four-year time frame and that Locus will be incurring the bulk of the development cost in year one of the contract." *See* SOW, Project Schedule.

69.     As Locus submitted invoices detailing the fixed fee and time and materials costs, Honeywell was required to pay the invoices within 105 days from receipt of an invoice, with payments scheduled for the first payment cycle after that period.

70.     If Honeywell disputed any portion of an invoice, Honeywell could only withhold the disputed amount and was required to pay the remainder on time. *See* MSA §§ 5.1, 5.4.

71.     If a dispute arose concerning the MSA or SOW, the parties were required to use their best efforts to achieve a settlement, including, but not limited to, attending an executive conference with at least one executive from each side. This conference would allow each party to present its view of the disputed issues, and then enter into good-faith negotiations to resolve the

dispute. Should that fail, either party would have the option of pursuing a resolution as they saw fit, consistent with the terms of the MSA and SOW. *See* MSA § 14.11.

72.     From the beginning of the disputes over the RIMS payments, Locus requested, on no less than ten occasions, to meet with Honeywell executives. All requests either went unanswered or were denied.

73.     Through this development period, Locus received changes in scope and incurred substantially higher development costs about which it advised and billed Honeywell pursuant to the terms of the MSA.

74.     Upon information and belief, French neither disclosed these higher costs to Honeywell's purchasing department nor disclosed the regular changes in scope of the work.

75.     Locus advised French that the project specifications were not clearly detailed by the Honeywell team and that his daughter was not suited for the role he created for her and that her lack of experience was causing delays and higher costs for the RIMS project.

**D.     Potential Acquisition of Locus by Honeywell**

76.     At the same time Locus was developing the RIMS application, Honeywell expressed interest in acquiring Locus for its unique software products and technical capabilities.

77.     To pursue the possible acquisition, the parties entered into a letter license agreement on March 1, 2018 (the "NDA") allowing Honeywell full access to Locus confidential engineering and financial information and protecting Locus' confidential information.  A true and correct copy of the NDA is annexed hereto as **Exhibit 5**.

78.    As Locus was providing Honeywell with complete access to its confidential information and intellectual property, the NDA imposed strict requirements and restrictions on Honeywell. Specifically, the NDA required Honeywell to:

- "treat confidentially such information that either the Seller, the Company/Business or their respective directors, officers, agents, employees or representatives furnish to Honeywell after the date hereof";

- "not to use any of the Confidential Information for any purpose other than the purpose of evaluating the possibility of a Transaction";

- "be responsible for any breach of this License Agreement by Honeywell's Representatives"; and

- "take all reasonable measures to restrain Honeywell's Representatives from disclosure or use of the Confidential Information and Transaction Information in violation of this License Agreement."

## II.    Unethical Conduct by Honeywell

79.    From the onset of the relationship, Honeywell employees began requesting gifts and gratuities from Locus.

80.    These requests were made as "part of the relationship."

81.    The most egregious demands were made by French, who was directly responsible for overseeing Locus' contracts and programs.

82.    French frequently demanded personal gifts and hospitalities from Locus, such as expensive dinners, airline tickets, ski vacations, electronics, and other valuable items for himself, his family, and his preferred consultants. For example:

- From 2005 to 2009, Locus annually paid for ski rentals, lift tickets, and condo rentals for French while he vacationed in Park City, Utah.

- On December 1, 2008, French requested via personal email that Locus pays for his airline ticket to Utah.

- On December 25, 2008, French requested that Locus pay for his airline ticket from Philadelphia, Pennsylvania to Salt Lake City, Utah.

- On December 13, 2009, Locus purchased and directly shipped a $165.99 Apple iPod to French's home address.

- On December 7, 2010, Locus purchased and directly shipped a $500.00 Apple iPad to French's home address.
- On December 20, 2011, French requested that future gifts be made via Amazon gift cards to his personal email address. Locus purchased and directly sent a $500.00 Amazon gift card to French's personal email address.
- On February 1, 2013, French demanded that Locus pay exorbitant travel expenses, including first-class airfare, hotels, and per diems, for Dr. Rene Surgi, an outside consultant with close ties to French, even though Surgi had no connection to Locus and was not employed by Honeywell.
- On May 16, 2015, French requested via personal email that Locus rent a condo in Park City, Utah for his family.

83.     French's demands were in violation of Honeywell's Code of Business Conduct, which prohibits Honeywell employees from soliciting gifts, or accepting gifts that are above nominal value.

