# EXHIBIT 3

# MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") is entered into as of Jan 15th 2015, ("**Effective Date**") between Honeywell International Inc., with offices at 101 Columbia Road, Morristown, NJ 07962 ("**Honeywell**") and Locus Technologies, a California corporation, with offices at 299 Fairchild Drive, Mountain View, CA 94043, ("**Locus**"). Locus is in the business of software development and related services for the EH&S and Sustainability industry. Honeywell desires to engage Locus, from time to time, to provide services to it. This Agreement sets forth the general terms and conditions applicable to all Statements of Work and purchase orders issued under this Agreement. "**Parties**" means Honeywell and Locus and "**Party**" means either of them individually.

**Glossary of Terms:**

SaaS: Software as a Service is a software licensing and delivery model in which software is licensed on a subscription basis and is centrally hosted. SaaS is typically accessed by users using a web browser. A software delivered via SaaS is owned, delivered and managed remotely by one or more providers. The provider delivers software based on one set of common code and data definitions that is consumed in a one-to-many model by all contracted customers at any time on a pay-for-use basis or as a subscription based on use metrics. The term SaaS is considered to be part of the nomenclature of cloud computing, along with infrastructure as a service (IaaS) and platform as a service (PaaS).

PaaS: Platform as a service (PaaS) is a category of cloud computing services that provides a computing platform and a solution stack as a service. Along with software as a service (SaaS) and infrastructure as a service (IaaS), it is a service model of cloud computing. In this model, the customer or provider creates an application or service using tools and/or libraries from the provider. The provider provides the networks, servers, storage, and other services that are required to host the customer's application.

Locus Platform: Locus Platform is a PaaS cloud computing platform from Locus that authorized users (domain experts or developers) use to build multitenant applications hosted on Locus' servers. The Locus Platform defines a standard on which applications can be developed by non-developers. It contains a set of tools and services that make it faster and easier to create user-facing applications that are integrated with the platform. Built on the Locus enterprise cloud platform, the Locus Platform, contains an intuitive interface with the immense flexibility to incorporate features such as drag-and-drop forms creation, visual business-process modeling, Excel import/export integration, and a rich and configurable user dashboards and reporting interface.

Locus Platform Applications: Software applications developed by Locus, Honeywell, or third party providers that are designed, built, and deployed on the Locus Platform to address one or multiple technical of financial domains. Software application is a type of software that allows you to perform specific tasks. Applications developed on Locus Platform run only inside the Locus Platform.

Newly Created Honeywell IP: Newly Created Honeywell IP is each invention, technique, device, discovery or procedure, whether patentable or not conceived or first actually reduced to practice solely by Locus and its employees or agents, or jointly with Honeywell and its employees or agents, as a result of Services performed under this Agreement, which may include, for purposes of example only, process maps or other documentation of Honeywell's business processes, reports, analyses, software, customizations to software, requirements documents, procedures manuals, etc. developed or modified for Honeywell, including RIMS (as defined below), but excluding SaaS, PaaS, and Locus Platform (SaaS, PaaS, and Locus Platform being collectively defined in Section 9.4 below as the "System").

RIMS. RIMS is the development code name and future name for the Honeywell Corporate Remediation and Evaluation Services group (RES) remediation information management system (RIMS). The system when developed as one or series Locus Platform Applications will address Honeywell-Alliance Partner project collaboration for (i) business planning; (ii) Purchase-to-Pay (P2P) pre-processing; (iii) project management and control; (iv) vendor validation; and (v) business analytics.

Project Portfolio Management (PPM) is the centralized management of processes, methods, and technologies used by project managers and project management offices (PMOs) to analyze and collectively manage current or proposed projects based on numerous key characteristics. The objectives of PPM are to determine the optimal resource mix for delivery and to schedule activities to best achieve an organization's operational and financial goals — while honoring constraints imposed by customers, strategic objectives, or external real-world factors.

1. **Services**

1.1 <u>Services</u>. All services performed or deliverables required under this Agreement (**"Services"** and **"Deliverables"**, respectively) will be performed or delivered in accordance with Schedule 1 "Standard Fees and Discounts", or as supplemented in accordance with individual Statements of Work ("SOWs"). Locus will make available to Honeywell a software or web tool, the use of, and/or access to which, enables Locus to deliver, or facilitate delivery of, all or part of the Services and/or Deliverables. Depending upon the SOW, the Services and/or Deliverables may be delivered solely through PaaS and SaaS, or SaaS may be one component of all the Services and/or Deliverables described in the SOW(s). Accordingly, the term "SaaS" may be synonymous with "Service" and/or "Deliverable" where the context indicates.

1.2 <u>SOW Issuance.</u> The Services to be provided shall be defined utilizing the SOW for Professional Services and Software Development. Each SOW shall be accompanied by a proposal and will be governed by individual purchase order releases or amendments to this Agreement. SOWs will become effective upon execution by an authorized representative of each Party. No SOW may change any of the terms of this Agreement as they apply to other SOWs, unless expressly intended by way of an amendment to this Agreement.

1.3 <u>Affiliates</u>. Affiliates of Honeywell are beneficiaries of this Agreement and may purchase Services under this Agreement and under any SOW issued thereunder from Locus and/or Locus's Affiliates by executing as applicable purchase orders or SOWs referencing this Agreement. In such event, (i) the Honeywell Affiliate executing the purchase order or the SOW shall, for the purposes of such purchase order, be considered "Honeywell" as that term is used in this Agreement, (ii) the Locus Affiliate receiving such purchase order or executing such SOW, if applicable, shall, for the purposes of such purchase order, be considered "Locus" as that term is used in this Agreement, and (iii) the purchase order or SOW shall incorporate all of the terms and conditions of this Agreement and be deemed to be a two party agreement between Locus or Locus Affiliate on the one hand and the applicable Honeywell Affiliate on the other hand. Each Party shall cause its Affiliates to comply with its obligations under this Agreement. "Affiliate(s)" means a Party's wholly-owned subsidiaries or a joint venture, partnership or corporation that directly or indirectly controls, is controlled by or is under common control of or with said Party or the Party's wholly-owned subsidiary. The word "control" as used in this definition will mean ownership of, or the right to acquire, not less than fifty percent (50%) of the stock of said corporation, the right to vote not less than fifty percent (50%) of the stock of said corporation, or not less than fifty percent (50%) ownership interest in a partnership or joint venture or corporation.

1.4 <u>Local Enabling Agreements</u>. In the event that Honeywell reasonably determines that it is necessary to execute a local enabling agreement to implement this Agreement and/or any SOW issued thereunder in a certain country, the Parties and/or their Affiliates, as applicable, shall enter into such local enabling agreement, which shall incorporate all of the terms and conditions of this Agreement and/or any SOW issued thereunder, subject only to the amendments required by applicable law.

2. **Changes to SOW's**

2.1 <u>Changes to SOW's</u>. The Honeywell Project Manager for an SOW may direct changes in the SOW using either the form attached to this Agreement as Exhibit B ("Change Order") or a change order issued through Honeywell's purchasing system. If any change causes an increase or decrease in the cost of, or the time required for, performing the SOW, an equitable adjustment will be made to the SOW price, delivery dates, or both. Honeywell may deny any request for adjustment under this provision unless it is asserted in writing (including the amount of the request and supporting documentation substantiating the request) and delivered to Honeywell within 30 days from the date of Locus's receipt of the Honeywell-directed change to the SOW. Any adjustment must be mutually agreed to by the Parties in writing. Notwithstanding any disagreement between the Parties regarding the impact of a change, Locus will proceed diligently with its performance under the SOW as changed pending resolution of the disagreement.

3. **Work Guidelines and Personnel**

3.1 <u>Project Managers</u>. Each Party will designate a Project Manager for this Agreement of each SOW to serve as the primary contact between the Parties. Performance of the Services will be coordinated between the designated Project Managers.

