**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| LOCUS TECHNOLOGIES, | : | |
| | : | |
| Plaintiff, | : | Case No. 1:19-cv-11532-PGG-KHP |
| | : | |
| v. | : | Judge Paul G. Gardephe |
| | : | |
| HONEYWELL INTERNATIONAL INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## DEFENDANT HONEYWELL INTERNATIONAL INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF LOCUS TECHNOLOGIES' COMPLAINT

Christine M. Haaker (OH #0063225)
Admitted *Pro Hac Vice*
Sean P. McCormick (OH #0088281)
Admitted *Pro Hac Vice*
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, Ohio 45342
Telephone: 937.443.6600
Facsimile: 937.443.6635
Christine.Haaker@ThompsonHine.com
Sean.McCormick@ThompsonHine.com

Emily J. Mathieu
THOMPSON HINE LLP
335 Madison Avenue, 12th Floor
New York, NY 10017
Telephone: 212.344.3963
Facsimile: 212.344.6101
Emily.Mathieu@ThompsonHine.com

*Attorneys for Defendant Honeywell International Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. iv

I.     INTRODUCTION ......................................................................................1

II.    FACTS ........................................................................................................3

    A.     Background ........................................................................................3

    B.     The EIM Agreement .........................................................................3

        1.     Honeywell terminates ePortal. ...............................................5

        2.     Honeywell terminates the EIM Agreement. ...........................6

    C.     The 2012 EIM Order Form ...............................................................7

    D.     The RIMS Agreement .......................................................................8

        1.     The Previously Settled RIMS Dispute. ...................................10

        2.     Honeywell terminates the RIMS Agreement. ..........................10

III.   LAW AND ARGUMENT ..........................................................................10

    A.     The Standard of Review Requires Dismissal in This Case..................10

    B.     Locus' Claim for Breach of The 2012 EIM Order Form
        Should be Dismissed as a Matter of Law.............................................11

    C.     Locus' Claim for Breach of the EIM Agreement Should be
        Dismissed as a Matter of Law..............................................................13

        1.     Honeywell does not owe Locus for the EIM Second Half Invoice..........14

            a.     The Parties agreed that Honeywell only owed EIM license
                fees through June 30, 2019. ..........................................14

            b.     Honeywell terminated the EIM Agreement in any event. .............14

        2.     Honeywell does not owe Locus for the EIM Termination Invoice..........15

        3.     Honeywell does not owe Locus for the ePortal Invoice...........................16

        4.      Honeywell timely paid the Final EIM Invoice. ........................................17

    D.     Locus' Claim for Breach of the RIMS Agreement Should be Dismissed as a Matter of Law. ...............................................................17

    E.     Locus' Claim for Account Stated Should be Dismissed as a Matter of Law. ....................................................................................19

    F.     Locus has Failed to State a Claim for Misappropriation of Trade Secrets. ..............................................................................................22

**IV.**    **CONCLUSION** ...............................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott, Duncan & Wiener v. Ragusa,*
    214 A.D.2d 412, 625 N.Y.S.2d 178 (1st Dep't 1995) ............................................19

*Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,*
    637 F. Supp. 2d 185 (S.D.N.Y. 2009)...................................................................21

*Anchor Motor Freight v. Ciabattoni,*
    716 A.2d 154 (Del. 1998) .....................................................................................12

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)....................10, 11, 19, 21

*Bakerman v. Sidney Frank Importing Co.,*
    No. 1844-N, 2006 Del. Ch. LEXIS 180, 2006 WL 3927242 (Del. Ch. Oct. 10,
    2006) .................................................................................................................13, 14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)................................10, 11

*Centennial El. Indus., Inc. v. New York City Dept. of Citywide Admin. Servs.,*
    No. 153706/2015E, 2018 N.Y. Misc. LEXIS 2075 (N.Y. Sup. Ct. May 11,
    2018) ...............................................................................................................20, 21

*Chen v. Antel Communs., LLC,*
    653 F. App'x 43 (2d Cir. 2016) ............................................................................11

*Chrysler Corp v. Airtemp Corp.,*
    426 A.2d 845 (Del. Super. Ct. 1980) ....................................................................20

*Citibank S.D., N.A. v. Santiago,*
    No. CPU4-11-005562, 2012 Del. C.P. LEXIS 89, 2012 WL 592873 (Del. C.P.
    Feb. 23, 2012) ................................................................................................20, 21

*Dyncorp v. GTE Corp.,*
    215 F. Supp. 2d 308 (S.D.N.Y. 2002)...................................................................22

*Elenza, Inc. v. Alcon Labs. Holding Corp.,*
    183 A.3d 717 (Del. 2018) .....................................................................................22

*Faulkner v. Beer,*
    463 F.3d 130 (2d Cir. 2006)..................................................................................11

iv

*Geier v. Mozido, LLC*,
    No. 10931-VCS, 2016 Del. Ch. LEXIS 149, 2016 WL 5462437 (Del. Ch.
    Sept. 29, 2016) ........................................................................................................18

*Global Network Communs., Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006).....................................................................................11

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016).....................................................................................11

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    679 F. Supp. 2d 395 (S.D.N.Y. 2009).......................................................................19

*Khalid v. Scagnelli*,
    290 A.D.2d 352, 736 N.Y.S.2d 374 (1st Dep't 2002) .............................................18

*Kuratle Contr., Inc. v. Linden Green Condo., Ass'n*,
    No. N12C-03-079 MJB, 2013 Del. Super. LEXIS 524, 2013 WL 6140000
    (Del. Super. Ct. Nov. 19, 2013) ...............................................................................12

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)......................................................................................11

*LeMay v. H.W. Keeney, Inc.*,
    124 A.D.2d 1026, 508 N.Y.S.2d 769 (4th Dep't 1986)............................................18

*Martin H. Bauman Assoc., Inc. v. H&M Int'l Transport, Inc.*,
    171 A.D.2d 479, 567 N.Y.S.2d 404 (1st Dep't 1991) ........................................20, 21

*My Play City, Inc. v. Conduit Ltd.*,
    589 F. App'x 559 (2d Cir. 2014) ..........................................................................22, 23

*Negrete v. Citibank, N.A.*,
    187 F. Supp. 3d 454 (S.D.N.Y. 2016).......................................................................22

*Sparebank 1 SR-Bank ASA v. Wilhelm Maass GmbH*,
    No. N19C-02-025 WCC, 2019 Del. Super. LEXIS 568, 2019 WL 6033950
    (Del. Super. Ct. Nov. 5, 2019) .................................................................................21

*Universal Instruments Corp. v. Micro Sys. Eng'g*,
    No. 3:13-cv-831, 2017 U.S. Dist. LEXIS 124926, 2017 WL 3396532
    (N.D.N.Y. Aug. 8, 2017) ..........................................................................................22

