**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
LOCUS TECHNOLOGIES,

                         Plaintiff,               Case No. 1:19-cv-11532-PGG-KHP

v.                                         Judge Paul G. Gardephe

HONEYWELL INTERNATIONAL INC.,

                         Defendant.
---------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

 

**MICHELMAN & ROBINSON, LLP**
800 Third Avenue, 24th Floor
New York, New York 10022
(212) 730-7700
*Attorneys for Locus Technologies*
John Giardino, Esq.
Alex Barnett-Howell, Esq.

# Table of Contents

**Page(s)**

I.      **PRELIMINARY STATEMENT** ........................................................................... 1

II.     **FACTS** ............................................................................................................... 2

   A.   **Locus And Honeywell Entered Into A Series Of Contracts** ........................................ 2

      1.   The 2003 Software License Agreement ......................................................... 2

      2.   The October 16, 2012 Order Form ................................................................ 3

      3.   The 2015 Master Services License Agreement to Development New Software Application ...... 4

      4.   The Letter License Agreement ........................................................................ 5

   B.   **Honeywell Improperly Terminated The Contracts After Locus Objected To The Unethical Behavior of Honeywell's Managers** ........................................................................... 5

   C.   **Honeywell Wrongfully Disclosed Locus' Confidential Information And Intellectual Property** 8

III.    **ARGUMENT** ................................................................................................... 9

   A.   **The Standard Of Review For A Motion To Dismiss** ................................................. 9

   B.   **Locus Has Pled A Valid Claim For Honeywell's Breach Of The Order Form** ...................... 10

   C.   **Locus Has Pled a Valid Claim for Honeywell's Breach of the License Agreement** ............... 12

      1.   Honeywell Owes Locus For the Second Half of the 2019 EIM Invoice .................... 13

      2.   Honeywell Owes Locus For the EIM Termination Invoice ................................... 14

   D.   **Locus Has Pled a Valid Claim For Honeywell's Breach of RIMS** ............................... 16

   E.   **Locus Has Pled A Valid Claim Against Honeywell For Account Stated** ........................ 18

   F.   **Locus Has Pled A Valid Claim For Honeywell's Misappropriation Of Trade Secrets** ........... 21

IV.    **CONCLUSION** ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agilent Techs., Inc. v. Kirkland*,
   No. CIV.A. 3512, 2010 WL 610725 (Del. Ch. Feb. 18, 2010)................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................................9, 10

*Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*,
   234 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................................10

*Bonanza Rest. Co. v. Wink*,
   No. CIV.A. S10C-10018, 2012 WL 1415512 (Del. Super. Ct. Apr. 17, 2012),
   *aff'd*, 65 A.3d 616 (Del. 2013).................................................................................................23

*BrandRep, LLC v. Ruskey*,
   No. CV 2018-0541, 2019 WL 117768 (Del. Ch. Jan. 7, 2019) ................................................22

*Brightstar Corp. v. PCS Wireless, LLC*,
   No. CVN18C10250, 2019 WL 3714917 (Del. Super. Ct. Aug. 7, 2019)...............................22

*Chrysler Corp. v. Airtemp Corp.*,
   426 A.2d 845 (Del. Super. Ct. 1980) ........................................................................................20

*Cinefot Int'l Corp. v. Hudson Photographic Indus.*,
   13 N.Y.2d 249 (1963) ................................................................................................................11

*Consol. Energy Design Inc. v. Princeton Club of New York*,
   590 F. App'x 115 (2d Cir. 2015) ...............................................................................................20

*Cont'l Cas. Co. v. Contest Promotions NY, LLC*,
   No. 15-CV-501, 2016 WL 1255726 (E.D.N.Y. Mar. 28, 2016)................................................21

*Crowley v. VisionMaker, LLC*,
   512 F.Supp.2d 144 (S.D.N.Y.2007)...........................................................................................16

*Darby & Darby, P.C. v. VSI Int'l Inc.*,
   95 N.Y.2d 308 (2000) ................................................................................................................19

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010).......................................................................................................10

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)................................................................16

*George v. Richter*,
    No. 11 CIV. 8648, 2014 WL 1666448 (S.D.N.Y. Apr. 25, 2014)...........................13

*Hawes Office Sys., Inc. v. Wang Labs., Inc.*,
    537 F. Supp. 939 (E.D.N.Y. 1982) ......................................................11, 12

*Hydrogen Master Rights, Ltd. v. Weston*,
    228 F. Supp. 3d 320 (D. Del. 2017)......................................................12

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
    679 F.Supp.2d 395 (S.D.N.Y.2009).....................................................18, 20

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007)...............................................................9

*Lankler Siffert & Wohl, LLP v. Rossi*,
    287 F.Supp.2d 398 (S.D.N.Y.2003).....................................................18, 19

*Nat'l Econ. Research Assocs., Inc. v. Purolite C Corp.*,
    No. 08 CIV. 7600, 2011 WL 856267 (S.D.N.Y. Mar. 10, 2011) ...........................19

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
    537 F.3d 168 (2d Cir. 2008)...............................................................21

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
    507 F.3d 117 (2d Cir. 2007)...............................................................10

*Roneker v. Kenworth Truck Co.*,
    977 F. Supp. 237 (W.D.N.Y. 1997) .......................................................23

*ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning
    Servs., Inc.*,
    No. 01 CIV. 2229, 2001 WL 396520 (S.D.N.Y. Apr. 19, 2001)...........................11

*Yiwu Lizhisha Accessories Co. v. Jjamz, Inc.*,
    336 F. Supp. 3d 179 (S.D.N.Y. 2018).....................................................20