84.     By 2016, Locus had incurred substantial costs responding to French's requests and refused to comply further.

85.     In addition, the RIMS project costs were escalating and French was refusing to acknowledge these costs or the reasons they were incurred.

86.     It is at this point that French, in connection with other Honeywell employees, began to undermine the relationship with Locus and attempt to discredit Locus.

87.     By this time, Honeywell had mismanaged RIMS by failing to define the project scope.

88.     As a result, Honeywell continuously changed the project requirements and specifications, driving up costs and wasting time.

89.     These issues were compounded by French who would regularly order Locus to accomplish tasks which contradicted his own prior instructions for the project.

90.    Furthermore, Honeywell failed to keep document revision cycles within nine business days and failed to accept deliverables or notify Locus of specific concerns within six business days, both of which were required by Schedule 2 of the SOW.

91.    Likewise, Honeywell began to ignore and deny all Locus' requests for Change Orders. For example, on April 19, 2017, Locus submitted 12 Change Orders regarding document changes directed by French. These Change Orders were ignored.

92.    Given these issues, Honeywell informed Locus that French would be replaced as lead on the project by Honeywell Project Manager Bill Hague ("Hague").

93.    However, as Hague was unfamiliar with the details of software development, Hague was completely reliant upon French for guidance.

94.    As a result, Hague was unwilling to meet or engage Locus in any meaningful discussions. Later, Locus learned that French continued to manage matters from behind the scenes in a continued effort to undermine Locus.

95.    Beginning in 2017 Honeywell began regularly delaying payment on Locus' invoices. For example:

- On March 27, 2018, Locus submitted Invoice No. 982851 in the amount of $4,338 for Honeywell RIMS 2018 project. Honeywell did not pay this invoice until August 10, 2018, 136 days later.

- On September 20, 2018, Locus submitted Invoice No. 983060 in the amount of $6,864 for Honeywell RIMS 2018 Enhancements. Honeywell did not pay this invoice until January 29, 2019, 131 days later.

- On October 25, 2018, Locus submitted Invoice Nos. 983108 and 983109 in the amounts of $92,040 for Honeywell RIMS 2019 and $348,855 for Honeywell EIM SaaS 2019.  Invoice 983108 was paid on February 26, 2019, 124 days later. Invoice 983109 was paid on February 19, 2019, 117 days later.

96.    Honeywell's delay of payments to Locus breached the Contracts, which required invoices to be paid within the stipulated time.

97.     Honeywell also breached the Contracts by refusing to pay any RIMS invoices for professional services, which eventually totaled $696,624.

98.     Honeywell employees continued their retaliation efforts against Locus by working to terminate Locus' business relationship with Honeywell.

99.     To further undermine Locus, French undertook a sham evaluation process using misrepresentations, biased reports, and false statements.

100.    The conclusions in the survey and evaluation concerning Locus were even contradicted by Honeywell's own prior reports, but French used them as justification for terminating Locus' contracts and projects.

101.    On June 26, 2018, Honeywell terminated ePortal.

102.    On May 2, 2019, Honeywell terminated EIM.

103.    Honeywell continued using EIM, despite having only paid for six months until Locus was forced to remove Honeywell's access on August 20, 2019.

104.    As a result of these behaviors, Locus reported French to Honeywell Senior Manager John Morris and the Honeywell ethics hotline.

105.    On May 15, 2019, Locus contacted the Honeywell Integrity Helpline and filed a formal complaint about French in an attempt to prevent further retaliation. For several weeks Locus cooperated with Honeywell senior investigators, shared relevant information, and invited Honeywell to perform an audit of Locus expense reports.  The Honeywell investigators claimed that Locus had no further cause for concern, as Honeywell would follow its non-retaliation policy.

106.    As a result of their own investigation, Honeywell terminated French.

107.    Nonetheless, the damage had been done, and Honeywell continued to retaliate against Locus.

108.   On November 15, 2019, Honeywell terminated RIMS.

109.   The EIM and ePortal cancellations breached the License Agreement, as Honeywell failed to provide the requisite 60 days written notice. *See* License Agreement, § 6.2.

110.   Moreover, once ePortal and EIM had been canceled, Honeywell refused to pay the outstanding invoices for the remainder of the year and pay hosting fees for RIMS that were until time of EIM and ePortal cancellation subsidized by those two products. For example:

- On April 3, 2019, Locus submitted Invoice No. 983264 in the amount of $359,321.00 for EIM. To date, Honeywell has not paid this invoice.