3.2 <u>Locus Personnel.</u> Locus will assign qualified personnel to perform the Services under this Agreement and each SOW and will ensure that its personnel devote sufficient time and effort to performing the Services as necessary to complete all Services in accordance with this Agreement and each SOW. Locus will bear all liability for the acts or omissions of the personnel assigned to perform the Services. Locus will use its best efforts to ensure the continuity of Locus's personnel performing the Services. There will be no charge to Honeywell for any replacement personnel assigned by Locus until Honeywell and Locus reasonably agree that the replacements have acquired orientation and background substantially equal to that of the personnel replaced. If Honeywell reasonably determines that any Locus personnel performing Services are unacceptable, Honeywell will notify Locus and Locus will take prompt, appropriate corrective action, which may include, at Honeywell's request, replacing the personnel. Locus will pay all costs associated with replacing the personnel. If Locus refuses to replace any of its personnel upon Honeywell's request, Honeywell may immediately terminate this Agreement or the SOW, or both.

3.3 Key Personnel. The Parties may designate certain Locus personnel critical for the successful performance of the Services as **"Key Personnel."** Locus will assign the Key Personnel to perform the Services and will not reassign or remove any Key Personnel without the prior written consent of Honeywell's Project Manager, which consent will not be unreasonably withheld.

3.4 Adherence to Delivery Schedule. **TIME IS OF THE ESSENCE** with respect to the delivery schedule ("**Delivery Schedule**"). If Locus reasonably believes that it will be unable to meet the Delivery Schedule or any portion thereof, Locus will immediately notify Honeywell of the anticipated delay and take immediate corrective action to comply with the Delivery Schedule (including without limitation working overtime or providing additional personnel or equipment or other resources). All corrective actions will be at Locus's sole cost and expense, unless the delay or anticipated delay is caused by Honeywell, in which case the Parties will mutually agree upon a corrective action plan and apportioning of the cost. If Locus fails to promptly develop and implement a corrective action plan, Honeywell may implement its own corrective action plan at Locus's expense, upon Locus's agreement.

3.5 Non-Solicitation. Neither Party may hire or solicit the services or employment of any personnel of the other Party directly involved in the Services or Deliverables during the Term. This restriction will not prohibit either Party from hiring personnel as a result of general recruiting strategies that are not directed specifically towards the other Party's employees, including but not limited to the placement of general advertisements or posting of positions on the World Wide Web.

3.6 Relationship of Parties/Independent Contractor. Nothing in this Agreement will be construed to place Locus and Honeywell in an agency, employment, franchise, joint venture, or partnership relationship. Neither Party has the authority to obligate or bind the other in any manner. Nothing contained in this Agreement will give rise or is intended to give rise to rights of any kind to any third parties, except as otherwise set forth in this Agreement. Neither Party will make any representation to the contrary. The Parties agree that Locus will perform its obligations under this Agreement as an independent contractor. Locus retains the right to exercise full control of, supervision over and responsibility for Locus's performance hereunder, including the employment, direction, compensation and discharge of Locus's personnel, as well as compliance with workers' compensation, unemployment, disability insurance, social security, withholding and all other laws, rules, codes, regulations and ordinances governing such matters.

4. **Term and Termination**

4.1 Term of Agreement. This Agreement will commence on the Effective Date and remain in effect for a period of three (3) years, with an option (that may be exercised at Honeywell's sole discretion) to renew the Agreement: (i) for one (1) additional 12-month period upon the expiration of the initial term; and (ii) for a second 12-month renewal period upon expiration of the first 12-month renewal period, unless otherwise terminated as provided below ("Term"). This Agreement will continue to govern SOWs entered into before the end of the Term where completion of those SOWs extends beyond the Term.

4.2 Termination for Convenience. Notwithstanding anything to the contrary contained in this Agreement or an SOW, Honeywell may, at any time, terminate this Agreement or any SOW, in whole or in part, with or without cause, without liability or obligation, for undelivered Deliverables or unperformed Services, upon 30 days' prior written notice.

4.3 Termination for Cause. A non-breaching Party may terminate this Agreement or any SOW, in whole or in part, if the other Party commits a material breach and fails to remedy the breach within 30 days following receipt of written notice specifying the grounds for the breach. A material breach includes, but is not limited to, late delivery or delivery of nonconforming Deliverables or Services. The solvent Party may terminate this Agreement or any SOW upon written notice if the other Party becomes insolvent or if any petition is filed or proceedings commenced by or against that Party relating to bankruptcy, receivership, reorganization, or assignment for the benefit of creditors.

4.4 Effect of Termination. If Honeywell terminates this Agreement or any SOW, in whole or in part, for either convenience or cause, Honeywell's sole liability to Locus, and Locus's sole and exclusive remedy, is payment for Deliverables received and accepted and Services completed and accepted by Honeywell before the date of termination. The payment can be set off against any damages to Honeywell. Upon termination, Honeywell may require Locus to transfer title and deliver to Honeywell any completed Deliverables and Honeywell will pay the Agreement or SOW price for those Deliverables subject to set off against any damages to Honeywell. Honeywell may also require Locus to transfer title and deliver to Honeywell any or all property produced or procured by Locus to perform this Agreement or any SOW. Honeywell will credit Locus with the reasonable value of the property, but not more that Locus's actual cost or the Agreement or SOW value, whichever is less.

4.5 Substitute Performance. If Honeywell terminates this Agreement or any SOW, in whole or in part, for cause, Honeywell may, without prejudice to any other rights or remedies it may have, provide or perform, or have a third party provide or perform, all or any part of the Services or Deliverables which have not been provided or performed at the time of termination, in accordance with the applicable SOW and this Agreement. All costs incurred by Honeywell in providing the Deliverables or performing the Services or having a third party do so, including reasonable overhead, incidental expenses and reasonable attorney and professional fees, will be charged to Locus or deducted from any sums due or to become due to Locus.

4.6 <u>Continued Performance.</u> To the extent that any portion of this Agreement or any SOW is not terminated for convenience or cause, Locus will continue performing that portion unless and to the extent performance of the non-terminated portion of this Agreement or any SOW is rendered impossible or infeasible by the termination of the terminated portion, but no longer than 120 days. Except as otherwise directed by the other Party, each Party shall continue performing its obligations under this Agreement while a dispute is being resolved except (and then only) to the extent the issue in dispute precludes performance (a payment dispute shall be deemed to not preclude performance) and without limiting either Party's right to terminate this Agreement. In the event of Locus's breach of this obligation (in addition to all other remedies and rights and without the same constituting an election of remedies), Honeywell shall be entitled to seek and obtain injunctive relief, without posting bond or proving damages, in addition to all other remedies.

4.7 <u>Termination Management.</u> In the event this Agreement is terminated for any reason, and Honeywell decides to discontinue using Locus Platform, Locus will make available to Honeywell an exact mirror copy of the Honeywell Data from the Locus Platform site within 10 business days from Honeywell's notification of readiness to accept the data, or as soon thereafter as reasonably practicable. Locus will provide Honeywell Data in a restorable, reproducible backup to be delivered to Honeywell via technology that has been mutually agreed upon. Locus will have the right to purge the data out of its system after Honeywell's written acknowledgement to Locus that the data export was acceptable and back-up copies are no longer needed. Honeywell will continue to be responsible for all fees to Locus through the date of written acknowledgement to the Locus that back-up copies are no longer required. The export of Honeywell's data will be an exact mirror copy from the Locus' site. The export will include all custom objects and fields present at the time in Locus's database. If Honeywell so requests, Locus can provide export to other commercially available databases or a database provided by Honeywell. Honeywell will be responsible to provide to Locus the commercial database schema. If custom programming is required, Locus will provide custom programming interface to other systems, services to be provided in accordance with this Agreement and in accordance with the Rate Schedule.