*VisionChina Media Inc. v. Shareholder Representative Servs., LLC*,
    109 A.D.3d 49, 967 N.Y.S.2d 338 (1st Dep't 2013) ...............................................17

## STATUTES/OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6) ...................................................................................................11, 19

6 Del. C. § 2001 ........................................................................................................................22

1 Am. Jur. 2d *Accounts and Accounting* § 24 (2020) ................................................................19

1 Am. Jur. 2d *Accounts and Accounting* § 30 (2020) ................................................................20

2 *Woolley on Delaware Practice* § 1460 (1906) ........................................................................20

## I.    INTRODUCTION

Plaintiff Locus Technologies ("Locus") alleges that the sophisticated commercial parties to this action entered into three agreements—a June 1, 2003 Software License Agreement ("EIM Agreement") regarding the licensing of environmental information management software ("EIM") (Doc. 1-1), an Order Form effective January 1, 2013 amending the EIM Agreement ("2012 EIM Order Form") (Doc. 1-2) and a Master Services Agreement effective January 15, 2015 ("RIMS Agreement") regarding a remediation information management system ("RIMS") (Doc. 1-3). But in attempting to weave a tale of inequity, retaliation and breach of contract on the part of Defendant Honeywell International Inc. ("Honeywell") (collectively, with Locus, the "Parties"), Locus artfully omits *other* contractual agreements bearing on the subject. While there is always another side to every story, and there certainly is here, the Court need never reach the point of any factual dispute because the express terms of the controlling agreements between the Parties bar each of Locus' claims as a matter of law—Honeywell had every right to end its relationship with Locus and take its own data as contractually agreed.

The Complaint fails to state a viable breach of contract claim against Honeywell because:

(1)    The terms of the 2012 EIM Order Form expressly state that they expired on December 31, 2015, with no provision for renewal, and there is no signed writing between the Parties extending the term of the 2012 EIM Order Form otherwise as expressly required pursuant to the EIM Agreement—the 2012 EIM Order Form was not operative after December 31, 2015 and Locus has not pled any basis for, and Honeywell is not liable for, any breach of the 2012 EIM Order Form as a matter of law;

(2)    In the fall of 2018, Honeywell agreed only to license EIM for an additional six months, until June 30, 2019, no more, and, in an abundance of caution, Honeywell was entitled to and did terminate the EIM Agreement with 60 days' notice to Locus of termination as of June

30, 2019—Locus has not pled any basis for, and Honeywell is not liable for, any failure to pay

for EIM invoices for after June 30, 2019 as a matter of law;

(3)     The EIM Agreement expressly states that Honeywell is the *sole* owner of its data

and that, upon termination of the EIM Agreement, Locus shall return Honeywell's data free of

charge with no contractual provision for a termination fee to do so—Locus has not pled any basis

for, and Honeywell is not liable for, any EIM termination fee as a matter of law;

(4)     The Parties agreed that Honeywell's ePortal subscription would expire at the end

of July 2018, Locus then performed closeout procedures and facilitated the termination of the

ePortal and nothing in any of the Parties' agreements required a longer term—Locus has not pled

any basis for, and Honeywell is not liable for, any ePortal fees after July 2018 as a matter of law;

(5)     The RIMS Agreement expired by its terms as of December 31, 2019 and, again,

in an abundance of caution, Honeywell also provided Locus with 30 days' written notice

confirming that it intended that the RIMS Agreement expire and timely paid the Final RIMS

Invoice—Locus has not pled any basis for, and Honeywell is not liable for, any additional RIMS

invoices as a matter of law; and

(6)     In October 2017, Honeywell and Locus expressly settled their dispute regarding

payment of certain RIMS invoices—Locus has not pled any basis for, and Honeywell is not

liable for, the settled RIMS invoices as a matter of law.

The Complaint also fails to state a viable claim for account stated as a matter of law

because Honeywell has consistently disputed that it owes Locus any additional monies under

either the EIM Agreement or the RIMS Agreement, and such claim is nothing more than a

repackaging of the contract claim, which is improper under both New York and Delaware law.

Finally, the Complaint fails to state a viable claim arising out of the alleged inclusion of Locus' confidential information in Honeywell's EIM RFP as a matter of law because, even if Locus' allegations were true (and they are not), Locus fails to allege anything more than speculative consequential damages—but the Parties' mutually and expressly agreed that all damages arising out of any use of confidential information other than direct damages were precluded pursuant to the EIM Agreement.

Accordingly, as set forth in full below, the Complaint should be dismissed as a matter of law.

## II.   FACTS

For the purposes of this Motion, the following facts are before this Court.

### A.  BACKGROUND

Honeywell, headquartered in North Carolina, produces and provides commercial and consumer products, engineering services, and aerospace systems. Doc. 1, ¶ 19 and *see* www.Honeywell.com *generally*. Locus provides software products for "collecting, organizing, analyzing, and reporting environmental data to comply with governmental regulations," and Honeywell contracted with Locus for a number of years related to such software. *Id.* at ¶ 23.

### B.  THE EIM AGREEMENT

In 2003, Honeywell and Locus entered into the EIM Agreement. Doc. 1, p. 4, ¶ 26; Doc. 1-1. The EIM Agreement governed the Honeywell-Locus relationship with regard to certain software provided by Locus that is used in the management, storage, and processing of technical and project data for the environmental industry. Doc. 1-1, p. 12. Locus licensed EIM, used for managing analytical, geological, geotechnical and location data, to Honeywell under the EIM Agreement. Doc. 1, ¶ 27; Doc. 1-1, p. 12, 15. The EIM Agreement also offered Honeywell the ability to license the LocusFocus Portal ("ePortal"), a document management system. Doc. 1, ¶ 27; Doc. 1-1, p. 2, 15.

The Parties contractually agreed that any claims arising under or relating to the EIM Agreement are to be governed by Delaware law. Doc. 1-1, p. 11, § 12.11. Though Locus' software is the property of Locus (Doc. 1-1, p. 6, § 7.1), the EIM Agreement expressly provides that Honeywell is the sole owner of Honeywell's data managed within the Locus software, and further that Locus, upon expiration of the EIM Agreement, is required to return to Honeywell its data "without cost . . . ." *Id.* at p. 7, §§ 7.4, 7.7.

Pursuant to Section 11, the Parties agreed to mutually limit liability:

> EXCEPT AS PROVIDED BELOW, IN NO EVENT SHALL LOCUS OR CUSTOMER BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES WHATSOEVER, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, AND THE LIKE, ***ARISING OUT OF THIS AGREEMENT OR THE USE OF*** OR INABILITY TO USE THE LICENSED PATENTS, OR ***ANY CONFIDENTIAL INFORMATION***, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING THE FOREGOING, LOCUS SHALL BE LIABLE FOR LOSS OF OR LOSS OF INTEGRITY OF CUSTOMER'S DATA, PROVIDED THAT LOCUS' AGGREGATE LIABILITY THEREFOR SHALL BE LIMITED TO $1,000,000.00.