**Statutes**

6 Del. C. § 2001(4) ...........................................................................21

6 Del.C. § 2003 ..............................................................................24

Delaware Uniform Trade Secrets Act, 6 Del. C. §§ 2001 et seq ...................................21

MSA § 5.....................................................................................19

## I.   **PRELIMINARY STATEMENT**

For more than fifteen (15) years, Plaintiff Locus Technologies ("Locus") provided Defendant Honeywell International Inc. ("Honeywell") with unique services through use of its proprietary software applications for the collection, management, and regulatory reporting of environmental data. Honeywell consistently lauded these services for their efficiency and comprehensiveness. For these services, Honeywell had only three primary obligations: (1) to pay Locus' invoices in a timely manner; (2) to abide by the contractual terms and conditions governing the use of Locus' software; and (3) to protect Locus' confidential trade secrets and intellectual property.

In 2019, Locus objected to unethical behavior by Honeywell managers. Although Honeywell's manager was eventually terminated for these unethical and arguably illegal acts, Honeywell retaliated by intentionally violating each of these obligations to Locus by improperly contesting or failing to make timely payments on valid invoices, breaching multiple contractual provisions, prematurely terminating its contracts with Locus, and issuing a request for proposal that publicly broadcasted Locus' confidential information and trade secrets to its direct competitors in an attempt to replace Locus' services.

Now, Honeywell has filed a baseless motion to dismiss, dated September 16, 2020 (the "Motion"), composed of false assertions, misinterpretations, and flawed appeals to caselaw. Honeywell's attempt to escape liability falls in the face of the detailed allegations and specific causes of action provided by Locus complaint, dated December 17, 2019 (the "Complaint"). Accordingly, the Motion should be denied in its entirety.

## II.   FACTS

### A.  Locus And Honeywell Entered Into A Series Of Contracts

From 2003 to 2018, Locus and Honeywell entered into four contracts governing the use of Locus' software, the payment procedures for Locus' invoices, and the protection of Locus' intellectual property. Some of the contracts between Locus and Honeywell contained overlapping provisions, while others remained independent. Regardless, Honeywell has managed to breach each contract individually and collectively.

### 1.  The 2003 Software License Agreement

On June 1, 2003, Locus and Honeywell entered into a Software License Agreement (the "License Agreement"), which granted Honeywell a non-exclusive license to use EIM, LocusFocus Portal ("ePortal"), and other Locus products and services. Complaint, ¶¶ 25-27. The License Agreement has three sets of provisions which are relevant to the Complaint and the Motion: (1) the duration of the License Agreement and the grounds for termination; (2) the requirements and deadlines for Honeywell to pay Locus' invoices; and (3) Honeywell's obligation to protect Locus' intellectual property from intentional or inadvertent disclosure. Complaint, ¶ 29.

First, pursuant to § 3.2, the License Agreement ran for an initial three-year term, after which it automatically renewed on a yearly basis for four successive one-year periods, and then continued to automatically renew for successive one-year periods until termination. Complaint, ¶¶ 30-31. Honeywell or Locus could terminate the License Agreement for cause due to a material breach if the offending party failed to cure within 30 days written notice, or for convenience within 60 days after written notice. Complaint, ¶¶ 32-33.

Second, Honeywell was required to pay all invoices within 60 days of the invoice date. Complaint, ¶ 36. If Honeywell objected to an invoice, it had 10 days from receipt to dispute the charge, otherwise the invoice would be accepted as stated. Complaint, ¶ 37. Additionally, if Honeywell failed to dispute and pay an invoice within those time limits, the unpaid invoices would accrue interest at 1.5% per month, with Honeywell liable for all expenses and attorney's fees necessary for recovery. Complaint, ¶¶ 38-40.

Third, and finally, the License Agreement fully protected all of Locus' intellectual property rights, confidential information, and trade secrets. Honeywell was explicitly required to maintain the confidentiality of Locus' software and intellectual property. Complaint, ¶¶ 41-42.

## 2. The October 16, 2012 Order Form

After a decade of operating under the License Agreement, Locus and Honeywell entered into a written order form dated October 16, 2012 (the "Order Form"). The Order Form was designed to benefit both Locus and Honeywell by substantially modifying the License Agreement's billing methodology, invoice frequency, costs, payment schedule, and, most importantly, the software subscription termination policy. Complaint, ¶¶ 43-45.

The Order Form provided Honeywell with significant cost savings and technical improvements over the License Agreement via a simplified fixed pricing structure. Complaint, ¶ 46. In exchange for providing Honeywell with reduced costs and additional services, Locus received payment security and guarantees—specifically, the subscriptions for EIM and ePortal could no longer be terminated on notice, but instead became "noncancelable before their annual End Date." Invoicing was also switched to an annual basis. Complaint, ¶¶ 48-50. Additionally, the Order Form required Honeywell to pay a stipulated transfer fee to cover the cost of transitioning and maintaining Honeywell's data upon the termination of EIM or ePortal. Complaint, ¶ 53. In

short, the Order Form provided Honeywell with pricing and payment advantages, while Locus received guaranteed subscription revenue for the entire year.

Finally, although the Order Form was initially set for a three-year period, Honeywell and Locus continued to operate under the Order Form's terms, in place of the License Agreement for another six (6) years. Complaint, ¶ 54.