- On May 15, 2019, Locus submitted Invoice No. 983297 in the amount of $185,702.40 for EIM. To date, Honeywell has not paid this invoice.

- On June 5, 2019, Locus submitted Invoice No. 983318 in the amount of $171,654.30 for ePortal. To date, Honeywell has not paid this invoice.

111.   The failure to pay the remaining invoices for ePortal and EIM breached the Contracts, as Honeywell had agreed to an annual subscription that could not be terminated before the end of the year. *See* Order Form, Terms and Conditions.

112.   As a final insult, rather than request a data transfer from Locus, Honeywell engaged its HTS division in India to improperly download large amounts of data from EIM, jeopardizing the performance and stability of all Locus customers.

113.   This improper transfer of data violated EIM's Terms of Use Agreement and constituted a separate breach of the Order Form, as Honeywell was required to pay the stipulated transfer fee. *See* Order Form, Special Terms and Notes, 7.

114.   On May 15, 2019, Locus submitted Invoice 983297 in the amount of $185,702.40, which represents the transfer fee Honeywell was required to pay after the termination of EIM and ePortal. To date, Honeywell has not paid this invoice and prevented Locus from transferring data.

16

115.    Honeywell's actions are in clear breach of the Contracts, and to date, Honeywell has amassed over $760,120.54 in unpaid invoices, fees, and interest for EIM and ePortal.

### III.    Honeywell Intentionally Discloses Locus' Confidential Information and Intellectual Property

116.    On October 24, 2018, Honeywell informed Locus that it was planning to issue a request for a proposal for a new environmental database management system which would replace EIM. Locus was surprised, as Honeywell had not raised any concerns about EIM's price of functionality.

117.    Additionally, for the first time since the Order Form was signed, Honeywell requested that Locus switch from annual billing to quarterly billing for 2019. Locus eventually agreed only to split the annual EIM and ePortal bills into two bi-annual payments.

118.    On December 20, 2018, Honeywell published a Request for Proposal, Remediation and Redevelopment Group, Environmental Database Management System, Introduction, Instructions and Scope, Project ID-10145 (the "RFP"). The RFP was widely distributed, including to all of Locus' major competitors.

119.    The RFP deviated from normal practices, as it disclosed a substantial amount of Locus' confidential information, including specific descriptions of Locus' proprietary methods, Locus' award-winning SaaS architecture and workflows, screenshots of Locus' software, and details concerning Locus' costs and billing. For example, the RFP contains:

- The current amounts paid to Locus, which disclosed Locus' confidential pricing structures and License Agreements.
- Charts illustrating Locus' high-level data flow, which disclosed the complete architecture of Locus' EIM software.
- Screenshots of Locus' software setup, which disclosed the parameters and methods that Locus' software utilizes.
- Screenshots of Locus' software outputs, which disclosed the organization, content, and functionality of Locus' software.

17

- Data dumps and screenshots of Locus' software, which disclosed the internal tools and processes within Locus' software.

120. Honeywell breached the Contracts by exposing Locus' confidential information and intellectual property to Locus' competitors via the RFP. Unlike a standard request for proposal, the RFP was designed to inflict as much damage to Locus and its business as possible. While none of Locus' competitors possessed software similar to EIM, the information in the RFP could be used by these competitors for their own benefits and to Locus' detriment.

121. On January 15, 2019, Locus wrote to Honeywell and requested a meeting. In the letter, Locus communicated its concerns about the falsehoods in the RFP, how Honeywell employees were retaliating against Locus, and how Honeywell had disclosed Locus' confidential information and intellectual property. Locus requested a meeting to discuss this matter with Honeywell, but Honeywell refused.

122. Subsequently, on January 16, 2019, Locus contacted French to discuss the disclosure of Locus' confidential information and intellectual property in the RFP. Locus also requested a separate meeting to discuss this matter with Honeywell, and an extension of the RFP deadline, which would permit Locus to better analyze the large amounts of information concerning Locus' software and procedures that Honeywell had embedded in various documents attached to the RFP.

123. All requests were denied.

## COUNT I

### Breach of Contract

124.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 123 as if fully set forth herein.

125.    Honeywell and Locus, for valuable consideration, entered into the License Agreement, Order Form, MSA, SOW, and NDA, which constitute valid, binding, and enforceable contracts.

126.    Pursuant to the Contracts, Honeywell was required to pay all invoices within a stipulated period.

127.    Pursuant to the License Agreement and Order Form, Honeywell could not cancel its ePortal or EIM subscriptions before the end of the year, and had to give, at a minimum, 60 days written notice.