5. **Pricing, Expenses, Invoicing and Payment Terms**

5.1 <u>Pricing</u>. Locus will perform the Services and deliver the Deliverables at or below the prices stated in Schedule 1 or the applicable SOW. Unless otherwise provided in Schedule 1 or the SOW, the prices include: (a) all packaging and freight to the specified delivery point; (b) all applicable taxes and other government charges including but not limited to all sales, use, or excise taxes; (c) all customs duties, fees, or charges; and (d) all items, intellectual property, and services necessary or incidental to provide the Deliverables and perform the Services in accordance with this Agreement and the applicable SOW. To the extent that value added tax (or any equivalent tax, including without limitation sales or use tax) is properly chargeable on the supply to Honeywell of any Deliverables or Services, Honeywell will pay the tax in addition to payments otherwise due Locus under this Agreement, if Locus provides to Honeywell a value-added tax (or equivalent tax) invoice.

5.2 <u>Most Favorable Pricing</u>: The Service Provider will be selected based on competitive bidding process (eRFP/eAuction) to accomplish the services required under each applicable SOW.

5.3 <u>Reimbursable Expenses.</u> Each invoice will separately set forth expenses authorized in advance in writing by Honeywell for reimbursement ("Reimbursable Expenses"). Honeywell will reimburse Locus for reasonable, necessary and pre-approved travel expenses incurred by Locus in providing the Services or Deliverables that are in accordance with the Honeywell Service Provider Travel Policy attached as Exhibit C to this Agreement. Invoices must enumerate expenses actually incurred and be accompanied by documentation such as receipts, vouchers and invoices that are reasonably necessary to verify the amount, date and nature of each expense.

5.4 <u>Invoicing.</u> Locus will submit invoices describing the Services, Deliverables and Reimbursable Expenses and the payments due. Unless otherwise agreed in a SOW, payment will be monthly in arrears. Invoices for Services not compensated on a fixed price basis will be itemized to reflect, as applicable, the number of hours or costs for which Locus seeks reimbursement, and will be supported by time sheets, receipts and other documentation as Honeywell may reasonably require. The invoice must also include the following information: (a) name and address of Locus and the Honeywell entity purchasing the Services and Deliverables; (b) name of shipper (if different from Locus); and (c) Honeywell's purchase order number(s). Payment of an invoice does not constitute acceptance of the Services, Deliverables or Reimbursable Expenses and such payment is subject to appropriate adjustment should Locus fail to meet the requirements of this Agreement. Payment terms are net 105 days from receipt of a correct invoice and conforming Services and Deliverables. Payment will be scheduled for the first payment cycle following expiration of the net terms period. If Honeywell disputes an invoice Honeywell will pay the undisputed portion of the invoice and withhold payment of the disputed portion until the dispute is resolved.

5.5 <u>Service Levels; Fees at Risk.</u> Should Locus fail to meet the Service levels ("**Service Levels**") specified in the Service Level Agreement ("SLA") contained in the SOW, then, in addition to any other remedies available to Honeywell at law, in equity or otherwise, Locus will pay to Honeywell the amount identified as the Service credit or fees at risk for each failure. Locus's payments will accompany its SLA reports at the frequency specified in the applicable SOW, or if no report frequency is specified, then quarterly within 30 days after the end of each calendar quarter. Locus's reports will provide sufficient detail (such as the Service Level not met, the due date or milestone missed, actual versus required time elapsed, etc.) to reasonably facilitate Honeywell's determination of the correctness of Locus's payment or credit, as applicable. Honeywell's acceptance of any report or payment will not be deemed Honeywell's agreement that the computation is accurate. Should Honeywell dispute Locus's report and/or computations, the Parties will promptly work in good faith to reconcile and, if necessary, adjust the payment or credit. After the Parties' good faith reconciliation attempts, should any

disagreement still remain, it may be resolved in accordance with the dispute resolution procedures in this Agreement, either separately, or aggregated with other unresolved SLA discrepancies over the Term of this Agreement or the applicable SOW.

5.6 Corrective Action. Locus acknowledges that its failure to meet the Service Levels established in the applicable SOW or SLA will result in delayed performance and may have a materially adverse impact on Honeywell's business and operations. In the event Locus fails to meet a Service Level, actual damages would be difficult to ascertain. Honeywell and Locus agree that the Service Level credits are a price adjustment for the relevant period to reflect the reduced level of Service performed by Locus and (a) reflect a reasonable financial remedy for failure to meet a Service Level in the normal course of business, provided Locus is otherwise using reasonable effort to perform consistent with the Service Levels and in compliance with this Agreement, and do not constitute a penalty, and (b) constitute Honeywell's a reasonable and agreed remedy with respect to any failure by Locus to meet applicable Service Levels; provided, however, that the remedy provided for herein (*i.e.,* Service Level credits for Service Level failures) shall not affect Honeywell's remedies under this Agreement, except that Honeywell may be made whole only once with respect to Service Level failures, if any. In addition to the foregoing price adjustment for the relevant period, if Locus fails to meet a Service Level, Locus will (i) investigate and assemble pertinent information with respect to, and report on the root causes of, the problem; (ii) advise Honeywell of the status of remedial efforts being undertaken with respect to such problem; (iii) minimize the impact of and correct the problem and begin meeting the Service Level; and (iv) take appropriate preventive measures so that the problem does not recur.

6. **Records and Audit**

6.1 Records. Locus will retain and preserve all records and materials, including invoice records, pertaining to the Services and Deliverables provided under this Agreement for a period of 7 years after the expiration or termination of this Agreement or for the period prescribed by applicable law, whichever period is longer. Thereafter, Locus will not destroy or dispose of or allow the destruction or disposition of such records and materials without first offering, in writing, to deliver such records and materials or copies thereof to Honeywell at Honeywell's expense. If Honeywell fails to request such records and materials within 90 days after receipt of the written offer, Locus may destroy or dispose of such records and materials.

6.2 Audit. For a period of 7 years after termination or expiration of this Agreement or for the period prescribed by applicable law, whichever period is longer, Honeywell will have the right in connection with an examination of Honeywell or to insure compliance with the terms of this Agreement to conduct an audit If any invoice submitted by Locus is found to be in error, an appropriate adjustment will be made to the invoice or the next succeeding invoice following the discovery of the error and the resulting payment or credit will be issued promptly. Locus will promptly correct any deficiencies discovered as a result of the audit.

6.3 Industry Reports. Honeywell conducts regular due diligence reviews of its processes, and its organizational and system controls. If Honeywell determines that Locus's performance under this Agreement may affect Honeywell's compliance with its quality or data security standards or controls, Honeywell may request, and Locus will provide, documents, records or reports relevant to Locus's performance hereunder, such as any Service Organization Control (SOC) Type 2 reports, including, for example, Locus's most current SSAE16 II Type 2 or ISAE3402 reports, if and as applicable. If Locus utilizes a third party Locus for a relevant aspect of its performance hereunder, such as a cloud host, Locus will obtain for Honeywell any such applicable reports or documents from Locus's suppliers, subject always to the confidentiality protections contained in this Agreement.

7. **Acceptance**

7.1 Acceptance – SaaS. Locus will notify Honeywell when access and fully functional use of the SaaS is enabled, and Honeywell's confirmation of the same will constitute initial acceptance. After initial acceptance, the SLA will govern subsequent and ongoing conformance with requirements in lieu of the re-performance remedy in Section 8.3.

7.2 Acceptance – Non SaaS. Locus will notify Honeywell's Project Manager in writing when Deliverables have been delivered or the Services have been completed and are ready for final inspection and acceptance. If Honeywell determines that the Deliverables or Services are defective or otherwise not in conformity with this Agreement, then Honeywell will, by written notice to Locus: (a) terminate this Agreement or any SOW, in whole or in part, for cause under the Termination for Cause clause; (b) accept the Deliverables or Services, in whole or in part, at an equitable reduction in price; or (c) reject the Deliverables or Services, in whole or in part. If Honeywell rejects the Deliverables or Services under subsection (c), then Locus will, at Locus's expense and in a timely manner, at Honeywell's option, re-perform, correct, repair or replace the defective or non-conforming Deliverables or Services so that they conform to the requirements of this Agreement. If Locus is unable or unwilling to fulfill this obligation within a reasonable time, then Honeywell may fulfill or have a third party fulfill Locus's obligation at Locus's expense.