Doc. 1-1, p. 9, § 11 (emphasis added).

The Parties further agreed that the EIM Agreement would (1) run for three years from the effective date (June 1, 2003 to May 31, 2006) ("Initial Term"); (2) then automatically renew for four successive one-year periods (to May 31, 2007, 2008, 2009 and 2010) ("Renewal Term(s)"), unless Honeywell gave notice of intent to terminate sixty days prior to the end of the Initial term or a Renewal Term; and (3) then automatically renew for successive one-year periods ("Optional Term(s)"), unless either Honeywell or Locus gave notice of intent to terminate sixty days prior to the end of the applicable renewal term. Doc. 1-1, p. 4, § 3.2. However, pursuant to Section 6.3 of the EIM Agreement, Honeywell also retained the right at any time to "terminate this Agreement for convenience within sixty (60) days after written notice." Doc. 1, p. 5, ¶ 32 & Doc. 1-1, p. 6.

4

If Honeywell chose to terminate the EIM Agreement upon sixty days' notice, Locus was expressly obligated to provide "termination assistance" to Honeywell, and the EIM Agreement identifies an "Exit Plan" for that purpose. Doc. 1-1, p. 6, § 6.5. There is no provision of the EIM Agreement that prohibits Honeywell from downloading its own data. *See generally* Doc. 1-1. There is also no provision that requires Honeywell to pay a termination fee. *Id.*

Finally, pursuant to Section 12.5 of the EIM Agreement, the Parties agreed that "[n]o amendments or modifications shall be effective unless in writing signed by authorized representatives of both parties." Doc. 1-1, p. 10.

### 1.   Honeywell terminates ePortal.

While the EIM Agreement provided Honeywell the option to license ePortal, it did not **require** Honeywell to license or to continue licensing the ePortal software. Instead, Honeywell had the right to change the scope of services at any time—"[Honeywell] retains the ability to make changes to the scope of work, services and maintenance." Doc. 1-1, p. 4, § 4.4.

On April 24, 2018, Honeywell provided Locus with notice of its intent to discontinue ePortal as of June 30, 2018.[1] Declaration of William J. Hague ("Hague Dec."), ¶ 2 and Ex. A. On June 7, 2018, Locus (Jennifer Peterson) confirmed this and agreed that Locus would initiate closeout procedures of the ePortal database beginning on July 2, 2018. *Id.* at ¶ 3 and Ex. A. Ultimately, the Parties agreed in writing that the termination date would be August 1, 2018. *Id.* at ¶ 4 and Ex. A. On June 29, 2018, Locus issued Honeywell Invoice No. 982943, which represented the final ePortal service charges, through July 31, 2018 (*Id.* at ¶ 5 and Ex. B), Honeywell paid that invoice, and Locus discontinued access to the ePortal database (*Id.* at ¶ 5

---

[1] Note, while a notice period was not required to change the scope, including to cancel ePortal, Honeywell nonetheless provided more than 60 days' notice of cancellation, which would have been the notice period to cancel the entire EIM Agreement for convenience if it chose to do so. Doc.1-1, § 6.3.

and Ex. A). However, on June 5, 2019, over eleven months later, and in retaliation for Honeywell choosing to terminate the EIM Agreement, Locus issued an invoice purporting to *post hoc* charge Honeywell for August through December of 2018 (the "ePortal Invoice"). Declaration of John Morris ("Morris Dec."), ¶ 2 and Ex. A.

### 2. <u>Honeywell terminates the EIM Agreement</u>.

On October 18, 2018, after the Initial Term, after the Renewal Terms and at the time of an Optional Term set to expire on December 31, 2018 (Doc. 1-1, § 3.2), in addition to Honeywell's continued ability to terminate at any time for convenience (*Id.* at § 6.3), Locus sent Honeywell a letter titled "Renewal of Locus EIM Solutions 2019," proposing rates totaling $692,082, scope, and a twelve-month term for EIM for 2019. Hague Dec., ¶ 6 and Ex. C. Honeywell responded through Mr. Hague that, in light of an upcoming Request for Proposal ("RFP") seeking bids for a replacement for EIM, Honeywell was not willing to enter into another Optional Term for an entire year but would agree to renew for only six months. *Id.* at ¶ 7. In response, Locus sent Honeywell an Invoice (No. 983109) dated October 25, 2018, for six months of EIM, from January 1, 2019 through June 30, 2019 ("Final EIM Invoice"). *Id.* at ¶ 8 and Ex. D. The invoice specifically states that it is a "[s]ummary of Invoice Charges for January 1, 2019 to June 30, 2019" for the specific price of $348,855.00. *Id.* Honeywell responded by issuing Purchase Order #A000127818 for the Final EIM Invoice on November 12, 2018, subject to payment terms of 105 days, and "subject to Honeywell's normally scheduled monthly payments runs." *Id.* at ¶ 10 and Ex. E. Hence, the parties agreed that the EIM Agreement would expire as of June 30, 2019.

Payment of the Final EIM Invoice cleared on February 19, 2019. Doc. 1, p. 14, ¶ 95.

In addition, for belt and suspenders, on May 2, 2019, Honeywell provided Locus with written notice of termination of the EIM Agreement pursuant to Section 6.3. Hague Dec., ¶ 5 and Ex. D. Honeywell paid Locus for EIM through the termination date. *Id.* at ¶ 6 and Ex. E. There is no provision of the EIM Agreement and no contractual agreement otherwise obligating Honeywell to pay Locus for anything more than six months of EIM in 2019. *See generally* Doc. 1-1.

Yet, on April 3, 2019, over five (5) months after agreeing to a six-month-only term, Locus issued an invoice to Honeywell purporting to charge Honeywell for July through December of 2019 (the "EIM Second Half Invoice"). Morris Dec., ¶ 3 and Ex. B.

Locus publicly filed the EIM Agreement herein as an attachment to its Complaint and in the nine months since has made no effort to maintain the confidentiality of the contents of that agreement. *See* Doc. 1-1.

### C.  THE 2012 EIM ORDER FORM

In 2012, Honeywell and Locus executed an Order Form with an effective date of January 1, 2013 (the "2012 EIM Order Form") (Doc. 1, p. 7, ¶ 44 & Doc. 1-2) and expressly agreed that it is "governed by the [EIM Agreement]." Doc. 1, p. 7, ¶ 45; Doc. 1-2, p. 3.