3.   The 2015 Master Services License Agreement to Development New Software Application

On January 15, 2015, Locus and Honeywell entered into a Master Services License Agreement (the "MSA") to develop a new software application, known as the Remediation Information Management System ("RIMS"), to better manage Honeywell's environmental and remediation financial data. Complaint, ¶¶ 56-57. The program design and operating parameters were provided in the Statement of Work #01, dated May 1, 2015 (the "SOW"). Complaint, ¶¶ 58-59.

As this was a set contract, Honeywell could only request changes or alterations to the SOW if, per the MSA, it made equitable adjustments to the price and/or delivery dates. Complaint, ¶¶ 62-63. Specifically, the MSA and SOW provided Locus with a fixed fee for defined services, but if Honeywell requested changes or additional services that went beyond the original SOW, Honeywell would be billed for Locus' professional services on a time and materials basis. Complaint, ¶¶ 64, 66.

The MSA also dictated the terms of Locus' invoicing. Honeywell was required to pay invoices within 105 days from receipt of an invoice, and if Honeywell disputed an invoice, it could only withhold the disputed amount. Complaint, ¶¶ 69-70.

4.  The Letter License Agreement

On or about the time Locus was developing RIMS, Honeywell expressed interest in acquiring Locus for its unique software products and technical capabilities. Complaint, ¶ 76. In order to perform a thorough evaluation, Locus and Honeywell entered into a letter license agreement on March 1, 2018 (the "NDA"). The NDA gave Honeywell unprecedented access to Locus' confidential engineering and financial information in exchange for explicit guarantee that Honeywell would protect Locus' confidential information from intentional or accidental disclosure. Complaint, ¶ 77. Specifically, Honeywell was required to:

- "treat confidentially such information that [Locus] furnish[es] to Honeywell after the date hereof";

- "not to use any of the Confidential Information for any purpose other than the purpose of evaluating the possibility of a Transaction";

- "be responsible for any breach of this License Agreement by Honeywell's Representatives"; and

- "take all reasonable measures to restrain Honeywell's Representatives from disclosure or use of the Confidential Information and Transaction Information in violation of this License Agreement."

Complaint, ¶ 78

**B.  Honeywell Improperly Terminated The Contracts After Locus Objected To The Unethical Behavior of Honeywell's Managers**

Honeywell employees violated Honeywell's own ethics policy by regularly demanding that Locus provide "gifts and gratuities" in order to maintain its business relationship with Honeywell. Complaint, ¶¶ 79-80. These "gifts and gratuities," which began as personal electronics or

5

expensive dinners, soon grew into demands for personal vacation packages and the hiring of unnecessary, expensive outside consultants. The worst offender was Honeywell's Project Manager Chris French ("French"), who supervised Locus' contracts and projects and used his management position and control over the Locus contract to extort Locus. Complaint, ¶ 82.

In August 2017, Locus informed Honeywell's upper management of the situation, but Honeywell refused to act or to meet with Locus.[1] As soon as Locus complained about and rejected these demands, Honeywell retaliated by threatening to harm Locus' work and starting to breach the contracts. For example, French was overseeing key parts of RIMS, and began issuing contradictory, self-defeating orders which resulted in escalating costs. Complaint, ¶¶ 61, 87-89. Locus incurred the RIMS expenditures in reliance on the MSA and with the expectation that it would be repaid, as Honeywell was required to provide equitable reimbursement. Complaint, ¶ 90. Instead, once Locus tendered the invoices for the increased RIMS costs, Honeywell refused to pay for any of the overages and began delaying subsequent payments. Complaint, ¶¶ 91-94. For example:

- On March 27, 2018, Locus submitted Invoice No. 982851 in the amount of $4,338 for Honeywell RIMS 2018 project. Honeywell did not pay this invoice until August 10, 2018, 136 days later;

---

[1] Locus would again communicate its concerns about the behavior of Honeywell's managers to the Honeywell Access Integrity Helpline on May 15, 2019. Locus was eventually contacted by Honeywell Global Security, and Locus assisted the investigation by providing detailed evidence and participating in multiple interviews. Shortly afterwards, top managers involved with Locus' projects were let go, forced to retire, or otherwise separated from Honeywell.

- On September 20, 2018, Locus submitted Invoice No. 983060 in the amount of $6,864 for Honeywell RIMS 2018 Enhancements. Honeywell did not pay this invoice until January 29, 2019, 131 days later;

- On October 25, 2018, Locus submitted Invoice Nos. 983108 and 983109 in the amounts of $92,040 for Honeywell RIMS 2019 and $348,855 for Honeywell EIM SaaS 2019. Invoice 983108 was paid on February 26, 2019, 124 days later. Invoice 983109 was paid on February 19, 2019, 117 days later.

Complaint, ¶ 97.

In addition to refusing to pay for the cost overruns and delaying payment on valid RIMS invoices, Honeywell used a sham evaluation process to prematurely terminate the Contracts. Complaint, ¶¶ 99-100.  On June 26, 2018, Honeywell terminated ePortal, and on May 2, 2019 Honeywell terminated EIM, although Honeywell continued to use EIM until Locus was forced to remove access on August 20, 2019. Complaint, ¶¶ 101-103. In both instances, Honeywell's termination occurred long after the annual subscriptions had begun running and would not come into effect until the following year. Likewise, Honeywell terminated RIMS on November 15, 2019. Complaint, ¶ 108.