128.    Pursuant to the Order Form, Honeywell was required to pay a data transfer fee upon terminating ePortal or EIM.

129.    Pursuant to the Contracts, Honeywell was required to protect Locus' intellectual property and confidential information.

130.    In breach of the express terms of the Contracts, Honeywell prematurely and without proper notice terminated ePortal and EIM.

131.    In breach of the express terms of the Contracts, Honeywell delayed and failed to pay valid invoices within the necessary time period.

132.    In breach of the express terms of the Contracts, Honeywell failed to pay the requisite data transfer fee upon terminating ePortal and EIM.

133.    In breach of the express terms of the License Agreement, Honeywell engaged in unsecure data dump from EIM in violation of Locus Terms of Use policy.

19

134.    In breach of the express terms of the Contracts, Honeywell intentionally disclosed Locus' intellectual property and confidential information.

135.    Locus has performed all of its obligations to Honeywell under the terms of the Contracts.

136.    Honeywell has refused repeated demands by Locus to pay for the remaining invoices.

137.    Honeywell has acted intentionally and with the purpose of harming Locus.

138.    As a result of the foregoing conduct, Locus has suffered damages in an amount to be proven at trial.

## COUNT II

### Account Stated

139.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 138 as if fully set forth herein.

140.    Locus and Honeywell entered into a contractual relationship by which Locus provided access to its products and performed services for Honeywell, and Honeywell, in turn, was indebted to Locus for said products and services.

141.    The Contracts fixed the amounts due, the frequency with which Locus would issue invoices, and the amount of time Honeywell had to pay said invoices.

142.    Pursuant to the Contracts, Honeywell had a stipulated period of time in which to object to or contest specific line items within an invoice. Otherwise, the invoice was deemed correct and valid.

143.    Pursuant to the Contracts, Honeywell agreed to pay such indebtedness within a stipulated period of time. Otherwise, the invoices would accrue interest.

144.    Locus presented its invoices to Honeywell, and Honeywell has accepted the invoices.

145.    As a result of the foregoing conduct, Locus has suffered damages in an amount to be proven at trial.

## COUNT III

### Misappropriation of Trade Secrets

146.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 145 as if fully set forth herein.

147.    Locus has expanded significant time, labor, and financial resources on developing its intellectual property, software, and confidential information, and in protecting this content from its competitors. Locus' methods and information cannot be easily determined or duplicated.

148.    Locus intellectual property and confidential information has substantial commercial value, particularly among Locus' competitors.

149.    Certain proprietary information maintained by Locus concerning its products, business, and operations constitutes a trade secret under Delaware law in that such information derives independent economic value from not being readily known to (or ascertainable through proper means) other parties seeking access to such economic value. Such information has also been the subject of reasonable measures and efforts by Locus to protect its secrecy. Accordingly, Locus is entitled to the protection of the Delaware Trade Secrets Act, 6 *Del. C.* § 2001, et seq., with regard to such information.

150.    Honeywell drafted and distributed the RFP which disclosed such information in violation of its contractual obligations to Locus and in violation of the Delaware Trade Secrets Act.

151.    Such misappropriation entitles Locus to injunctive relief and/or damages as a matter of law under the Delaware Trade Secrets Act, 6 *Del. C.* §§ 2002-03.

152.    In the event that such misappropriation is deemed willful or malicious by this Court, this Court may award reasonable attorneys' fees to Locus pursuant to 6 *Del. C.* § 2004.

153.    As a result of the foregoing conduct, Locus has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs seek judgment in their favor and against Defendants as follows:

(i)    On Count I, for breach of contract, damages in an amount to be determined at trial;

(ii)    On Count II, for account stated, damages in an amount to be determined at trial;

(iii)    On Count III, for misappropriation of trade secrets, damages in an amount to be determined at trial;

(vii)    Reasonable attorneys' fees;

(viii)    Costs; and

(ix)    For such further relief as the Court deems just and proper.

Dated:  New York, New York
        December 17, 2019

                              MICHELMAN & ROBINSON, LLP

                              By:     /s/ John Giardino
                                      John Giardino, Esq.
                                      Alex Barnett-Howell, Esq.
                                      800 Third Avenue, 24th Floor
                                      New York, New York 10022
                                      (212) 730-7700
                                      jgiardino@mrllp.com
                                      abarnett-howell@mrllp.com
                                      *Attorneys for Plaintiffs*