8. **Warranties and Remedies**

8.1 General Warranties. Locus warrants (a) each of its personnel has the proper skill, training and background necessary to accomplish his or her assigned tasks; (b) all Services will be performed in a competent and professional manner, by qualified personnel under the direction and control of Locus, and in accordance with the highest standards in the industry provided by reputable service providers performing services of a similar nature; (c) that Locus has the rights and assets, including all intellectual property rights necessary to

perform its obligations, including the hosting, management, and operation of a web site (if applicable) under this Agreement in a professional, timely, and efficient manner; (d) all SaaS or software Deliverables provided to Honeywell will be free of code capable of disrupting, disabling, damaging, or shutting down a computer system or software or hardware component thereof or other items that may interfere with Honeywell's use of any software; and (e) Honeywell has the right to use for any purpose any ideas, methods, techniques, materials and information provided to it or otherwise obtained by Honeywell as a result of this Agreement or any SOW without restriction, liability or obligations, except as may be specified in this Agreement or any SOW.

8.2 Service and Deliverable Warranties – Non SaaS. Locus warrants that for a period of one (1) year, or such longer period of time as is set forth in the applicable Statement of Work, from the date of acceptance by Honeywell ("**Warranty Period**"), the Services and Deliverables (including all replacement or corrected Services and Deliverables or components) will be free from defects in material, workmanship, and design, even if the design has been approved by Honeywell; conform to applicable drawings, designs, quality control plans, specifications and samples and other descriptions furnished or specified by Honeywell; be merchantable; be fit for the intended purpose and operate as intended; comply with all laws; be free and clear of any and all liens or other encumbrances; not infringe any patent, published patent application, or other intellectual property rights of any third party; and not utilize misappropriated third party trade secret information.

8.3 Remedies. Locus will correct and repair any defect, malfunction, deficiency, error or non-conformance (collectively, "**Non-Conformance**") in a Service or Deliverable which prevents the Service or Deliverable from conforming to the requirements of this Agreement or any SOW and performing as warranted, at no cost to Honeywell. If Locus is unable or unwilling to correct or repair a Non-Conformance within the time specified by Honeywell, Honeywell may, in addition to any other rights or remedies it may have at law or in equity, by itself or through a third party correct or repair the Non-Conformance, re-perform the non-conforming Services or Deliverables at Locus's expense, upon Locus' approval, or require Locus to provide Honeywell with a refund for all Services and Deliverables which do not conform and perform as warranted. Subject to Section 11.1 below, Locus is responsible for the costs of repairing, replacing or correcting nonconforming Services or Deliverables, and for all related costs, expenses and damages including, but not limited to, the costs of removal, disassembly, failure analysis, fault isolation, reinstallation, re-inspection, and retrofit of the nonconforming Services or Deliverables or of Honeywell's affected end-product; all freight charges; all customer charges; and all other corrective action costs (including costs of additional inspection or quality-control systems).

8.4 Conditions Applicable to All Warranties. The warranties survive delivery, inspection, acceptance or payment by Honeywell for the entire Warranty Period. Claims for breach of warranty do not accrue until discovery of Non-Conformance, even if the Services or Deliverables were previously inspected but claims for breach of warranty must be made within the applicable Warranty Period. The warranties and rights provided are cumulative and in addition to any warranty and right provided at law or in equity. Any applicable statute of limitation runs from the date of discovery.

8.5 Authorization to Perform. Each Party represents that it is duly organized and authorized to enter into this Agreement and to perform all obligations; and that it is not a party to any Agreement with a third party which would restrict its ability to perform its obligations under this Agreement. Locus will promptly notify Honeywell of any action taken by or against it that could result in a breach of Locus's obligations or representations under this Agreement.

8.6 Disclaimer. SUPPLIER DOES NOT REPRESENT OR WARRANT THAT ANY SOFTWARE WILL OPERATE UNINTERRUPTED OR ERROR-FREE; NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM ITS USE. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SUPPLIER MAKES NO WARRANTIES, AND SUPPLIER HEREBY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT WITH RESPECT TO THE SOFTWARE OR SYSTEMS MADE AVAILABLE TO HONEYWELL UNDER THIS AGREEMENT.

8.7 No Viruses. Any software or System (as defined in Section 9) used or made available by Locus does not and will not contain any programming devices (e.g., key locks (including those that control the number of users) or back doors) that would (a) disrupt the use of the System or device to which the same is interfaced or other computer equipment with which such equipment communicates; or (b) destroy or damage data or make data inaccessible or delayed, except for file and purge routines necessary to routine functioning. The System or software does not contain any viruses or worms. Locus agrees to use programming practices and state of the art security procedures to avoid insertion of programming devices of the sort specified above, to scan for viruses and remove any viruses found before sending any media containing programming code to Honeywell.

9.  **Intellectual Property Ownership**

9.1 Ownership of Existing Intellectual Property

(a) **Honeywell's Existing Intellectual Property.** Locus acknowledges that ownership of, and title in and to all Honeywell intellectual property that exists as of the Effective Date or that may be created by Honeywell thereafter, including patent,

trademark, service mark, copyright, trade dress, logo and trade secret rights ("**Honeywell IP**"), will remain with Honeywell. Ownership of and title in and to all Honeywell IP, and all derivative works based on Honeywell IP, will remain with Honeywell. Locus will not use the Honeywell IP for any purpose other than as explicitly set forth in this Agreement.

(b) **Locus's Existing Intellectual Property**. Honeywell acknowledges that ownership of, and title in and to all Locus intellectual property that exists as of the Effective Date, including patent, trademark, service mark, copyright, and trade secret rights ("**Locus IP**"), will remain with Locus. Unless otherwise expressly specified in a SOW, ownership of and title in and to all Locus IP will remain with Locus, and nothing contained in this Agreement will be construed to restrict, impair or deprive Locus of any of its rights or proprietary interest in technology or products which existed prior to and independent of the performance of Services under this Agreement. Nevertheless, but subject to Section 9.1(c) below, if any Locus IP is delivered in connection with the Services, Deliverables, and Newly Created Honeywell IP, Locus grants, and covenants that in the future that it will grant, to Honeywell an irrevocable, unrestricted, non-exclusive, paid-up, perpetual, worldwide license to use, duplicate, modify, distribute, display, benefit from and otherwise use, directly or through its authorized third parties, such Locus IP to enable the full use and benefit of the Services, Deliverables and Newly Created Honeywell IP for Honeywell's business purposes; provided, however, that the license so granted will not include a license with respect to the System (as defined in Section 9.4 below), and Locus shall in all cases be entitled to compensation for any use of the System.

(c) **Ownership of Improvements**. Subject to the licenses granted by Locus herein, Locus will have and retain sole and exclusive ownership of, and all right, title and interest in, all Locus Intellectual Property, including, without limitation, the System, together with any and all enhancements, improvements, modifications or other new developments conceived, created, acquired, or made by Locus without use of any Honeywell IP or confidential information provided by Honeywell after the date hereof, ("**Locus Improvements**"), and Honeywell shall have no right, license or interest therein.