Pursuant to the 2012 EIM Order Form, Locus proposed and the Parties agreed to updated pricing terms for Locus' software applications, as well as the support services offered in conjunction with those applications, for a thirty-six-month term, or three Optional Terms, from January 1, 2013 to December 31, 2015. Doc. 1-2, p. 2. The Parties also agreed to amend the term of the EIM Agreement to a set term from January 1, 2013 to December 31, 2015, expressly stating a "***Contract End Date***" of December 31, 2015. *See* Doc. 1-2, p. 2 (emphasis added). Pursuant to Section 7 of the 2012 EIM Order Form, titled "Program termination and return of data," upon termination of the EIM Agreement during the term of the 2012 EIM Order Form, if

Honeywell so chose, it could make a request for Locus to provide Honeywell's data by DVD for a set fee per record. *Id.* at p. 3, ¶ 7. Nothing in the 2012 EIM Order Form or the EIM Agreement prohibits Honeywell from downloading its own data. *See generally* Doc. 1-2.

However, on May 15, 2019, over three years after the 2012 EIM Order Form expired, Locus issued an invoice to Honeywell purporting to charge it a termination and data transfer fee pursuant to the 2012 EIM Order Form ("EIM Termination Invoice"). Morris Dec., ¶ 4 and Ex. C.

Though the terms of the 2012 EIM Order Form state that the "Order Form pricing is strictly confidential[,]" Locus publicly filed the form in its entirety with the Complaint and has made no efforts to maintain the confidentiality of those pricing terms. *See* Doc. 1-2.

### D.  THE RIMS AGREEMENT

In 2015, Honeywell and Locus entered into the RIMS Agreement, dated January 15, 2015. Doc. 1, p. 8, ¶ 57 & Doc. 1-3. The RIMS Agreement governed the Parties' joint development of the Honeywell Corporate Remediation and Evaluation Services group ("RES") Remediation Information Management System ("RIMS"), which was used to manage Honeywell's environmental financial data. Doc. 1-3, p. 2

The Parties agreed that New York law governs the RIMS Agreement. Doc. 1-3, p. 14, § 14.15. Pursuant to the RIMS Agreement, Locus was obligated to grant "an irrevocable, unrestricted, non-exclusive, paid-up, perpetual, worldwide license to use, duplicate, modify, distribute, display, benefit from and otherwise use, directly or through its authorized third parties, such Locus IP to enable the full use and benefit of the Services, Deliverables and Newly Created Honeywell IP for Honeywell' business purposes . . . ." Doc. 1-3, p. 8, § 9.1(b). Locus agreed that Honeywell had extensive exclusive ownership and rights, including to outputs:

> Honeywell will have exclusive, unlimited ownership rights to all Deliverables, including any Disclosed Subject, *which may include, for purposes of example only, process maps or other documentation of Honeywell's business processes,*

*reports, analyses, software, customizations to software, requirements documents, procedures manuals, etc. developed or modified for Honeywell* constituting Newly Created Honeywell IP.

*Id.* at § 9.2 (emphasis added). The RIMS Agreement expressly provides payment terms of net 105 days subject to Honeywell's normally scheduled monthly payment runs. *Id.* at p. 4, § 5.4. Pursuant to Section 4.2 of the RIMS Agreement, Honeywell had the right to "terminate this Agreement or any SOW . . . upon *30 days' prior written notice*." *Id.* at p. 3, § 4.2 (emphasis added).

Section 12.5 of the RIMS Agreement designates certain categories of information as confidential, but contains express exclusions from confidentiality for information that:

- [W]as rightfully in Recipient's possession before receipt from Discloser and was not accompanied by a duty of confidentiality;
- [I]s or becomes a matter of public knowledge through no fault of Recipient;
- [I]s rightfully received by Recipient from a third party and is not accompanied by a duty of confidentiality;
- [I]s disclosed by Discloser to a third party without a duty of confidentiality on the third party;
- [I]s independently developed by Recipient without use of Discloser's Confidential Information; or
- [I]s disclosed under operation of law, provided Recipient notifies Discloser and upon Discloser's request and at Discloser's cost cooperates in all reasonable respects to contest the disclosure or obtain a protective order or other remedy.

Doc. 1-3, p. 11, § 12.5.

The term of the RIMS Agreement was for an initial period of three years (January 15, 2015 to January 14, 2018), with an option at Honeywell's sole discretion to renew for up to two one-year periods (or until January 14, 2020). Doc. 1-3, p. 4, § 4.1. Like the EIM Agreement, Honeywell also had the option at any time to terminate the RIMS "Agreement or any SOW, in whole or in part, with or without cause, without liability or obligation, for undelivered Deliverables or unperformed Services, upon 30 days' prior written notice." *Id.* at § 4.2.

9

        **1.**     **The Previously Settled RIMS Dispute.**

In 2017, Locus claimed that Honeywell owed it for "professional services" related to RIMS. Doc. 1, p. 15, ¶ 97. Honeywell disputed these charges, and the Parties settled their dispute in October 2017 for $275,000. Hague Dec., ¶ 12 and Ex. F. Locus expressly confirmed this contractual settlement agreement in writing in an October 25, 2017 letter from Locus' Ben Afzal to Honeywell's Bill Hague. *Id.* Locus issued Honeywell a "replacement" invoice for $275,000.00, dated October 4, 2017, which expressly referenced the "agreed settlement." *Id.* ¶ 14 and Ex. G. Honeywell timely paid all remaining RIMS invoices. Doc. 1, p. 14, ¶ 95.

        **2.**     **Honeywell terminates the RIMS Agreement.**

While the RIMS Agreement was set to expire shortly in any event, again for belt and suspenders, on November 13, 2019, Honeywell provided Locus with thirty days' written notice, in compliance with Section 4.2 of the RIMS Agreement, of termination in confirmation of its intent to allow the expiration of the RIMS Agreement. Doc. 1, p. 16, ¶ 108.

Despite the RIMS Agreement being labeled as "CONFIDENTIAL" on each page and Section 12.1 expressly defining the terms of the agreement as confidential, Locus publicly filed the RIMS Agreement in its entirety with the Complaint in breach and has made no efforts to maintain the confidentiality of the contents of that agreement. *See* Doc. 1-3.

**III.**    **LAW AND ARGUMENT**

    **A.**  **THE STANDARD OF REVIEW REQUIRES DISMISSAL IN THIS CASE.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Plausibility "depends on a host of

considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 550 U.S. at 678.

 "'[M]aterials outside the record may become the basis for a dismissal' if: (1) the document is 'integral' to the 'complaint'; (2) 'no dispute exists regarding the authenticity or accuracy of the document'; and (3) 'there exist no material disputed issues of fact regarding the relevance of the document.'" *Chen v. Antel Communs., LLC*, 653 F. App'x 43 (2d Cir. 2016) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason – usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim – was not attached to the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citing *Global Network Communs., Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)). The exception thus prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting. *Global Network Communs., Inc.,* 458 F.3d at 157.

Here, Locus attempted such clever drafting but still cannot avoid the warranted dismissal.