Although Honeywell had the right to discontinue these projects and contracts, Honeywell was required to pay all outstanding invoices and accrued costs, per the terms of the Contracts. Additionally, as ePortal and EIM were operating under annual subscriptions, Honeywell was required to pay for the remainder of the year. Complaint, ¶ 111. By way of example, Locus identified three invoices which Honeywell has failed to pay:

- On October 13, 2017, Locus submitted Invoice No. 982713 in the amount of $411,970.00 for ePortal. To date, Honeywell has not paid this invoice;

- On April 3, 2019, Locus submitted Invoice No. 983264 in the amount of $359,321.00 for EIM. To date, Honeywell has not paid this invoice;

- On May 15, 2019, Locus submitted Invoice No. 983297 in the amount of $185,702.40 for EIM. To date, Honeywell has not paid this invoice;

- On June 5, 2019, Locus submitted Invoice No. 983318 in the amount of $171,654.30 for ePortal. To date, Honeywell has not paid this invoice; and

- On December 20, 2019, Locus submitted Invoice No. 983566 in the amount of $59,000.00 for RIMS. To date, Honeywell has not paid this invoice.

Complaint, ¶ 110.

Finally, after termination, Honeywell was required to pay a separate data transfer fee, but instead chose to improperly download massive quantities of data from EIM, jeopardizing the platform and violating EIM's Terms of Use Agreement. Complaint, ¶¶ 112-113.

### C. Honeywell Wrongfully Disclosed Locus' Confidential Information And Intellectual Property

On December 20, 2018, Honeywell eclipsed its prior wrongful conduct by publishing a Request for Proposal, Remediation and Redevelopment Group, Environmental Database Management System, Introduction, Instructions and Scope, Project ID-10145 (the "RFP") to Locus' direct competitors. Complaint, ¶ 118. The RFP contained substantial amount of Locus' confidential information, including specific descriptions of Locus' proprietary methods, Locus' award-winning SaaS architecture and workflows, screenshots of Locus' software, and details concerning Locus' costs and billing. For example, the RFP contains:

- The current amounts paid to Locus, which disclosed Locus' confidential pricing structures and License Agreements;

- Charts illustrating Locus' high-level data flow, which disclosed the complete architecture of Locus' EIM software;

- Screenshots of Locus' software setup, which disclosed the parameters and methods that Locus' software utilizes;

- Screenshots of Locus' software outputs, which disclosed the organization, content, and functionality of Locus' software; and

- Data dumps and screenshots of Locus' software, which disclosed the internal tools and processes within Locus' software.

Complaint, ¶ 119. There is no justification or explanation for this disclosure, and despite multiple requests by Locus, Honeywell has refused to withdraw the RFP. Complaint, ¶¶ 120-123.

## III.   <u>ARGUMENT</u>

### A.  The Standard Of Review For A Motion To Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss[,] ... the court is to accept as true all facts alleged in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

Allegations that "are no more than conclusions[ ] are not entitled to the assumption of truth," however. *Iqbal*, 556 U.S. at 679. A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" *id.* at 678, offers "'a formulaic recitation of the elements of a cause of action,'" *id.*, and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). While legal conclusions "can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

"On a motion to dismiss for breach of contract, courts look ... at the contract itself, which by definition is integral to the complaint." *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017) (citing *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011)).

**B. Locus Has Pled A Valid Claim For Honeywell's Breach Of The Order Form**

On June 1, 2003, Locus and Honeywell entered into the License Agreement. By 2012, the License Agreement had long since passed its original three-year term, and was operating under successive one-year terms, automatically renewing at the end of the year. Complaint, ¶¶ 30-31. On

10

October 16, 2012, Honeywell and Locus modified the License Agreement via the Order Form. Complaint, ¶¶ 25-27, 43-45. The Order Form was structured similarly to the License Agreement, as it was set for an initial three-year period (January 1, 2013 to December 31, 2015). However, after this time expired, Honeywell was eager to keep the Order Form's significant reduction in pricing for EIM and ePortal, as well as other benefits, without having to negotiate another contract. Likewise, Locus wanted to maintain the security of guaranteed, noncancelable year-long subscriptions, and was willing to extend and continue operating under the Order Form. From January 1, 2016, Honeywell and Locus both continued to mutually operate under the terms, conditions, and provisions of the Order Form, as if the Order Form had renewed on an annual basis. Complaint, ¶¶ 54-55.

Courts have long held that when reviewing a seemingly-expired yet still-operational contract, if the parties continue "to act as if its time had not run, [it] is sufficient evidentiary support for a finding that the parties in fact intended to keep it alive for another year." *Cinefot Int'l Corp. v. Hudson Photographic Indus.*, 13 N.Y.2d 249, 252 (1963). The doctrine of automatic renewal is valid, regardless of whether the contract contained explicit expiration provisions, when "the undisputed facts show that the parties continued dealing with each other subsequent to expiration of the initial term with no apparent hesitation or distinction…the parties' course of conduct demonstrates their…[authorization of] renewal by mutual assent without written notice." *Hawes Office Sys., Inc. v. Wang Labs., Inc.*, 537 F. Supp. 939, 942 (E.D.N.Y. 1982). If the parties agree by their conduct to maintain an expired contract, *i.e.*, such as by accepting benefits from the supposedly-expired contract, courts have not hesitated to find that the contract has automatically renewed. *ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.*, No. 01 CIV. 2229 (JSM), 2001 WL 396520, at *2 (S.D.N.Y. Apr. 19, 2001) ("The parties submit

no evidence of renewal when the Agreement expired in December 1998. However, because they continued to operate as if the [Agreement] was in place…the parties at a minimum impliedly agreed that the [Agreement] would continue to govern their relationship.") (citations omitted). In short, "courts may infer agreement to renew an express contract from continued performance after expiration of a set term." *Hawes*, 537 F. Supp. at 943.