9.2 **Newly Created Honeywell IP**: Locus will promptly make a complete written disclosure to Honeywell of each invention, technique, device, discovery or procedure, whether patentable or not ("**Disclosed Subject**") constituting Newly Created Honeywell IP, conceived or first actually reduced to practice solely by Locus and its employees or agents, or jointly with Honeywell and its employees or agents, as a result of Services performed under this Agreement. As to each Disclosed Subject, Locus will specifically point out the features or concepts that Locus believes to be new or different. Subject to Section 9.1(c) above, Honeywell will have exclusive, unlimited ownership rights to all Deliverables, including any Disclosed Subject, which may include, for purposes of example only, process maps or other documentation of Honeywell's business processes, reports, analyses, software, customizations to software, requirements documents, procedures manuals, etc. developed or modified for Honeywell constituting Newly Created Honeywell IP. Subject to Section 9.1(c) above, Honeywell's ownership rights will apply to all Newly Created Honeywell IP, whether completed or otherwise. For any partially completed Newly Created Honeywell IP, Honeywell will pay for such Deliverables on a pro rata basis based on the percentage of work performed under the relevant SOW. Subject, to Section 9.1(c) above, all Newly Created Honeywell IP will be considered works made for hire and made in the course of Services rendered and will belong exclusively to Honeywell, with Honeywell having the sole right to obtain, hold and renew, in its own name or for its own benefit, patents, copyrights, registrations or other appropriate protection. Subject to Section 9.1(c) above, to the extent that exclusive right, title or interest in the Newly Created Honeywell IP may not originally vest in Honeywell as contemplated in this Agreement (e.g., the work product does not constitute works made for hire), Locus hereby irrevocably assigns, transfers and conveys to Honeywell all right, title and interest to the Newly Created Honeywell IP. Locus and its personnel will give Honeywell or any Honeywell designee all reasonable assistance and execute all documents necessary to assist or enable Honeywell to perfect, preserve, register or record its rights in any Newly Created Honeywell IP. Subject to Section 9.1(c) above, if for some reason the right, title and interest to Newly Created Honeywell IP is not assignable to Honeywell, then Locus hereby grants to Honeywell an exclusive (even as to Locus), world-wide, assignable, paid-up, royalty-free, irrevocable, perpetual license to: (a) use, execute, reproduce, display, perform, maintain, distribute (internally and externally) copies of and prepare derivative works of the Newly Created Honeywell IP; (b) use, make, have made, sell, offer to sell, import and export the Newly Created Honeywell IP; and (c) authorize or sublicense others to do any, some or all of the foregoing without accounting to Locus. Subject to Section 9.1(c) above, Locus will, immediately upon request of Honeywell, or upon termination, cancellation or expiration of the applicable SOW or this Agreement, turn over to Honeywell all Newly Created Honeywell IP and any Honeywell documents or other materials held by or on behalf of Locus, together with all copies thereof. Notwithstanding anything to the contrary contained in this Agreement, Locus will be free to utilize any concepts, knowhow, techniques, improvements or methods which it may discover or adapt in the provision of the Services and Deliverables for Honeywell subject to any of Locus's obligations with respect to the care and use of Honeywell IP and Honeywell Confidential Information. For the avoidance of doubt, Locus's residual rights under this Section include Locus's right to use the concepts, knowhow, techniques, improvements or methods which Locus may discover or adapt in the creation of any Newly Created Honeywell IP but subject to Section 9.1(c) above, such residual rights will not include the use of any Newly Created Honeywell IP itself or any Honeywell IP or any Honeywell Confidential Information.

9.3 **Third Party Intellectual Property**. If and to the extent that any pre-existing works or other materials owned by any third party ("**Third Party IP**") are delivered in connection with the Services, contained in a Deliverable or as any part of Newly Created Honeywell IP, those materials will be specifically identified in the applicable SOW. With respect to Locus works or other material owned by Locus or any Third Party IP incorporated into the Deliverables or Services, Locus hereby grants or will obtain from the third party owner at no cost to Honeywell and grant to Honeywell an irrevocable, perpetual, non-exclusive, worldwide, royalty-free, paid-up, assignable license to: (a)

use, execute, reproduce, display, perform, maintain, distribute (internally and externally) copies of and prepare derivative works thereof; (b) use, make, have made, sell, offer to sell, import and export the Locus works or material or Third Party IP; and (c) authorize or sublicense others to do any, some, or all of the foregoing without accounting to Locus. Locus represents, warrants and covenants that the Services, Deliverables and Newly Created Honeywell IP will not contain any Third Party IP unless Locus obtains this license for Honeywell. Unless otherwise specified in the SOW, ownership of, and title in and to any Third Party IP will remain with the applicable third party, but nothing set forth in this paragraph shall be deemed to adversely affect or limit Locus's rights with respect to any Third Party IP for which Locus hold an exclusive license.

9.4 SaaS and PaaS License. During the Term, Locus may provide or otherwise make available to Honeywell Locus's SaaS, PaaS, Locus Platform, and/or web portal for access by Honeywell under this Agreement, including all related documentation (collectively the "**System**") in connection with Locus's performance under this Agreement. Locus grants to Honeywell a worldwide, non-exclusive, transferable, royalty-free, fully paid-up (subject to access or license fees set forth in the SOW) license, irrevocable (except for material breach) during the Term, to (a) access and use the System and any Locus content and any third party content through the System solely in connection with the Services and Deliverables provided by Locus under this Agreement; (b) generate, print, copy, upload, download, store and otherwise process all audio, visual, digital and other output, displays and other content as may result from any access to or use of the System; and (c) input, upload and download any Honeywell data available through the System without restriction. This license will not be restricted to any set number of Honeywell's computers or users. Honeywell or its Affiliates and their respective employees, customers, suppliers, outsourcers, facility managers, consultants, agents and independent contractors will be permitted to have access to and use of the System on Honeywell's behalf (collectively, "**Permitted Users**"). Notwithstanding anything to the contrary contained in this Agreement, upon the expiration or termination of this Agreement or the applicable SOW(s) related to Honeywell's utilization of the System, the license granted to Honeywell under this license section will be terminated. Honeywell will not: (i) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer or otherwise make the System available to any third party, except as expressly permitted by this Agreement or in any SOW; or (ii) use or authorize the use of the System in any manner or for any purpose that is unlawful under applicable law.

9.5 Web-Based License Terms. Locus's web-based terms and conditions of license or use will in no event restrict or diminish the rights and license grants set forth in this Agreement. Any terms or conditions that are in addition to the terms set forth in this Agreement will be ineffective as to Honeywell to the extent they decrease Honeywell's rights or negatively affect the Services or Deliverables provided to Honeywell under this Agreement, or impose new or materially different terms or obligations on Honeywell. This provision applies regardless whether or how often any Permitted Users indicate their agreement to Locus's terms.

9.6 Trademark License. If and as applicable, Locus may use Honeywell name and mark, consistent with Honeywell's brand standards (as provided by Honeywell), on the Honeywell-specific web portal accessed solely by Honeywell Permitted Users. Locus will make no external use of Honeywell's name or mark without first executing a separate Honeywell trademark license through Honeywell's intellectual property licensing division.

9.7 Honeywell Data. Honeywell may, but is not required to, provide Honeywell data to Locus in connection with this Agreement. As between Locus and Honeywell, Honeywell is and will remain the sole and exclusive owner of all right, title, and interest in and to all Honeywell data, including all intellectual property rights relating thereto, in accordance with this Section 9. Subject to the terms and conditions of this Agreement, Honeywell hereby grants Locus a limited, royalty-free, fully-paid up, non-exclusive, non-transferable and non-sublicensable license to process Honeywell data strictly as instructed by Honeywell and solely as necessary to provide the Services and Deliverables under this Agreement for so long as Honeywell or any Permitted User uploads or stores such Honeywell data for processing by or on Locus's System. In no event will Locus restrict or impair Honeywell's access or right to Honeywell data, regardless whether this Agreement is expired or terminated, and notwithstanding any dispute between the Parties whether or not related to this Agreement. On or before expiration or termination of this Agreement, if Honeywell does not instruct Locus in writing to destroy, erase, or return Honeywell data, Locus will notify Honeywell in writing within 10 business days after such effective date of expiration or termination, and in no event fewer than 30 days before erasing, destroying or otherwise disposing of any such Honeywell data, of such intended erasure, destruction or other disposition, and the pending date thereof, and await Honeywell's written instruction as to disposition in accordance with this Section and Section 4.6, termination management. This provision survives this Agreement for all purposes.