## B. LOCUS' CLAIM FOR BREACH OF THE 2012 EIM ORDER FORM SHOULD BE DISMISSED AS A MATTER OF LAW.

To the extent Locus claims Honeywell breached the 2012 EIM Order Form by terminating ePortal and the EIM Agreement (Doc. 1, ¶ 127) or by refusing to pay the Termination Invoice (*Id.* at ¶ 128), such claim should be dismissed because the 2012 EIM Order

Form expired its terms on December 31, 2015 ("Expiration Date") and there was no written and signed agreement between the Parties extending the term of the 2012 EIM Order Form.

Delaware law strictly enforces contract terms that dictate how an agreement may be amended. *See, e.g., Anchor Motor Freight v. Ciabattoni,* 716 A.2d 154, 156 (Del. 1998) ("There is no enforceable contract if the parties do not intend to be bound before a formal written agreement is drafted and signed."); *Kuratle Contr., Inc. v. Linden Green Condo., Ass'n,* No. N12C-03-079 MJB, 2013 Del. Super. LEXIS 524, at *37-38, 2013 WL 6140000 (Del. Super. Ct. Nov. 19, 2013) (where an agreement provides that any modification must be in writing and signed by the parties, any attempt to unilaterally modify such agreement is improper and ineffective).

Here, the "Contract End Date" for the 2012 EIM Order Form was expressly agreed to be December 31, 2015. Doc. 1-2, p. 2. Further, the 2012 EIM Order Form is governed by the EIM Agreement (*Id.* at p. 3) and Section 12.5 of the EIM Agreement expressly provides that "no amendments or modifications shall be effective unless in writing signed by authorized representatives of both parties." Doc. 1-1, p. 10. Therefore, following the Expiration Date, and in the absence of any signed writing between the Parties extending the term of the 2012 EIM Order Form, the Parties did not extend the 2012 EIM Order Form terms or agree to any further express required term. *Id.* Accordingly, to the extent Locus relies on the terms of the 2012 EIM Order Form to support any breach of contract claim, such claim should be dismissed.[2]

---

[2] The Complaint improperly relies on the 2012 EIM Order Form in support of the following allegations, which are not supported by the express terms of the operative EIM Agreement:

- EIM and ePortal subscriptions were annual and could not be terminated for convenience on sixty days' written notice. Doc. 1, ¶¶ 49-50, 127, 130.
- Upon termination of EIM or ePortal, Honeywell was required to pay Locus a termination fee for data transfer. *Id.* at ¶¶ 53, 128, 131-132.

### C. LOCUS' CLAIM FOR BREACH OF THE EIM AGREEMENT SHOULD BE DISMISSED AS A MATTER OF LAW.

Under Delaware law, to recover damages for breach of contract, a plaintiff must prove: (1) the existence of a contract; (2) that the defendant breached an obligation imposed by the contract; and (3) that the plaintiff sustained damages as a result of the breach. *Bakerman v. Sidney Frank Importing Co.,* No. 1844-N, 2006 Del. Ch. LEXIS 180, at *19, 2006 WL 3927242 (Del. Ch. Oct. 10, 2006). Locus claims that Honeywell breached the terms of the EIM Agreement by: (a) failing to pay the EIM Second Half Invoice; (b) failing to pay the Termination Invoice; (c) failing to pay the ePortal Invoice; and (d) paying the Final EIM Invoice late. Locus' claims fail as a matter of law because: (a) the Parties mutually agreed only to extend the EIM Agreement six months through June 30, 2019, and Honeywell provided Locus with sixty days' written notice of termination in any event; (b) the 2019 EIM Termination Invoice is based on the 2012 EIM Order Form, which expired at the end of 2015, and no provision of the EIM Agreement requires Honeywell to pay a termination fee; (c) the Parties agreed that ePortal would terminate at the end of July 2018, and Locus performed closeout procedures; and (d) Honeywell timely paid the Final EIM Invoice. Accordingly, Locus' claims for breach of the EIM Agreement fail as a matter of law and should be dismissed.

---

- Honeywell and Locus continued to operate under the 2012 EIM Order Form from January 1, 2013, to present. *Id.* at ¶ 54.
- Locus submitted annual invoices in accordance with the 2012 EIM Order Form's pricing structure, and Honeywell paid invoices in accordance with the 2012 EIM Order Form. *Id.* at ¶ 55.
- Because the 2012 EIM Order Form contemplates a termination fee for data transfer, Honeywell owes Locus for the Termination Invoice. *Id.* at ¶¶ 110, 113-114, 131-132.
- Because the 2012 EIM Order Form required annual subscription renewals that were not cancelable for convenience, Honeywell owes Locus for the EIM Second Half Invoice and the ePortal Invoice. *Id.* at ¶¶ 110-111, 131.

1.     **Honeywell does not owe Locus for the EIM Second Half Invoice.**

Honeywell does not owe Locus for the EIM Second Half Invoice for two separate but equally enforceable reasons. First, the Parties mutually agreed only to extend the EIM Agreement for six months through June 30, 2019, no longer. Second, independent of the fact that the EIM Agreement expired on June 30, 2019, Honeywell provided Locus with sixty days' written notice of termination on May 2, 2019, which it had every right to do under the EIM Agreement. Either way, Honeywell does not owe Locus for the EIM Second Half Invoice.

     a.     *The Parties agreed that Honeywell only owed EIM license fees through June 30, 2019.*

Because Honeywell was only willing to renew the EIM Agreement subscriptions for the first half of 2019, Locus sent Honeywell Invoice No. 983109 for six months of EIM on October 25, 2018. Hague Dec., Ex. D. The invoice specifically states that it is a "[s]ummary of Invoice Charges for January 1, 2019 to June 30, 2019" for the specific price of $348,855.00. *Id.* Honeywell responded by issuing its Purchase Order, dated November 12, 2018, in that exact amount. *Id.* at Ex. E. Hence, as of November 12, 2018, the Parties' agreement for the EIM license was for a six-month term for $348,455.00. *Id.* at Exs. D and E. Nothing in the EIM Agreement (or any other document for that matter) obligated Honeywell to pay Locus for anything more than six months of EIM in 2019.[3]

     b.     *Honeywell terminated the EIM Agreement in any event.*

In addition, on May 1, 2019, Honeywell provided Locus with sixty days' written notice of termination of the EIM Agreement pursuant to Section 6.3. Morris Dec., Ex. D. Honeywell

---

[3] Locus contends that the 2012 EIM Order Form prevented Honeywell from terminating its EIM and ePortal subscriptions before the end of 2019. Doc. 1, p. 16, ¶ 111. But, as demonstrated *supra*, the 2012 EIM Order Form expired on December 31, 2015, and there was no signed writing between the Parties agreeing to extend its terms past that date as would be expressly required pursuant to Section 12.5 of the EIM Agreement.

paid Locus for EIM through the termination date. *Id.* at Ex. E; Hague Dec., Exs. D and E. Accordingly, there is no contractual basis for Honeywell to be liable to Locus for the EIM Second Half Invoice. To the extent Locus' breach of contract claim is based on nonpayment of the EIM Second Half Invoice, it should be dismissed as a matter of law.