The facts are not disputed that Honeywell continued dealing with Locus, and there were no distinctions whatsoever to their dealings before or after the Order Form's original contract term expired. Honeywell and Locus, through their combined actions and agreement, extended the Order Form by continuing to perform under the Order Form's terms after December 31, 2015, without ever reverting back to the License Agreement. That there is no signed writing formally extending the Order Form is immaterial—it would be absurd for Honeywell, after benefiting from the Order Form for years, to rewrite history by claiming that the Order Form terminated on December 31, 2015. Honeywell continued to enjoy the Order Form's reduced prices and complied with the Order Form's terms and conditions, without ever reverting back to the License Agreement. It is disingenuous and unjust for Honeywell, after receiving the benefit of the bargain, to retroactively void the Order Form in order to deny Locus the annual subscriptions.[2]

## C.  Locus Has Pled a Valid Claim for Honeywell's Breach of the License Agreement

Under Delaware law a Plaintiff  "must allege facts plausibly demonstrating: '(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff" to bring cause of action for breach of contract. *Hydrogen Master Rights, Ltd. v.*

---

[2] Notably, Honeywell seeks to retain the benefits derived from the Order Form as it does not offer to repay the difference in price between the Order Form and the License Agreement from December 31, 2015 onwards.

*Weston,* 228 F. Supp. 3d 320, 333 (D. Del. 2017) (quoting *H-M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 140 (Del. Ch. 2003)).

Locus has alleged that Honeywell failed to pay invoices due under the Order Form and License Agreement, and also incurred penalties due to late payments. In response, Honeywell asks the Court to ignore Locus' facts in favor of its own. This is impossible, as Honeywell cannot substitute its own opinions and interpretations in place of Locus' well-pled facts. *See George v. Richter*, No. 11 CIV. 8648, 2014 WL 1666448, at *1 (S.D.N.Y. Apr. 25, 2014) ("[F]acts taken from the Complaint are accepted as true.").

1. Honeywell Owes Locus For the Second Half of the 2019 EIM Invoice

As discussed *supra*, Locus and Honeywell were still operating under the Order Form and License Agreement into 2019. The terms and purpose of the Order Form are not in dispute: Locus provided Honeywell with superior terms from the License Agreement in exchange for noncancelable, annual subscriptions for EIM and ePortal.

Locus never agreed to terminate the License Agreement on June 30, 2019, or to waive its annual subscription. Instead, Honeywell requested that Locus separate its annual invoice into two separate bills for accounting purposes (January 1 to June 30, 2019, and July 1 to December 31, 2019), which Locus agreed to do. That Locus agreed to split the annual invoice does not and cannot establish that Locus agreed to forfeit its annual subscription, or that Locus was even aware that Honeywell intended to prematurely terminate their agreements. In response, Honeywell has only produced the six-month invoice itself, and has provided no other evidence that Locus agreed to waive the second half of its contractual fees.

Additionally, Honeywell claims that it could terminate the License Agreement on sixty days' notice, regardless. However, as discussed *supra*, the ability to unilaterally terminate on notice was one of the primary things which Honeywell relinquished in exchange for the price reductions and improved services under the Order Form. As Honeywell continued to operate under and benefit from the Order Form into 2019, Honeywell was still bound by its terms. As a result, Honeywell had no right to terminate the License Agreement prematurely, making Honeywell liable for all remaining invoices.

2. <u>Honeywell Owes Locus For the EIM Termination Invoice</u>

As is becoming apparent, Honeywell persists in its attempts to ignore the Order Form. The Order Form clearly and unambiguously states that Honeywell must pay fees to compensate Locus for transferring its data upon termination. As discussed *supra*, the Order Form remained in effect at the time of termination, as evidenced by Honeywell and Locus' actions and continued operation under its terms. Honeywell cannot now attempt to escape liability, after benefiting from the Order Form for years, by claiming that it had no further obligation.

Separately, Honeywell breached Locus' Terms of Use Agreement.[3] Honeywell feigns ignorance, but as Locus provides software-as-a-service, Honeywell was required to comply with

---

[3] Locus' Terms of Use Agreement is automatically accepted by logging into the Locus' software is published live on Locus' EIM website at the time when Honeywell's improper downloads occurred. The Terms of Use can be accessed at: https://www.locustec.com/terms-of-use/. The Terms of Use state, in relevant part: "Usage Restrictions. Customer will not…<u>(j) attempt to download entire Customer database(s) without prior approval by LOCUS</u>, (j) frame or mirror any part of any Service or Content, other than framing on Customer's own intranets or otherwise for its own internal business purposes or as permitted in the Documentation, (k) except to the extent permitted by applicable law, disassemble, reverse engineer, or decompile a Service or Content or access it to (1) build a competitive product or service, (2) build a product or service using similar ideas, features, functions or graphics of the Service, (3) copy any ideas, features, functions or graphics of the Service, or (4) determine whether the Services are within the scope of any patent." Although Honeywell had exclusive ownership of data, Honeywell had no right to violate its

the Terms of Use. These Terms of Use prevented Honeywell from taking certain actions which would destabilize or harm Locus' products. However, in an attempt to circumvent the Order Form, Honeywell impermissibly ripped its data from Locus' servers, violating the Terms of Use Agreement and putting Locus' software and other customers at risk. This breach is separately compensable from the Order Form and the License Agreement.