9.8 Remedies. Locus acknowledges and agrees that, in the event of a breach or threatened breach of this Intellectual Property Ownership Section, Honeywell will have no adequate remedy at law and, accordingly, will be entitled to an injunction against a breach or threatened breach.

## 10 Indemnification and Remedies
10.1 General Indemnification. Subject to Section 11, inclusive, below, Locus will, at its expense, defend, hold harmless and indemnify Honeywell and its subsidiaries, affiliates, and agents, and their respective officers, directors, shareholders, and employees, and

Honeywell's customers (collectively "**Indemnitees**") from and against any and all third party claims and related loss, cost, expense, damage, claim, demand, or liability, including reasonable attorney and professional fees and costs, and the cost of settlement, compromise, judgment, or verdict incurred by or demanded of an Indemnitee ("**Loss**") arising out of, resulting from or occurring in connection with negligent acts or omissions or willful misconduct of Locus or its personnel, Locus's breach of the terms of this Agreement, or any theft or other misappropriation of Honeywell's or its personnel's information, property or funds by Locus or its personnel, except to the proportionate extent such Losses arise out of Honeywell's negligence, gross negligence or willful misconduct or breach of the Contract Documents.

10.2 <u>Security Breach Indemnification</u>. Locus shall defend, hold harmless and indemnify the Indemnitees from and against any and all Losses relating to or resulting from any Security Breach and/or resulting from or associated with Locus's or its subcontractors' breach of any of the terms and conditions or obligation relating to data security, privacy, or Personal Data (as defined below) set forth in this Agreement and/or its Exhibits. "**Security Breach**" means any event involving any actual, suspected, potential, or threatened compromise of the confidentiality, integrity, or availability or the Personal Data or the systems and databases on which the Personal Data is stored, transmitted or processed. It includes but is not limited to any accidental, unauthorized, impermissible, or unlawful destruction, use, acquisition, viewing, loss, theft, alteration, or disclosure of, or access to, Personal Data.

10.3 <u>Intellectual Property Indemnification</u>. Subject to Section 11, inclusive, Locus will, at its expense, defend, hold harmless and indemnify the Indemnitees from and against any and all Loss arising out of, resulting from, or occurring in connection with any alleged: (a) patent, copyright or trademark infringement; (b) unlawful disclosure, use or misappropriation of trade secrets; or (c) any other violation of any third party intellectual property right. If any injunction or restraining order is issued, Locus will, at its expense, obtain for Indemnitee either the right to continue to use and commercialize the Services and Deliverables and the allegedly misappropriated trade secrets, or replace or modify the Services and Deliverables to make them non-infringing.

10.3 <u>Right to Defend</u>. Locus will have the right to conduct the defense and settlement of any claim or action described in this Indemnification and Remedies Section if it acknowledges in writing its responsibility for such claim, but in no event will Locus enter into any settlement without Honeywell's prior written consent. Honeywell may participate in the defense or negotiations to protect its interests, but such participation shall be at Honeywell's sole expense if Locus has agreed to conduct the defense. If Locus fails to defend or settle any Loss in a prompt and competent manner, then Honeywell, at its option, has the right to take over the defense and settlement of the Loss at Locus's expense. Locus will pay all costs, expenses (including reasonable attorney and professional fees and costs), awards, judgments and settlements promptly as they become due, and Locus will give Honeywell all information, assistance and authority to enable Honeywell to defend and settle the claim or action.

10.4 <u>Remedies</u>. Unless expressly provided otherwise, all Honeywell remedies set forth in this Agreement are in addition to, and will in no way limit, any other rights and remedies that may be available to Honeywell at law or in equity.

## 11. Limitation of Liability

11.1 <u>Limit on Types of Damages Recoverable</u>. EXCEPT AS SPECIFICALLY SET FORTH IN THIS SECTION, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT OR OTHERWISE AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

11.2 <u>Limit on Amount of Damages Recoverable</u>. Except as specifically set forth in this Section 11, each Party's cumulative aggregate liability whether in contract or in tort, for all damages arising out of or relating to this Agreement will be limited to an amount equal to the lesser of (i) actual direct damages incurred by the other Party as a result of the event(s) giving rise to the liability, or (ii) two million U.S. dollars (USD $2,000,000). Each Party shall have a duty to mitigate its damages.

11.3 <u>Exceptions</u>. The limitation set forth in this Section will not apply with respect to: (a) claims for either Party's breach of its obligations with respect to the care and use of the other's Confidential Information, (b) claims for which Locus is obligated to indemnify Honeywell under this Agreement, (c) claims for bodily injury or death or physical damage to tangible property resulting from either Party's negligence or willful misconduct, or (d) any claims resulting from either Party's gross negligence, fraudulent or willful misconduct.

## 12. Confidential Information

12.1 <u>Definition</u>. "**Confidential Information**" means all information exchanged between the Parties under this Agreement and in the performance of any SOW, subject to the exclusions below, including: (a) any Honeywell data made available to Locus (the "Honeywell Data"), (b) any Honeywell-owned or Honeywell-licensed software made available to Locus, (c) any Personal Data of all Honeywell officers, directors, employees, agents and personnel, (d) any Locus software licensed to or otherwise made available to Honeywell, including without limitation any software that enables Honeywell's use of Locus's System (e) any business plans or records of the

disclosing Party ("**Discloser**") made available to the receiving Party ("**Recipient**"), (f) the terms and conditions of this Agreement, and (g) any and all such other information that Discloser specifies as confidential and makes available to Recipient. Each Party's obligations of confidentiality with respect to the other Party's Confidential Information continue for 10 years after the expiration or termination of this Agreement, except for trade secrets specifically identified by Honeywell as such, which will be held in confidence perpetually, Personal Data, which will be held in confidence perpetually, and other Confidential Information which the Parties agree, in writing, will be held in confidence perpetually.

12.2 Personal Data. "**Personal Data**" means any information relating to an identified or identifiable natural person; an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to his physical, physiological, mental, economic, cultural or social identity.

12.3 Use of Confidential Information. Recipient will (a) disclose Confidential Information only to (i) its employees who are under a duty to protect the Confidential Information and (ii) those of its agents, personnel or third parties who are required to have the Confidential Information in connection with the performance or receipt of the Services or Deliverables or the performance of obligations under this Agreement or any SOW and who are bound to Recipient to protect and use the Confidential Information in accordance with the confidentiality obligations of this Agreement. The Recipient will be responsible for any breaches of the confidentiality obligations of this Agreement by such employees, agents, personnel or third parties; including all Permitted Users (b) use Confidential Information only in relation to the performance or receipt of the Services or Deliverables or the performance of obligations under this Agreement or any SOW or as provided in this Agreement; (c) protect the Confidential Information using the same degree of care of as it uses to protect its own proprietary information, but with no less than a reasonable degree of care; and (d) not decompile, disassemble, decode, attempt to derive the source code, decrypt, reproduce, redesign, or reverse engineer Confidential Information or any part thereof. Recipient may make a limited number of copies of Confidential Information as necessary to complete the performance or receipt of the Services or Deliverables or the performance of obligations under this Agreement or any SOW. All copies made will reproduce the restrictive legends of the original. Each Party retains ownership of its Confidential Information including, without limitation, all rights in patents, copyrights, trademarks and trade secrets.