### 2. Honeywell does not owe Locus for the EIM Termination Invoice.

Honeywell does not owe Locus for the Termination Invoice because nothing in the EIM Agreement imposes fees against Honeywell upon termination of that agreement. In fact, the EIM Agreement expressly provides that Locus was affirmatively obligated to provide "termination assistance" to Honeywell on the termination of agreement, not that Honeywell owed Locus any fee. Doc. 1-1, p. 6, § 6.5. The EIM Agreement also expressly provides that Honeywell is the sole owner of its data, and further that Locus, on the expiration of the agreement, would return Honeywell's data to it "without cost . . . ." *Id.* at p. 7, § 7.7.

Faced with the inevitable conclusion that the Termination Invoice is not supported by the EIM Agreement, Locus attempts to manufacture support under Section 7 of the 2012 EIM Order Form. Doc. 1, p. 16, ¶ 113. But, as demonstrated *supra*, the 2012 EIM Order Form expired on December 31, 2015, and cannot serve as a basis for the Termination Invoice. *See supra* § III(B). In addition, even if the 2012 EIM Order Form remained an enforceable agreement between the parties (which it did not), it clearly contemplated a request by Honeywell to Locus for the return of its data on DVD, which never occurred, is not alleged to have occurred, and, consequently, no DVD of data was ever provided to Honeywell by Locus. Doc. 1-2, p. 3, ¶ 7. Because there is no

contractual basis for the EIM Termination Invoice, any breach of contract claim based on Honeywell's refusal to pay it should be dismissed as a matter of law.[4]

### 3. Honeywell does not owe Locus for the ePortal Invoice.

Honeywell does not owe Locus for the ePortal Invoice because the Parties agreed to terminate ePortal as of the end of July 2018, and Locus performed closeout procedures. In any event, Honeywell had the right to change the scope of services and Locus had actual notice of Honeywell's intent to terminate ePortal well in advance of even the sixty days' notice for termination required under the EIM Agreement.

Jennifer Peterson from Locus confirmed in writing that Honeywell intended to "discontinue use" of ePortal at the end of June 2018, and that Locus would initiate closeout procedures of the ePortal database beginning on July 2, 2018. Hague Dec., Ex. A. Ultimately, the Parties agreed to push out the termination date to August 1, 2018. *Id.* On June 29, 2018, Locus issued Honeywell Invoice No. 982943, representing the final ePortal service charges, through July 31, 2018. *Id.* at Ex. B. Accordingly, by virtue of the Parties' agreement, Honeywell paid Locus for ePortal through July 2018, and Locus closed Honeywell's access to the ePortal database. *Id.* at Ex. A. Therefore, Locus had no grounds to attempt to bill Honeywell nearly one year later for ePortal (post-termination and post any use by Honeywell of ePortal) and maintaining such a claim is without basis in fact or law.

---

[4] Locus also claims that Honeywell breached Locus' "Terms of Use Agreement" by retrieving Honeywell data from EIM prior to terminating the EIM Agreement. Doc. 1, p. 16, ¶¶ 112-113. But there was no "Terms of Use Agreement" between the Parties and the Complaint fails to either specifically identify or attach a copy of the same. The EIM Agreement controls and nothing in that agreement, a fully integrated agreement, prevented Honeywell from retrieving its data from EIM or ePortal. On the contrary, the EIM Agreement expressly states that Honeywell owns its data, which is to be returned to it "without cost" on the termination of the agreement. Doc. 1-1, p. 7, § 7.7.

In addition, Locus had actual notice of Honeywell's intent to terminate ePortal on April 24, 2018, ninety-nine (99) days before the August 1, 2018, termination date. Hague Dec., Ex. A. Section 6.3 of the EIM Agreement only required Honeywell to provide Locus with sixty (60) days' notice of its intent to terminate for convenience. Doc. 1-1, p. 6, § 6.3. Thus, Locus has no contractual basis for the ePortal Invoice on the separate and independent basis that Honeywell terminated ePortal pursuant to the express terms of the EIM Agreement, and, by acknowledging Honeywell's intent to do so and instituting closeout procedures, Locus waived any objection. Thus, to the extent Locus' breach of contract claim is based on nonpayment of the ePortal Invoice, it should be dismissed as a matter of law.

### 4.   Honeywell timely paid the Final EIM Invoice.

Locus claims that Honeywell paid the Final EIM Invoice twelve (12) days late. Doc. 1, p. 14, ¶ 95. However, Honeywell issued Purchase Order #A000127818 for the Final EIM Invoice on November 12, 2018, subject to payment terms of 105 days, and "subject to Honeywell's normally scheduled monthly payments runs." Hague Dec., Ex. E. Payment of the Final EIM Invoice cleared on February 19, 2019; there was no late payment. Doc. 1, p. 14, ¶ 95. To the extent Locus' breach of contract claim is based on an allegation of late payment of the Final EIM Invoice, it should be dismissed as a matter of law.

### D.  LOCUS' CLAIM FOR BREACH OF THE RIMS AGREEMENT SHOULD BE DISMISSED AS A MATTER OF LAW.

Under New York law, to recover damages for breach of contract, a plaintiff must prove: (1) the existence of a contract; (2) plaintiff performed; (3) defendant failed to perform; and (4) damages. *VisionChina Media Inc. v. Shareholder Representative Servs., LLC,* 109 A.D.3d 49, 58, 967 N.Y.S.2d 338 (1st Dep't 2013). And, the interpretation of a settlement and release is a question of law for the court, and, therefore, "is appropriate for disposition on a motion to

dismiss." *Geier v. Mozido, LLC,* No. 10931-VCS, 2016 Del. Ch. LEXIS 149, at *7, 2016 WL 5462437 (Del. Ch. Sept. 29, 2016) (applying New York law); *see also LeMay v. H.W. Keeney, Inc.*, 124 A.D.2d 1026, 1027, 508 N.Y.S.2d 769 (4th Dep't 1986) (same); *Khalid v. Scagnelli,* 290 A.D.2d 352, 352, 736 N.Y.S.2d 374 (1st Dep't 2002) (reversing trial court's denial of motion to dismiss based on the parties' settlement).

Locus claims that Honeywell breached the RIMS Agreement by failing to pay outstanding and unidentified RIMS invoices totaling $696,624.00. Doc. 1, ¶ 97. However, Honeywell settled its dispute with Locus regarding payment of $467,142.00 of RIMS invoices in October 2017. Doc. 1, p. 15, ¶ 97; Hague Dec., Ex. F. Locus expressly confirmed this settlement in an October 25, 2017, letter from Ben Afzal to Bill Hague. *Id.* Locus issued Honeywell a "replacement" invoice for $275,000.00, dated October 4, 2017, which expressly referenced the "agreed settlement." *Id.* at Ex. G. Accordingly, to the extent Locus' claim for breach of the RIMS Agreement is based on the nonpayment of the settled RIMS invoices, it should be dismissed as a matter of law.