   3.   <u>Honeywell Owes Locus for the ePortal Invoice and Final EIM Invoices</u>

   As discussed in detail *supra*, ePortal and EIM were both governed by the License Agreements and the Order Form. Both ePortal and EIM had noncancelable annual subscriptions, requiring Honeywell to give notice at least 60 days prior to the end of the year if it wished to terminate the contracts. Honeywell did not terminate ePortal and EIM before their annual subscription began, and Locus only acknowledged that Honeywell would discontinue usage on a certain date. Therefore, Honeywell is liable for the unpaid ePortal invoice.

   As for Honeywell's late payments, it misunderstands the contract and basic math. Under the terms of the License Agreement, all invoices had to be paid within 60 days, although this was extended to 90 days under the Order Form, whereas the MSA required all invoices to be paid within 105 days. The payment terms from the MSA were not applicable to the Order Form or the License Agreement, despite Honeywell's fixation on the MSA's payment terms. However, Honeywell regularly refused to make timely payments for all three contracts. In one example, Locus submitted two invoices, one for EIM and one for RIMS, on October 25, 2018. Locus did not receive payment until February 19 and 26, 2019, 119 and 124 days late, respectively. Complaint, ¶ 95. Per the terms of the Order Form and License Agreement, EIM invoices had to be

---

contractual obligations, and Honeywell has admitted as much in subsequent conversations with Locus.

paid within 90 days, whereas it took Honeywell 119 days to pay, while RIMS required payment within 105, while Honeywell took 124 days to pay. That Honeywell delayed issuing a purchase order for 18 days is not an excuse, especially given Honeywell's clear contractual mandate to pay all invoices within the stipulated period, and because the purchase orders were not part of the License Agreement, Order Form, MSA, or SOW. Instead, these late payments were part of Honeywell's scheme to damage Locus by constantly delaying valid invoices, thereby interrupting Locus' cash flow.

### D. Locus Has Pled a Valid Claim For Honeywell's Breach of RIMS

In order to "make out a viable claim for breach of contract a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citations omitted). A motion to dismiss is only granted when the language of a contract is clear and unambiguous. *Crowley v. VisionMaker, LLC,* 512 F.Supp.2d 144, 152 (S.D.N.Y.2007).

On January 15, 2015, Locus began working on RIMS pursuant to the contractual provisions contained with the MSA and SOW. Complaint, ¶¶ 56-57. As the SOW was a set contract, Honeywell could only request changes in exchange for equitable adjustments. Complaint, ¶¶ 62-63. As a set contract, the MSA and SOW provided Locus with fixed fees for defined services and fixed scope of work, but if Honeywell requested changes or additional services that went beyond the original SOW, Honeywell would be billed for Locus' professional services on a time and materials basis ("T&M"). Complaint, ¶¶ 64, 66. Costs were broken into two separate sections in Schedule 9: Section I provided for the fixed fee engagement, whereas Section II required Honeywell to pay for Locus' professional services fees. Specifically,

The following fee schedule sets forth the maximum fees to be used when calculating project fees for Services under this SOW that are billed on a time and materials basis. <u>All extra work</u>, including Honeywell added administrative tasks that were not identified in the Locus Proposal date 5 September 2014 <u>will be billed on Time and Material basis</u>. (emphasis added).

Finally, the MSA required Honeywell to pay invoices within 105 days from receipt of an invoice, and if Honeywell disputed an invoice, it could only withhold the disputed amount. Complaint, ¶¶ 69-70.

Here, Honeywell does not dispute that RIMS is a contract, Locus performed, and that Honeywell has failed to pay approximately $700,000 of RIMS invoices, thereby breaching the agreement and damaging Locus. This, by itself, should be the end, as Locus has met the pleading standard for a breach of contract. Instead, Honeywell attempts to substitute its own facts by claiming that the RIMS disputes were previously settled, and that Locus agreed to waive the remainder of its resulting fees and damages.

Honeywell's claims are fatally flawed. First, although Honeywell is welcome to dispute Locus' factual allegations at a later date, it is inappropriate to do so within the confines of a motion to dismiss.

Second, Honeywell is simply wrong. As Locus has alleged, Locus was directed by Honeywell to perform additional authorized work, as proven by numerous emails and correspondence from Honeywell. The additional work for RIMS quickly grew due to Honeywell's constantly changing demands and causing Locus to incur substantial costs in reliance on these changes.

In October 2017, Locus agreed to a limited settlement regarding payment of RIMS software subscription fees, or Part I of RIMS SOW. Honeywell and Locus never settled T&M billings for RIMS, or Part II of SOW. To date, Honeywell has refused to pay Locus' T&M invoices for RIMS, despite being obligated to do so. In short, although Locus reached a limited settlement with Honeywell regarding invoices for software SAAS fees, Locus has never agreed to settle or forgo the T&M invoices. The documents to which Honeywell cites do not demonstrate any sort of final settlement agreement, and Honeywell has, in conclusory, self-serving fashion, alleged that the unpaid and late invoices are moot. Therefore, Honeywell's request to dismiss Locus' claim for breach of contract based on RIMS must be denied.

### E.  Locus Has Pled A Valid Claim Against Honeywell For Account Stated

An account stated, "refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *Lankler Siffert & Wohl, LLP v. Rossi,* 287 F.Supp.2d 398, 407 (S.D.N.Y.2003) (citations omitted). In order to allege a claim for account stated, a plaintiff "must plead that: (1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated." *IMG Fragrance Brands, LLC v. Houbigant, Inc.,* 679 F.Supp.2d 395, 411 (S.D.N.Y.2009) (citations omitted). Critically, both the second and third elements "may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment." *Houbigant,* 679 F.Supp.2d at 411 (citations omitted); *accord Interman Indus. Prods.,* 37 N.Y.2d at 154 ("[W]hile the mere silence and failure to object to an account stated cannot be construed as an agreement to the correctness of the account, the factual situation attending the particular transactions may be such that, in the absence of an objection made within a reasonable time, an implied account stated may be found." (citations omitted); *see also Rossi,* 287 F.Supp.2d at 407 ("[A]n agreement to pay an

indebtedness may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable amount of time.").