12.4 Personal Data Protection. Locus will treat any Personal Data of all Honeywell officers, directors, employees, agents and personnel as Confidential Information. The Parties agree that the Locus will be the Data Processor (as defined in the EU Data Protection Directive 95/46/EC) for the purposes of processing Personal Data pursuant to this Agreement. Locus will (a) take appropriate technical and organizational security measures as are required by Honeywell to protect Personal Data; (b) use and permit employees and third parties to use Personal Data pursuant to Honeywell's instructions only for purposes directly related to the performance of the Services or Deliverables or the performance of obligations under this Agreement or any SOW; (c) refrain from transferring Personal Data out of the European Union unless Honeywell has given its prior written consent to the transfer and Locus has satisfied any further requirements reasonably imposed by Honeywell; (d) indemnify Honeywell against all losses, costs, expenses, damages, liabilities, demands, claims, actions or proceedings which Honeywell may suffer or incur arising out of any breach of this Section; and (e) promptly notify Honeywell about: any legally binding request for disclosure of Personal Data by a law enforcement agency (unless otherwise prohibited); any accidental or unauthorized processing of Personal Data; and any requests received from individuals to whom Personal Data relates, without responding to that request unless it has been otherwise authorized to do so by Honeywell. If Locus will process Personal Data that Honeywell transfers from any of its affiliates in the European Union to any of its affiliates in the US pursuant to the U.S. - EU Safe Harbor Framework ("**Safe Harbor Personal Data**"), Locus warrants that either (a) Locus self-certifies to the U.S. – EU Safe Harbor Framework with respect to the processing of the Safe Harbor Personal Data and will notify Honeywell immediately if its self-certification terminates for any reason, or (b) Locus must provide at least the same level of privacy protection as required by the U.S. – EU Safe Harbor Framework.

12.5 Exclusions. With the exception of Personal Data, this Agreement imposes no obligation upon Recipient if Recipient can demonstrate that the Confidential Information: (a) was rightfully in Recipient's possession before receipt from Discloser and was not accompanied by a duty of confidentiality; (b) is or becomes a matter of public knowledge through no fault of Recipient; (c) is rightfully received by Recipient from a third party and is not accompanied by a duty of confidentiality; (d) is disclosed by Discloser to a third party without a duty of confidentiality on the third party; (e) is independently developed by Recipient without use of Discloser's Confidential Information; or (f) is disclosed under operation of law, provided Recipient notifies Discloser and upon Discloser's request and at Discloser's cost cooperates in all reasonable respects to contest the disclosure or obtain a protective order or other remedy.

12.6 Return. Except for return or destruction of Honeywell data as provided in Section 9 and Section 4.6, or as may be expressly otherwise stated in this Agreement Recipient will return or destroy, at Discloser's discretion, Confidential Information and all copies or other embodiments in any form that reflect or incorporate the Discloser's Confidential Information upon the earlier of Discloser's written request or termination of this Agreement and will certify in writing to such return or destruction compliance with this provision within 30 days.

12.7 Security Terms and Conditions. Locus will comply with Honeywell's Security Terms and Conditions attached as Exhibit D to this Agreement.

## 13. Insurance

13.1 Insurance. Locus will maintain and carry liability insurance which includes, but is not limited to, commercial general liability (including product liability and, for Services to be performed, completed operations liability) in a sum no less than $2 million, automobile liability in a sum no less than $1 million, workers' compensation in an amount no less than the applicable statutory minimum requirement, employer's liability in an amount of no less than $1 million, and professional liability in a sum no less than $4 million, during and for a period of at least 3 years after completion of Services, with insurance carriers with an AM Best rating of no less than A- or equivalent. Locus will provide excess liability with limits of not less than $2 million per occurrence and in the aggregate for bodily injury and property damage. This insurance will be primary and non-contributory, and will be specifically endorsed or otherwise name Honeywell International Inc. and its subsidiaries as additional insureds, except for the workers' compensation and professional liability. Before delivery of any Deliverables or commencement of any Services under this Agreement, Locus will provide to Honeywell evidence, in the form of one or more certificates of insurance, that Locus maintains the described insurance, and that the coverage will not be changed without 30 days' advance written notification to Honeywell from the carrier(s). Except where prohibited by law, Locus will require its insurers to waive all rights of recovery or subrogation against Honeywell, its subsidiaries and affiliated companies, and its and their respective officers, directors, shareholders, employees, and agents. The amount of insurance carried in compliance with the above requirements is not to be construed as either a limitation on or satisfaction of the indemnification obligations in this Agreement.

## 14. Miscellaneous

14.1 Entire Agreement and Modifications. The exhibits, schedules and other attachments to this Agreement are incorporated by reference. This Agreement contains the entire Agreement between the Parties and supersedes and replaces any prior or inconsistent agreements, negotiations, representations or promises, written or oral, between the Parties respecting the subject matter hereof. Neither Party has relied on any promises, inducements nor representations by the other, except those expressly stated in this Agreement. No modification of this Agreement will be binding on either Party unless set forth in a writing signed by an authorized representative of both Parties specifically stating it is amending this Agreement. No course of dealing, prior dealings, usage of trade or course of performance will be used to modify, supplement or explain any terms used in this Agreement.

14.2 Order of Precedence. If there is a conflict between or among the documents applicable to this Agreement, the order of precedence for resolving the conflict is (in descending order): (a) a fully signed SOW, but only for purposes of that particular SOW; (b) this Agreement; (c) the exhibits, schedules and other attachments to this Agreement; (d) Honeywell's applicable specifications, plans, drawings, designs, procedures, processes, descriptions and directions; and (e) any purchase orders issued hereunder. For purposes of clarity, a fully signed SOW can only modify the terms of this Agreement as such terms relate solely to the scope and fees of the Services and Deliverables to be provided under that particular SOW.

14.3 Waiver. The failure of either Party to enforce at any time any of the provisions of this Agreement will not be construed to be a continuing waiver of those provisions, nor will any failure prejudice the right of the Party to take any action in the future to enforce any provision.

14.4 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable by a court of competent jurisdiction, that provision will be severed from this Agreement; the remaining provisions will remain in full force and effect; and a similar legal, valid and enforceable provision will be substituted in lieu of the severed provision.

14.5 Headings and Captions. Headings and captions are for convenience of reference only and do not alter the meaning or interpretation of any provision of this Agreement.

14.6 Assignment and Subcontracting. This Agreement will inure to the benefit of and be binding on the Parties and their respective permitted successors and assigns. Locus will not assign this Agreement or any rights or obligations under this Agreement or subcontract all or any aspect of the work called for without the prior written approval of Honeywell. Any assignment or subcontract without Honeywell's written approval will be voidable at the option of Honeywell. Honeywell may assign this Agreement or any rights or obligations under this Agreement to any of its subsidiaries or affiliates or to any purchaser or successor to all or substantially all of the assets of Honeywell without Locus's consent and upon written notice to Locus.

14.7 Notices. All notices relating to this Agreement ("Notices") must be in writing. Notices to the Parties will be sent to their respective addresses appearing below. Any Notice will be deemed given on the date delivered if delivered personally; the next business day if sent by recognized overnight courier; 3 business days after being mailed certified first class mail, postage prepaid; or upon confirmation receipt that it was transmitted satisfactorily if transmitted by facsimile or email to addresses or numbers set forth below or as otherwise provided in writing by either Party.

If to Honeywell:

    Honeywell International Inc.
    101 Columbia Rd.
    Morristown, NJ 07962
    Attention: Mr. Raj Ghaisas
    Telephone: (225) 290-0705
    E-Mail: raj.ghaisas@Honeywell.com

With an additional copy to:
    Honeywell International Inc.
    Assistant General Counsel – Technology and Operations
    Law Department
    101 Columbia Road (AB-2B)
    Morristown, NJ 07962

If to Locus:

    Locus Technologies
    Legal Department
    299 Fairchild Drive
    Mountain View, CA 94043

14.8 <u>Non-Exclusivity.</u> Nothing in this Agreement will restrict Honeywell's right to contract with any third party to provide or perform, or to provide or perform on its own behalf, Services, Deliverables and related products similar or identical to the Services, Deliverables and related products provided by Locus pursuant to this Agreement or any SOW. Furthermore, unless otherwise specified in an SOW, there is no requirement that any minimum level of business or fees be provided to Locus by Honeywell.

14.9 <u>Advertising.</u> Locus will not use Honeywell's name or marks or refer to or identify Honeywell in any advertising or publicity releases or promotional or marketing materials without Honeywell's prior written approval. Furthermore, Locus will not claim or suggest, implicitly or explicitly, that Honeywell's use of its services or deliverables constitutes Honeywell's endorsement of its services or deliverables.