Moreover, Honeywell timely paid the RIMS invoices that are specifically identified in the Complaint. Doc. 1, p. 14, ¶ 95. The RIMS Agreement expressly provides payment terms of net 105 days subject to Honeywell's normally scheduled monthly payment runs. Doc. 1-3, p. 4, § 5.4. All of the RIMS invoices identified were paid within a month of the expiration of the net terms period. Doc. 1, p. 14, ¶ 95. Accordingly, the RIMS invoices were timely paid pursuant to the RIMS Agreement. To the extent Locus' claim for breach of the RIMS Agreement is based on Honeywell's alleged late payment of the RIMS invoices identified in the Complaint, it should be dismissed as a matter of law.

The remainder of Locus' allegations of alleged nonpayment of unidentified RIMS invoices amount to little more than legal conclusions couched as factual allegations, which are insufficient to avoid Rule 12(b)(6) dismissal. *Iqbal,* 556 U.S. at 678.

### E. LOCUS' CLAIM FOR ACCOUNT STATED SHOULD BE DISMISSED AS A MATTER OF LAW.

Locus fails to state a claim for account stated because: (1) the Complaint fails to allege that Honeywell either promised to pay disputed invoices or otherwise admitted to owing them; and (2) the claim is duplicative of the breach of contract claim as it relies on the same underlying factual allegations.

An account stated is "an agreement, based on the prior transactions between the parties to an open account, that the items of the account are true and that the balance struck is due and owing from one party to another." 1 Am. Jur. 2d *Accounts and Accounting* § 24 (2020). "Otherwise stated, an 'account stated' is essentially a contract claim seeking to enforce an agreement to settle a disputed debt." *Id*. To state a claim for account stated in New York, a plaintiff must plead that (1) an account was presented; (2) the account was accepted as correct; and (3) the debtor promised to pay the amount stated. *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009); *see also, Abbott, Duncan & Wiener v. Ragusa*, 214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (1st Dep't 1995) ("An account stated is an account, balanced and rendered, with an assent to the balance either express or implied. There can be no account stated where no account was presented or where any dispute about the account is shown to have existed.").

Similarly, to state a claim for account stated in Delaware, a plaintiff must plead that (1) an account existed between the parties; (2) the defendant stated or admitted to owing a specific sum on the account to the plaintiff; and (3) the defendant made this admission after the original

account or debt was created. *Citibank S.D., N.A. v. Santiago*, No. CPU4-11-005562, 2012 Del. C.P. LEXIS 89, at \*4-5, 2012 WL 592873 (Del. C.P. Feb. 23, 2012); *Chrysler Corp v. Airtemp Corp.*, 426 A.2d 845, 848 (Del. Super. Ct. 1980) ("No recovery can be had under an account stated, unless there was an account agreed upon between the parties, by which the person said to be charged, stated, or admitted a certain sum to be due and owing from him to the other.") (citing 2 *Woolley on Delaware Practice* § 1460 (1906)).

A party is not permitted to rest its claim for account stated on the same set of facts and damages underlying a claim for breach of contract. *See*, 1 Am. Jur. 2d *Accounts and Accounting* § 30 (2020) ("Although a stated account may be a species of a breach of contract claim, it has different elements and is based on a different agreement made at a different time. An action on an account may not be based on an unliquidated claim for breach of contract."); *Centennial El. Indus., Inc. v. New York City Dept. of Citywide Admin. Servs.*, No. 153706/2015E, 2018 N.Y. Misc. LEXIS 2075, at \*20-21 (N.Y. Sup. Ct. May 11, 2018) ("Defendants have demonstrated that the account stated cause of action is predicated upon the same facts as the breach of contract cause of action and seeks the same damages."). In other words, an account stated claim "may not be utilized simply as another means to attempt to collect under a disputed contract." *Martin H. Bauman Assoc., Inc. v. H&M Int'l Transport, Inc.*, 171 A.D.2d 479, 485, 567 N.Y.S.2d 404 (1st Dep't 1991) ("[A]n account stated cannot be made an instrument to create liability when none otherwise exists but assumes the existence of some indebtedness between the parties or an express agreement to treat the statement in question as an account stated.").

Here, the Complaint contains no allegation that Honeywell either promised to pay the disputed invoices or otherwise admitted to owing them. Instead, Locus alleges only that "[p]ursuant to the Contracts, Honeywell agreed to pay . . . within a stipulated period of time.

20

Otherwise, the invoices would accrue interest," and that "Locus presented its invoices to Honeywell, and Honeywell has accepted the invoices." Doc. 1, pp. 20-21, ¶¶ 143-44. Instead, Honeywell has demonstrated that Locus is not entitled to payment of the disputed invoices as a matter of law. *See, supra* § III(B), (C), and (D). And, even if it had not, Locus' conclusory allegations are insufficient to satisfy the *Iqbal* plausibility standard. *See*, *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 199 (S.D.N.Y. 2009) (dismissing account stated claim where "the Complaint . . . fails to provide facts sufficient under *Iqbal* to support the allegation that [defendant] promised to pay the amount stated."); *see also Citibank S.D., N.A.*, 2012 Del. C.P. LEXIS 89 at *5-6 (dismissing complaint that failed to allege that defendant stated or admitted to owing a specific sum); *Sparebank 1 SR-Bank ASA v. Wilhelm Maass GmbH*, No. N19C-02-025 WCC, 2019 Del. Super. LEXIS 568, at *18, 2019 WL 6033950 (Del. Super. Ct. Nov. 5, 2019) (same).

Moreover, the account stated claim should be dismissed because it is duplicative of the breach of contract claim as it is premised on the same set of facts and seeks the same damages. *Centennial El. Indus., Inc.*, 2018 N.Y. Misc. LEXIS 2075 at *20-21. Indeed, the Complaint relies exclusively on alleged violations of "the Contracts" in support of the account stated claim. Doc. 1, p. 20, ¶¶ 140-43. Locus should not be permitted to use an account stated claim "as another means to attempt to collect under [the] . . . contract" or as "an instrument to create liability when none otherwise exists." *Martin H. Bauman Assoc., Inc.*, 171 A.D. 2d at 485; *Centennial El. Indus., Inc.*, 2018 N.Y. Misc. LEXIS 2075 at *20-21. Accordingly, the account stated claim fails as a matter of law and should be dismissed.