In order to "defeat a claim for account stated, a client's objection must be timely made," as objections "*made for the first time upon the commencement of proceedings will not suffice*." (emphasis added). *Feldman,* 2002 WL 31385826, at *5. General, vague, or unsubstantiated claims of disputes or issues concerning the invoices are insufficient. *See*, *e.g.*, *Rossi,* 287 F.Supp.2d at 408; *Darby & Darby, P.C. v. VSI Int'l Inc.,* 95 N.Y.2d 308, 312 (2000); *Nat'l Econ. Research Assocs., Inc. v. Purolite C Corp.*, No. 08 CIV. 7600, 2011 WL 856267, at *2–3 (S.D.N.Y. Mar. 10, 2011).

The first element of Locus' claim for account stated is not in doubt. Locus and Honeywell entered into the License Agreement, the Order Form, and the MSA. Complaint, ¶¶ 25-78. These contracts provided the terms and conditions under which Locus would provide services, when Locus would submit invoices, how Honeywell could dispute invoices, and how long Honeywell had to pay undisputed invoices. For example, under § IV of the License Agreement, Honeywell was required to dispute certain invoice within ten days of receipt. If Honeywell failed to do so, Honeywell would be required to pay the invoice within 60 days, or else incur an interest rate of 1.5% per month. Compliant, ¶¶ 35-38. This was modified by the Order Form, which converted the EIM and ePortal subscription licenses to annual invoicing, but gave Honeywell 90 days to pay. Compliant, ¶¶ 48-50, 55. Separately, under § 5 of the MSA, Honeywell was required to pay all undisputed invoices within 105 days, and could only withhold payment on specific items, after which it had to enter into a good faith effort to resolve the dispute. Compliant, ¶¶ 69-71.

Locus regularly billed Honeywell for services rendered and submitted invoices that Honeywell did not object to at the time. Compliant, ¶¶ 95, 97, 110, 114-15. Locus has presented

Honeywell with multiple invoices for these services which have either gone unpaid, or else payments were made long after the mandated period, triggering late fees. Complaint, ¶¶ 6-7, 55, 69, 95, 110. Honeywell then failed to make timely payments. Therefore, Locus has clearly established that its "account" has been "presented" to Honeywell.

In response, Honeywell vaguely claims that it never "promised" to pay the invoices. Honeywell fails to grasp that a claim for account stated does not require some separate agreement to pay an invoice. Instead, the "second and third requirements (acceptance of the account as correct and a promise to pay the amount stated) may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time." *IMG Fragrance Brands*, 679 F. Supp. 2d at 411–12 (citations omitted); *see also Consol. Energy Design Inc. v. Princeton Club of New York*, 590 F. App'x 115, 116 (2d Cir. 2015) (holding that a claim for account stated was properly alleged when plaintiff claimed that an "invoice was delivered to and received and retained by the [defendant] without any objection to the contents of said statements."); *see also Yiwu Lizhisha Accessories Co. v. Jjamz, Inc.*, 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018) (holding that the failure to "object in writing" meets the second elements of account stated, and a "debtor's partial payment of a debt is evidence of its implied agreement to pay" meets the third element of account stated).[4] Honeywell accepted Locus' invoices and failed to raise any timely dispute about them. Acceptance combined with silence established the second and third elements of Locus' claim for account stated. *IMG Fragrance Brands*, 679 F. Supp. 2d at 411–12.

---

[4] This issue is similarly discussed in *Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 849 (Del. Super. Ct. 1980), where the court analyzed the plaintiff's allegations that it had "perform[ed] certain services" and submitted "invoices…for such services" to the defendant. The court held that the "the validity of the alleged account stated…must turn on whether [the defendant] had an underlying liability to support the account stated."

In an attempt to avoid this result, Honeywell argues that Locus' claim for account stated duplicates its claim for breach of contract. Again, this is incorrect. A claim is not duplicative of another when the damages are distinguishable. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) ("Thus, when a party has both a claim for account stated and a claim under a contract that provides for an award of attorneys' fees, the claims for breach of contract and account stated are not duplicative."); *see also Cont'l Cas. Co. v. Contest Promotions NY, LLC,* No. 15-CV-501, 2016 WL 1255726, at *4 (E.D.N.Y. Mar. 28, 2016). Here, Locus claim for account stated may be limited to the actual unpaid invoices, whereas Locus' claim for breach of contract allows for a much broader scope of compensatory and punitive damages, as well as attorney's fees. Therefore, Honeywell's request to dismiss Locus' claim for account stated must be denied.

### F.  Locus Has Pled A Valid Claim For Honeywell's Misappropriation Of Trade Secrets

Under Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. §§ 2001 et seq, a "trade secret" is defined as information that both "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 6 Del. C. § 2001(4). DUTSA further defines "misappropriation" as the:

> b.    Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> 2.    At the time of disclosure or use, knew or had reason to know that his knowledge of the trade was:
>
> B.    Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use 6 Del.C. § 2001.