14.10 <u>Survival.</u> All provisions of this Agreement which by their nature should apply beyond its Term will remain in force after any termination or expiration of this Agreement including, but not limited to, those addressing the following subjects: Pricing, Expenses, Invoicing and Payment Terms; Records and Audit; Warranties and Remedies; Intellectual Property Ownership; Indemnification and Remedies; Limitation of Liability, Confidential Information; Insurance; Severability; Notices; Advertising; Survival; Dispute Resolution - Executive Escalation; Governing Law and Forum; and Interpretation.

14.11 <u>Dispute Resolution - Executive Escalation.</u> The Parties will use their best efforts to settle any disputes, controversies or differences arising out of this Agreement ("**Disputes**"). Before the Parties initiate any legal action, other than injunctive relief, the Parties will consider using an executive conference. The conference will be attended by at least one executive from each Party. At the conference, each Party will present its view of the Dispute and the executives will enter into good faith negotiations in an attempt to resolve the Dispute. If the Dispute is not resolved, then either Party may pursue resolution of the Dispute consistent with the other terms of this Agreement.

14.12 <u>Force Majeure.</u> Neither Party will be in default for any delay or failure to perform due to causes beyond its control and without its fault or negligence ("**Force Majeure Event**"), but any delay or failure to perform caused by the default of a sub-tier supplier of Locus will be excused only if (a) it is beyond the control of both Locus and its sub-tier supplier(s) and without the fault or negligence of any of them, and (b) the Deliverables or Services to be furnished cannot be obtained from other sources in sufficient time to permit Locus to meet the Delivery Schedule. Locus's ability to sell Services or Deliverables at a more advantageous price or Locus's economic hardship in buying materials or processing necessary for manufacture of the Services or Deliverables will not constitute a Force Majeure Event. The Party affected by a Force Majeure Event will promptly provide written notice to the other, explaining in detail the full particulars and expected duration of the Force Majeure Event, and will use its best efforts to remedy the delay if it can be remedied. If Locus's delivery is delayed, Honeywell may, at Honeywell's sole option, cancel deliveries scheduled during the Force Majeure Event or elect to extend the period of performance to cover the period of delay caused by the Force Majeure Event. If a Force Majeure Event occurs that affects delivery of Deliverables or Services to Honeywell, Locus will allocate its available supply of Deliverables and Services in a manner that assures Honeywell of at least the same proportion of Locus's total output of Deliverables and Services as was allocated to Honeywell before the Force Majeure Event. If delivery of any Deliverables or Services is delayed for more than 30 days, Honeywell may, without liability, cancel all or any part of this Agreement or SOW.

14.13 <u>Disaster recovery</u>. At Honeywell's request or, if no request is made, within 90 days after the Effective Date, Supplier will provide Honeywell with a copy of its disaster recovery plan. Throughout the Term, Supplier will maintain such plan, periodically update and test the operability of its disaster recovery plan annually and will certify to Honeywell following such update and testing that the disaster recovery plan is fully operational. In the event of a disaster (including any event that constitutes a force majeure event under the Force Majeure Section), Supplier will implement all necessary disaster recovery plans. In the event of such a disaster, Supplier will not increase any fees charged under this Agreement. Honeywell reserves the right to audit Supplier's compliance with such disaster recovery plan once per year during the Term.

14.14 <u>Integrity and Compliance.</u> Supplier will, and the Services and Deliverables, including the System will, comply with all laws, ordinances, codes, rules, regulations and judicial and administrative orders and settlements, and any applicable to spamming, privacy, and consumer protection, and will secure and maintain all required and appropriate visas, work permits, business licenses and other documentation and clearances necessary for Supplier's performance of this Agreement. Supplier will comply with all immigration requirements imposed upon any of Supplier's employees, agents and personnel providing the Services and Deliverables. Supplier will procure all permits and licenses and pay all fees and other charges required by all laws, ordinances, codes, rules, regulations and judicial and administrative orders and settlements. The Services, System, and Deliverables do not, and will not, contain any encryption technology, such as DES, which is subject to export restrictions by the United States government. With respect to all Services performed and Deliverables developed outside of the U.S. by Supplier and delivered/shipped to Honeywell inside the U.S. or to another country which is different than the country in which Supplier developed/performed the Services/Deliverables, and except as otherwise set forth in a SOW, Supplier will act as the exporter of record for purposes of the Export Administration Act of 1979, as amended, the Arms Export Control Act, and all other relevant laws or regulations and will be responsible for obtaining all necessary validated export licenses and permits necessary to ship or transmit the Services/System/Deliverables to Honeywell. Supplier will advise Honeywell of any import/export restrictions imposed by any governmental authority upon any of Supplier's products or Services licensed by Honeywell. When physically present at Honeywell's facility, Locus personnel will observe and comply with Honeywell's security procedures, rules, regulations, policies, working hours and holiday schedules. Locus will comply with all laws, regulations and ordinances and Honeywell's Code of Business Conduct ("**Code**") in performing this Agreement. A copy of the Code may be obtained at http://www.honeywell.com/sites/honeywell/codeofconduct.htm. Locus will maintain an integrity and compliance program acceptable to Honeywell and effective in preventing and correcting ethical violations and in maintaining compliance with laws.

14.15 <u>Governing Law and Forum.</u> The construction, interpretation and performance of this Agreement and all transactions under this Agreement will be governed by the laws of the State of New York, without regard to or application of its principles or laws regarding conflicts of laws and the federal and state courts in New York, New York will have exclusive jurisdiction of any Dispute.

14.16 <u>No ISG/UCITA.</u> The Parties hereby agree that their respective rights and obligations will be solely and exclusively as set forth in this Agreement and that the International Sale of Goods and UCITA, whether enacted in whole or in part by any state or applicable jurisdiction, regardless of how codified, will not apply to this Agreement and are hereby disclaimed.

14.17 <u>Counterparts.</u> This Agreement may be signed in one or more counterparts (including faxed or electronically scanned copies), each of which will be deemed one and the same original. Reproductions of this executed original (with reproduced signatures) will be deemed to be original counterparts of this Agreement.

14.18 <u>Interpretation.</u> This Agreement has been negotiated at arms-length between Parties who are experienced and knowledgeable in the matters contained in this Agreement, and the Parties hereby agree that any statute, law or common law principles or other authority that would require interpretation of any ambiguities in this Agreement against the Party who has drafted it are not applicable and are hereby waived.

14.19 <u>Divested Businesses.</u> In the event Honeywell divests a subsidiary, division or business unit, Locus will extend services pursuant to this Agreement to such subsidiary, division or business unit for a period not to exceed 12 months from the date of divestiture under the terms of this Agreement.

14.20 <u>Acquired Contracts.</u> If Honeywell acquires a company that is a customer of Locus, Locus will permit the termination, at Honeywell's option, of the acquired entity's agreement with Locus without liability so that the services provided to the acquired entity may be provided pursuant to the terms, condition, rates and charges contained in this Agreement between Honeywell and Locus.

14.21 <u>US Equal Employment Opportunity Regulations</u>. To the extent employment activities of Supplier occur in the United States and if otherwise applicable, **this contractor and subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to**

employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.

| | |
|---|---|
| **AGREED TO:**<br>Honeywell International Inc.<br><br>By: __RajGhaisas_____<br><br>Name: _____*[signature]*_____<br><br>Title: _Sr. Remediation Procurement Manager_<br><br>Date: __February 2, 2015_____ | **AGREED TO:**<br>Locus Technologies<br>A California corporation<br><br>By: _____**Neno**_____<br><br>Name: ____**Duplan**_____<br><br>Title: _____<br><br>Date: _____<br><br>Digitally signed by Neno Duplan<br>DN: cn=Neno Duplan, o=Locus Technologies, ou=Locus Technologies, email=neno@locustec.com, c=US<br>Date: 2015.01.30 14:15:44 -08'00' |