### F. LOCUS HAS FAILED TO STATE A CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS.

Locus has failed to state a viable claim for misappropriation of trade secrets as limited by the EIM Agreement[5] and under 6 Del. C. § 2001, *et seq.*,[6] as Locus has failed to assert the existence of any direct damages. "To prove trade secret misappropriation, the plaintiff must demonstrate that: (1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff." *Elenza, Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 721 (Del. 2018).

The Southern District of New York has consistently held that a court "may dismiss a complaint based on a contract if the contract unambiguously shows that the plaintiff is not entitled to the requested relief." *Dyncorp v. GTE Corp.*, 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002) (dismissing complaint based on limitation of liability provision that only permitted recovery of direct damages, which plaintiff did not allege); *see also Negrete v. Citibank, N.A.,* 187 F. Supp. 3d 454, 469 (S.D.N.Y. 2016) (same). Specifically, the Second Circuit has held that a contractual clause limiting liability may apply to claims other than breach of contract and for conduct occurring after the contract at issue is terminated. *My Play City, Inc. v. Conduit Ltd.*, 589 F. App'x 559, 562 (2d Cir. 2014); *Universal Instruments Corp. v. Micro Sys. Eng'g*, No. 3:13-cv-831 (GLS/DEP), 2017 U.S. Dist. LEXIS 124926, at *8-9 n.1, 2017 WL 3396532 (N.D.N.Y. Aug. 8, 2017) (noting in *dicta* that, with regard to plaintiffs' claims, including a claim for

---

[5] Locus generically alleges that "Honeywell drafted and distributed the RFP which disclosed such information in violation of its contractual obligations[,]" (Doc. 1, p. 21, ¶ 150) but fails to identify which contractual obligations Honeywell allegedly violated. However, as the RFP was performed to identify a replacement for Locus' EIM software, the EIM Agreement is the only contract potentially at issue.

[6] Pursuant to Section 12.11 of the EIM Agreement, "[a]ny claim arising under or relating to this Agreement shall be governed by the internal substantive laws of the State of Delaware, without regard to principles of conflict of laws."

misappropriation of trade secrets, the court "agrees with defendants that the lost profit and future lost profit damages which [plaintiff] seeks to recover are either precluded by the limited liability provision of the [parties' agreement], or are speculative.").

For example, in *My Play City*, the Second Circuit analyzed whether a contractual clause that limited potential liability to $5,000 applied to allegations of trademark infringement that involved conduct after the contract at issue was terminated. 589 F. App'x at 562. In holding that the contractual clause applied, the court noted that the clause extended to "any claims arising out of or related to this agreement." *Id.* The court specifically stated that the plaintiff's complaint "naturally enough, describes its trademark infringement claims by reference to the agreements. The infringing conduct was a continuation of the very conduct that [defendant] undertook in performing the contract." *Id.* at 562-63. The court, therefore, reasoned that "[c]laims based on that conduct therefore relate to the agreements[,]" and ultimately held that the limitation of liability clause "applies to the entirety of [plaintiff's] claims in this litigation. [Defendant] is liable for no more than $5,000 here." *Id.* at 563.

This case is nearly identical. Locus alleges that Honeywell, by drafting and distributing the RFP, disclosed certain information in violation of its contractual obligations and the Delaware Trade Secrets Act. Doc. 1, p. 21, ¶ 150. As a result, Locus seeks "damages in an amount to be proven at trial" but identifies no damages. *Id.* at ¶ 153. This is insufficient to state a claim in light of the limiting language of the EIM Agreement. Specifically, Section 11 provides:

> EXCEPT AS PROVIDED BELOW, IN NO EVENT SHALL LOCUS OR CUSTOMER BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES WHATSOEVER, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, AND THE LIKE, ARISING OUT OF THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THE LICENSED PATENTS, OR ANY CONFIDENTIAL INFORMATION, EVEN IF SUCH

23

> PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING THE FOREGOING, LOCUS SHALL BE LIABLE FOR LOSS OF OR LOSS OF INTEGRITY OF CUSTOMER'S DATA, PROVIDED THAT LOCUS' AGGREGATE LIABILITY THEREFOR SHALL BE LIMITED TO $1,000,000.00.

Doc. 1-1, p. 9, § 11. Section 11 of the EIM Agreement, therefore, expressly limits all forms of damages other than direct damages and such limitation applies to all damages "arising out of" the EIM Agreement. Because Locus has failed to allege any damages that would not be excluded by the plain language of the EIM Agreement, Locus' claim for misappropriation of trade secrets should be dismissed as a matter of law.

## IV.     CONCLUSION

Honeywell and Locus maintained a mutually beneficial business relationship for many years, which included Honeywell's paying Locus millions of dollars in fees. Honeywell ultimately determined it was in its best interests to end its relationship with Locus, and it terminated the ePortal services, the EIM Agreement and the RIMS Agreement pursuant to the express terms of the agreements. Unhappy with Honeywell's termination of the relationship, Locus responded by issuing baseless invoices and accusing Honeywell of misappropriating trade secrets. And while Locus has filed a relatively long Complaint crafted to attempt to avoid dismissal, when deconstructed, none of Locus' claims are viable as a matter of law. Accordingly, Honeywell requests that the Court grant its Motion to Dismiss and dismiss Locus' Complaint.

Dated: September 16, 2020

Respectfully submitted,

/s/ Christine M. Haaker
Christine M. Haaker (OH #0063225)
Admitted *Pro Hac Vice*
Sean P. McCormick (OH #0088281)
Admitted *Pro Hac Vice*
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, Ohio 45342
Telephone:  937.443.6600
Facsimile:  937.443.6635
Christine.Haaker@ThompsonHine.com
Sean.McCormick@ThompsonHine.com

Emily J. Mathieu
THOMPSON HINE LLP
335 Madison Avenue, 12th Floor
New York, NY 10017
Telephone:  212.344.3963
Facsimile:  212.344.6101
Emily.Mathieu@ThompsonHine.com

*Attorneys for Defendant Honeywell International Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

LOCUS TECHNOLOGIES,

                                        Plaintiff,            Case No. 1:19-cv-11532-PGG-KHP

v.                                                            Judge Paul G. Gardephe

HONEYWELL INTERNATIONAL INC.,

                                        Defendant.

-------------------------------------------------------------- x

### CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2020, I served Defendant Honeywell International

Inc.'s Notice of Motion to Dismiss the Complaint, Memorandum of Law in support of Motion to

Dismiss the Complaint and the supporting Declarations of William Hague and John Morris by

electronic mail and first class mail enclosed in a securely sealed postage-paid envelope addressed

to the following at the last known address as follows:

John Giardino, Esq.
Alex Barnett-Howell, Esq.
MICHELMAN & ROBINSON, LLP
800 Third Avenue, 24th Floor
New York, New York 10022
jgiardino@mrllp.com
abarnett-howell@mrllp.com
*Attorneys for Plaintiff Locus Technologies*

Dwayne Lunde