In order to "survive a motion to dismiss a DUTSA claim under Rule 12(b)(6), the complaint must plead four elements:

> (i)     A trade secret exists;
>
> (ii)    The plaintiff communicated the trade secret to the defendant;
>
> (iii)   The communication was made pursuant to an express or implied understanding that the defendant would maintain the secrecy of the information; and
>
> (iv)    The trade secret has been misappropriated within the meaning of that term as defined in the DUTSA.

*Brightstar Corp. v. PCS Wireless, LLC*, No. CVN18C10250, 2019 WL 3714917, at *4 (Del. Super. Ct. Aug. 7, 2019); *see also BrandRep, LLC v. Ruskey*, No. CV 2018-0541, 2019 WL 117768, at *7 (Del. Ch. Jan. 7, 2019).

Here, Locus alleges—and Honeywell does not dispute—each necessary element. Specifically, Locus has alleged that it expended significant time and effort in developing its trade secrets, and that its trade secrets are of substantial value to its competitors. Complaint, ¶¶ 147-148. Locus communicated its trade secrets to Honeywell throughout the course of its business relationship, and Honeywell was required to protect Locus' confidential materials, intellectual property, and pricing structures. Complaint, ¶ 149. Honeywell's obligation to maintain Locus' trade secrets was both explicitly stated in the License Agreement, Order Form, and NDA, but also was based upon an independent, implicit understanding that Honeywell would protect Locus' trade secrets. Complaint, ¶¶ 40, 78. Yet, despite Honeywell's contractual obligations and implicit understanding, Honeywell misappropriated Locus' trade secrets by deliberately and recklessly issuing the RFP and broadcasting Locus' confidential information, trade secrets, and pricing structures to Locus' direct competitors. Complaint, ¶¶ 118-120, 150-151.

These allegations are sufficient to survive a motion to dismiss and Honeywell does not deny its actions. Instead, Honeywell argues that all intellectual property claims are nullified by the damages limitation clause in Section 11 of the License Agreement ("Section 11"). Honeywell's argument is fatally flawed. First, although Locus is not even required to allege damages at the motion to dismiss stage, Honeywell's actions constitute direct harm. Honeywell provided Locus' competitors with access to some of Locus' most confidential trade secrets with the goal of developing products capable of replacing Locus. Honeywell's actions have directly damaged Locus, there is nothing that "consequential" or "incidental" about Locus' claims. *See Bonanza Rest. Co. v. Wink*, No. CIV.A. S10C-10018, 2012 WL 1415512, at *3 (Del. Super. Ct. Apr. 17, 2012), *aff'd*, 65 A.3d 616 (Del. 2013) ("Because the [contracts]…do not define the terms 'actual damages' or 'consequential damages,' the Court presumes the parties intended their ordinary meaning….Direct damages are those inherent in the breach…[and] are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong."); *see also Roneker v. Kenworth Truck Co.*, 977 F. Supp. 237, 239 (W.D.N.Y. 1997) ("Direct damages…are those which are the natural and probable consequence of the breach….the precise demarcation between direct and consequential damages is a question of fact ... [which] must be left for resolution at trial.") (citations and internal quotations omitted).

Second, Honeywell's obligation to protect Locus' trade secrets was both explicitly provided in the Order Form and the NDA and implicit throughout their business relationship, none of which contain any limitation or restriction on damages. The requirement that Honeywell had to maintain Locus' trade secrets was not solely restricted to the EIM Agreement.

Finally, Honeywell misrepresents both the scope of Section 11 and the allegations in the Complaint. Section 11 states that there is a limitation of damages for "CONSEQUENTIAL,

23

INDIRECT, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES." Notably, this language does not limit direct, actual, compensatory, or statutory damages, nor does it prevent Locus from bringing claims for trade secret misappropriation, nor does it limit Honeywell's liability for the disclosure of confidential information. Damages arising from the misappropriation of trade secret are, by definition, direct and/or compensatory damages—which are not limited by Section 11 of the EIM Agreement. *See* 6 Del.C. § 2003 ("Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."); *see also Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512, 2010 WL 610725, at *27 (Del. Ch. Feb. 18, 2010) ("Compensatory damages in actions for trade secret misappropriation, and in analogous patent infringement cases, are generally determined by 'the difference between the plaintiff's position before and after the misappropriation of his secret.' The loss suffered by the plaintiff, such as lost profits, is the usual indicator of damage; but, in cases where a specific injury to the plaintiff cannot be established, the defendant's actual gain may be considered.") (*quoting Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir.1974)).

The Order Form, the NDA, and Honeywell's implied understanding all required Honeywell to protect Locus' trade secrets and confidential information, and none contain any restrictions on damages. Moreover, Honeywell's actions have directly damaged Locus, and nothing in Section 11 limits Locus' ability to bring claims for direct damages, nor does Section 11 categorically bar claims for misappropriation of trade secrets. Therefore, Honeywell's request to dismiss Locus' claim for misappropriation of trade secrets must be denied.

## IV.    __CONCLUSION__

For the reasons herein, Defendants' Motion to Dismiss should be denied in its entirety. However, in the event the Court grants the Motion to Dismiss in any respect, Plaintiff respectfully requests leave to amend its Complaint pursuant to Rule 15(a)(2) to address any alleged deficiencies.

Dated: October 28, 2020

MICHELMAN & ROBINSON, LLP

By:    */s/*John Giardino
       John Giardino, Esq.
       Alex Barnett-Howell, Esq.
       800 Third Avenue, 24th Floor
       New York, New York 10022
       (212) 730-7700
       jgiardino@mrllp.com
       abarnett-howell@mrllp.com
       *Attorneys for Plaintiff Locus*
       *Technologies*
