UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOCUS TECHNOLOGIES,

                              Plaintiff,

        - against -

HONEYWELL INTERNATIONAL INC.,

                              Defendant.

**ORDER**

19 Civ. 11532 (PGG) (KHP)

PAUL G. GARDEPHE, U.S.D.J.:

            Plaintiff Locus Technologies filed this diversity action against Defendant

Honeywell International Inc., asserting claims for breach of contract, account stated, and

misappropriation of trade secrets. (Cmplt. (Dkt. No. 1) ¶¶ 124-53) These claims arise out of a

16-year business relationship between the parties, during which Defendant utilized Plaintiff's

proprietary software products, pursuant to contractual agreements. Plaintiff alleges that

Defendant breached the parties' underlying contracts; did not make payments required by those

agreements; and disclosed Plaintiff's proprietary information, in violation of Defendant's

contractual obligations and the Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. §

2001, et seq. (Id. ¶¶ 25-153)

            Defendant has moved to dismiss for failure to state a claim, pursuant to Fed. R.

Civ. P. 12(b)(6). (Dkt. No. 36) On November 19, 2020, this Court referred the motion to

Magistrate Judge Katharine H. Parker for a Report and Recommendation ("R&R"). (Dkt. No.

42) On April 7, 2021, Judge Parker issued an R&R recommending that Defendant's motion be

denied, except as to certain invoices that are the subject of Plaintiff's account stated claim.

(R&R (Dkt. No. 51))  On April 21, 2021, Defendant filed objections to Judge Parker's R&R. (Def. Obj. (Dkt. No. 54))

For the reasons stated below, Defendant's objections will be overruled, the R&R will be adopted in its entirety, and Defendant's motion to dismiss will be denied except as to certain invoices that are the subject of Plaintiff's account stated claim.

## BACKGROUND

I.    FACTS[1]

Plaintiff Locus Technologies is a California corporation with its principal place of business in California.  It develops software applications that enable property owners and site managers to collect, manage, and report environmental data to government regulators.  (Cmplt. (Dkt. No. 1) ¶¶ 2, 18)  Defendant Honeywell International Inc. is a Delaware corporation with its principal place of business in North Carolina.  (Id. ¶ 19)  Between 2003 and 2018, the parties entered into (1) a Software License Agreement (the "License Agreement") and "Order Form"; (2) the "RIMS Agreement"; and (3) a non-disclosure agreement.

### A.    License Agreement and Order Form

On June 1, 2003, Plaintiff and Defendant entered into the License Agreement, which grants Defendant a non-exclusive license to use several of Plaintiff's software products. (Id. ¶¶ 25-27; id., Ex. 1 (License Agreement) (Dkt. No. 1-1) at 3)[2]  Exhibit B to the License Agreement – entitled "Scope of Work, Services and Maintenance" – specifies the scope of Plaintiff's obligations with respect to its products, including that it would make specific

---

[1]  The facts set forth in this Order are drawn from the Complaint and the documents incorporated therein, and are presumed true for purposes of resolving Defendant's motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[2]  The page numbers referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

modifications to Plaintiff's products and provide training and technical support.  (License

Agreement (Dkt. No. 1-1) at 15-17)  The products licensed to Defendant include (1) the

Environmental Information Management module (the "EIM"), a "cloud-based . . . data

management and compliance system for the environmental industry"; and (2) the LocusFocus

Portal ("ePortal"), a "web portal for multiple Honeywell sites that includes tools for document

storage and management, a task/schedule management tool[,] . . . and other collaboration

applications." (Cmplt. (Dkt. No. 1) ¶ 22; License Agreement (Dkt. No. 1-1) at 15)

      The License Agreement has an initial three-year term, and provides for annual

automatic renewal for four successive one-year periods unless Defendant gives Plaintiff written

notice of its intent to terminate the agreement 60 days prior to the renewal term.  (License

Agreement, § 3.2 (Dkt. No. 1-1) at 4)  Thereafter, the agreement automatically renews annually

for a one-year term, unless either party terminates the agreement.  (Id.)  Both parties have the

right to terminate for cause in the event of the other party's material default, as long as the

default is not cured within 30 days of written notice.  (Id. § 6.2, at 5)  In addition, Defendant has

the right to terminate the contract for its convenience upon 60 days' notice to Plaintiff.  (Id. §

6.3, at 6)

      Under the License Agreement, Plaintiff was to bill Defendant on a monthly or bi-

monthly basis, with payment due to Plaintiff within 60 days of the invoice date.  (Id., Ex. E, §

IV, at 34)  Unpaid invoices would accrue interest at a rate of 1.5% per month beginning on the

thirty-first day of the month.  (Id.)

      Section 7.3 of the License Agreement describes Defendant's obligation to

"safeguard the right to access the Locus Software and other software installed on Locus's

Application Server using the . . . standard of care . . . [Honeywell] uses for its similar confidential materials, but in no event less than reasonable care." (Id. at 7)

Section 12.5 of the License Agreement provides that

> [n]o amendments or modifications shall be effective unless in writing signed by authorized representatives of both parties. These terms and conditions will prevail notwithstanding any different, conflicting or additional terms and conditions that may appear on any purchase order, acknowledgement or other writing not expressly incorporated into this Agreement.

(Id. § 12.5, at 10 (the "written modification provision"))

From 2003 to 2012, "[t]he License Agreement remained in full force and effect." (Cmplt. (Dkt. No. 1) ¶ 34)  On October 16, 2012, the parties executed a written order form (the "Order Form") with an effective date of January 1, 2013 and a "Contract End Date" of December 31, 2015.  (Id., Ex. 2 ("Order Form") (Dkt. No. 1-2) at 2)  The Order Form incorporates the License Agreement by reference, except as to certain modified terms.  (See id. at 3 ("This legally binding Order Form is governed by the Software License Agreement between Honeywell International, Inc. and Locus Technologies dated 1 June 2003."))  Plaintiff asserts that the Order Form constitutes "an amendment of the License Agreement." (Cmplt. (Dkt. No. 1) ¶ 43)

According to Plaintiff, the Order Form amends the pricing structure, termination fee, cancellation procedure, and costs associated with Defendant's subscriptions to ePortal and EIM.  (Id. ¶ 45)  As to pricing, the License Agreement has a line-item pricing structure (see License Agreement, Ex. C (Dkt. No. 1-1) at 18-23), while the Order Form provides for a fixed annual price for year-long subscriptions to EIM and ePortal (Order Form (Dkt. No. 1-2) at 2). And in place of the License Agreement's monthly or bi-monthly billing periods, the Order Form provides for annual invoicing.  (Order Form (Dkt. No. 1-2) at 2)  And while the License Agreement has a 60-day deadline to pay invoices, the Order Form provides for a 90-day

deadline.  (Id.)  As to termination, the Order Form provides for a fee based on the volume of data that Plaintiff would have to return to Defendant.  (Id. at 3 ("Program termination fee is $100 + 0.005 per record for data provided on DVD. . . ."))  And while the License Agreement permits Defendant to terminate the contract upon 60 days' notice (see License Agreement (Dkt. No. 1-1) at 6), the Order Form states that "[s]ubscriptions are noncancelable before their annual End Date," which is the last day of the year in which the Order Form is in effect (Order Form (Dkt. No. 1-2) at 3).

        According to Plaintiff, these modifications to the License Agreement "provided Honeywell with pricing and payment advantages and Locus with annual revenues from the subscriptions."  (Cmplt. (Dkt. No. 1) ¶ 51)  The Order Form states that its "pricing structure . . . provides Honeywell . . . with significantly discounted pricing from Locus' standard rate sheet," and that the Order Form's pricing structure is "strictly confidential."  (Order Form (Dkt. No. 1-2) at 3)

        According to Plaintiff, the parties "continued to operate under the Order Form's terms from January 1, 2013 through [the filing of the Complaint in December 2019]."  (Cmplt. (Dkt. No. 1) ¶ 54; see id. ¶ 55 ("Locus submitted annual invoices using the Order Form's pricing structure and Honeywell paid the annual invoices in accordance with the terms of the Order Form."))

        On June 26, 2018, however, Defendant terminated its ePortal subscription (id. ¶ 101), and on October 24, 2018, Defendant informed Plaintiff that it planned to issue a request for proposal ("RFP") for a new environmental database management system to replace EIM. Defendant also asked to switch the billing period in 2019 from annual to quarterly.  (Id. ¶¶ 116-17)  Plaintiff agreed to a bi-annual billing.  (Id. ¶ 117)  On May 2, 2019, Defendant terminated

its EIM subscription.  (Id. ¶ 102)  According to Plaintiff, "Honeywell continued using EIM, despite having only paid for six months, until Locus was forced to remove Honeywell's access on August 20, 2019."  (Id. ¶ 103)  Plaintiff contends that, although Defendant terminated its ePortal and EIM subscriptions, Defendant was required to pay the fees associated with these annual subscriptions for the remainder of, respectively, 2018 and 2019, pursuant to the Order Form's cancellation provisions.  (Id. ¶¶ 110-11)

Plaintiff further alleges that, "[b]eginning in 2017," Defendant regularly delayed payment on Plaintiff's invoices, and, in 2019, Defendant did not make any payment on certain invoices.  (Id. ¶¶ 95, 110-11, 114-15)  For example, on October 25, 2018, Plaintiff issued Invoice No. 983109 in the amount of $348,855 for EIM services during the first half of 2019 (the "EIM First Half Invoice").  The invoice contained a 90-day payment term, but Defendant did not pay the invoice until February 19, 2019 – 117 days after the invoice had been issued.  (See Cmplt. (Dkt. No. 1) ¶ 95; Hague Decl., Ex. D (Dkt. No. 39-4) at 2)[3]  On April 3, 2019, Plaintiff issued Invoice No. 983264 in the amount of $359,321 for EIM services during the second half of 2019 (the "EIM Second Half Invoice").  (Id. ¶ 110)  On May 15, 2019 – after Defendant terminated its EIM subscription – Plaintiff issued Invoice No. 983297 (the "EIM Termination Fee Invoice") in the amount of $185,702.40, representing the data transfer fee described in the Order Form.  (Id. ¶¶ 110, 114)  On June 5, 2019, Plaintiff issued Invoice No. 983318 in the amount of $171,654.30 for ePortal services from August to December 2018 (the "ePortal Invoice").  (Id. ¶ 110; Morris Decl., Ex. A (Dkt. No. 38-1))  Defendant has not paid the EIM Second Half Invoice, the EIM Termination Fee Invoice, or the ePortal Invoice.  (Cmplt. (Dkt. No. 1) ¶¶ 110, 114)

_____

[3]  Although Plaintiff's invoices are not attached to the Complaint, they may nonetheless be considered by this Court, because they are incorporated by reference in the Complaint.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted).

On December 20, 2018, Defendant issued an RFP soliciting bids to replace the EIM software. (Id. ¶ 118) According to Plaintiff, Defendant's RFP disclosed Plaintiff's "confidential pricing structures," the "high level data flow" of the EIM software, "parameters and methods" of Plaintiff's products, and "software output" and "[d]ata dumps" of these products. (Id. ¶ 119) Plaintiff complains that the RFP disclosed Plaintiff's confidential information and intellectual property and was "designed to inflict as much damage to Locus and its business as possible." (Id. ¶ 120)

## B.   RIMS Agreement

In 2015, the parties entered into a separate contract for Plaintiff to develop a software application known as the Remediation Information Management System ("RIMS"). (Id. ¶ 56) This project is governed by a Master Services License Agreement (the "MSA"), dated January 15, 2015, and a Statement of Work (the "SOW"), dated May 1, 2015 (collectively, the "RIMS Agreement"). (Id. ¶¶ 56-59; id., Ex. 3 ("MSA") (Dkt. No. 1-3); id., Ex. 4 ("SOW") (Dkt. No. 1-4)) The MSA authorizes Defendant to alter the scope of the Statement of Work through a specified process. (Cmplt. (Dkt. No. 1) ¶ 62) If the proposed changes altered the cost or schedule of the Statement of Work, Defendant is required to make "equitable adjustments to the SOW price and/or order delivery dates." (Id. ¶ 63; see MSA, § 2.1 (Dkt. No. 1-3) at 3; SOW (Dkt. No. 1-4) at 26-27) Plaintiff may also charge Defendant for "extra time and resources beyond the expectations" established by the original project scope, as set forth in the Statement of Work. (See Cmplt. (Dkt. No. 1) ¶ 64; SOW (Dkt. No. 1-4) at 4)

The MSA states that "[p]ayment terms are net 105 days from receipt of a correct invoice and conforming Services and Deliverables," and that "[p]ayment will be scheduled for the first payment cycle following expiration of the net terms period." (MSA, § 5.4 (Dkt. No. 1-

3) at 5)  If Defendant disputes an invoice, it is entitled to withhold the disputed amount, but is required to pay the remaining undisputed balance and then use its best efforts to settle the dispute in good faith.  (Id., §§ 5.4, 14.11 (Dkt. No. 1-3) at 5, 13)

Plaintiff asserts that Defendant regularly delayed payment due on RIMS invoices. (Cmplt. (Dkt. No. 1) ¶ 95)  For example, invoices dated March 27, 2018, September 20, 2018, and October 25, 2018 were respectively paid 136, 131, and 124 days after they were issued.  (Id.) And while Plaintiff acknowledges that Defendant disputed certain RIMS invoices, Plaintiff complains that Defendant refused to meet with Plaintiff, or ignored Plaintiff's requests to meet, about the invoices it disputed.  (Id. ¶ 72)  On November 15, 2019, Defendant terminated the RIMS Agreement, and did not pay $696,624 in outstanding RIMS invoices.  (Id. ¶¶ 97, 108) (The Court refers to the untimely paid RIMS invoices and the unpaid RIMS invoices collectively as the "RIMS Invoices.")

### C.    Non-Disclosure Agreement

While Plaintiff was developing the RIMS application, Defendant expressed interest in acquiring Plaintiff.  (Id. ¶ 76)  The parties entered into a non-disclosure agreement (the "NDA"), which permitted Defendant to access Plaintiff's confidential engineering and financial information.  (Id. ¶ 77; id., Ex. 5 ("NDA") (Dkt. No. 1-5))  The NDA requires Defendant to protect from disclosure Plaintiff's confidential information disclosed pursuant to the NDA.  (Cmplt. (Dkt. No. 1) ¶ 78; NDA (Dkt. No. 1-5))

## II.    PROCEDURAL HISTORY

The Complaint was filed on December 17, 2019, and asserts claims for breach of contract, account stated, and misappropriation of trade secrets.  (Cmplt. (Dkt. No. 1) ¶¶ 124-153) Plaintiff asserts that Defendant (1) prematurely terminated its ePortal and EIM subscriptions; (2)

failed to provide adequate notice of its terminations of these subscriptions; (3) delayed or failed to pay invoices when due; and (4) disclosed Plaintiff's confidential and proprietary information to Plaintiff's competitors. (Id.) On August 19, 2020, this Court referred this case to Judge Parker for general pretrial supervision. (Dkt. No. 30)

On November 18, 2020, Defendant moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 36) Defendant argues that (1) it was not obligated to pay the EIM Second Half Invoice, the EIM Termination Fee Invoice, or the ePortal Invoice because, at the time of termination, the License Agreement – and not the Order Form – governed the parties' relationship, and Defendant timely cancelled its subscriptions under the terms of the License Agreement (Def. Br. (Dkt. No. 37) at 17-23); (2) the EIM First Half Invoice and all RIMS Invoices were timely paid, or were the subject of a settlement between the parties (id. at 23-25); (3) the account stated claims are duplicative of the breach of contract claims (id. at 25-27); and (4) the misappropriation claim is barred by the License Agreement's limitation of liability provision and, in any event, Plaintiff waived any right to claim trade secret protection when it publicly filed the Order Form containing it purported trade secrets (id. at 28-30).

On March 30, 2021, this Court referred the Defendant's motion to dismiss to Judge Parker for an R&R. (Dkt. No. 48) In her April 7, 2021 R&R, Judge Parker recommends that Defendant's motion to dismiss be denied, except as to the RIMS Invoices that are the subject of Plaintiff's account stated claim. (R&R (Dkt. No. 51) at 34)

On April 21, 2021, Defendant filed objections to the R&R, in which it disputes all of Judge Parker's findings except those relating to the RIMS Invoices that are the subject of the account stated claim. (Def. Obj. (Dkt. No. 54)) On June 2, 2021, Plaintiff filed a response to Defendant's objections. (Pltf. Response (Dkt. No. 59))

# DISCUSSION

## I.   LEGAL STANDARDS

### A.   Review of Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), a party may submit objections to the magistrate judge's R&R. Any objections must be "specific" and "written," and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). "'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.'" Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district court judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d

201, 211 (S.D.N.Y. 2013) (quoting Vega v. Artuz, 97CIV.3775LTSJCF, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)) (second alteration in Phillips). "To the extent . . . that the party makes only conclusory or general arguments, or simply reiterates the original arguments, [courts] will review the Report strictly for clear error." IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07 Civ. 6865 (LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003) and Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, . . . 'rehashing . . . the same arguments set forth in the original petition." (quotation marks and citations omitted)).

### B.    Rule 12(b)(6) Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the complaint[,]" Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests," Port Dock & Stone Corp. v. Oldcastle Northeast Inc.,

11

507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish an entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers, 282 F.3d at 153 and Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

Where a party moving to dismiss cites to material that is outside the pleadings and is not incorporated by reference, the Court must either exclude that material and disregard it for purposes of the motion to dismiss or "'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'" Kopec v. Coughlin, 922 F.2d 152, 154 (2d Cir. 1991) (quoting Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988)).

## II.   ANALYSIS

### A.   Breach of Contract

Plaintiff's breach of contract claim is premised on Defendant's alleged untimely payment or failure to pay the (1) EIM and ePortal invoices, in violation of the Order Form; and (2) RIMS Invoices, in violation of the RIMS Agreement. (Cmplt. (Dkt. No. 1) ¶¶ 124-38) In its motion to dismiss, Defendant contends that the terms of the Order Form – including its non-

cancellation, termination fee, and payment terms – expired on December 31, 2015, and that, accordingly, Defendant could cancel its EIM and ePortal subscriptions without having to pay subscription fees for the remainder of the 2018 and 2019 calendar years. (Def. Br. (Dkt. No. 37) at 17-23) As to the EIM First Half Invoice and the RIMS Invoices, Defendant argues that the parties settled their dispute over unpaid RIMS Invoices in October 2017, and that the remaining RIMS Invoices and EIM First Half Invoice were timely paid. (Id. at 23-25)

## 1.   Legal Standard

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate:  first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003) (citations omitted); see also W.B. David & Co. v. DWA Commc'ns, Inc., No. 02 CIV. 8479 (BSJ), 2004 WL 369147, at *2 (S.D.N.Y. Feb. 26, 2004) ("To state a claim for breach of contract under New York law, the complaint must allege (1) the existence of a contract, (2) the plaintiff's performance of his obligations thereunder, (3) the defendant's failure to perform his obligations, and (4) resulting damages to the [p]laintiff." (citations omitted)).

"In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions." VLIW Tech., 840 A.2d at 615 (citations omitted). "Where ambiguity exists, dismissal is proper only if the defendants' interpretation is the only reasonable construction as a matter of law." MicroStrategy Inc. v. Acacia Rsch. Corp., 2010 WL 5550455, at *5 (Del. Ch. Dec. 30, 2010) (quotation marks, alteration, and citation omitted); see also LDIR, LLC v. DB Structured Prod., Inc., 172 A.D.3d 1,

5 (2019) (noting that court should not "choose between the parties' two reasonable competing interpretations [at the pleading stage]").[4]

## 2.   Which Contract Applied After December 31, 2015?

The parties' dispute regarding the EIM and ePortal invoices turns on whether the License Agreement or the Order Form governed in 2018 and 2019, when Defendant terminated its EIM and ePortal subscriptions.  Defendant argues that the License Agreement governed in 2018 and 2019, because (1) the Order Form has a "Contract End Date" of December 31, 2015; and (2) the License Agreement provides that any modification must be in writing.  (See Def. Br. (Dkt. No. 37) at 12, 17-23)

Plaintiff responds that, notwithstanding the "Contract End Date" of December 31, 2015 in the Order Form, the parties continued operating pursuant to the Order Form's terms until 2019, as evidenced by the parties' continued reliance on the Order Form's payment and pricing terms.  (See Pltf. Opp. (Dkt. No. 40) at 14-16)

As Judge Parker notes (see R&R (Dkt. No. 51) at 12), under Delaware law, courts may enforce unwritten modifications to contracts where they are sufficiently "specific[] and direct[] [so] as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." Reeder v. Sanford School, Inc., 397 A.2d 139, 141 (Del. 1979).  Where there is a course of conduct showing that the parties to a contract in fact agreed to change the terms of their relationship, Delaware courts have declined to enforce no-non-written-

---

[4] Judge Parker correctly finds that Delaware law governs the interpretation of the License Agreement – and, by extension, the Order Form – because the License Agreement contains a Delaware choice of law provision.  (R&R (Dkt. No. 51) at 9-10 (citing, inter alia, Hawes Office Sys., Inc. v. Wang Labs., Inc., 537 F. Supp. 939, 942 (E.D.N.Y. 1982)); License Agreement, §§ 12.11-12 (Dkt. No. 1-1) at 11)  Judge Parker also correctly concludes that New York law governs the interpretation of the RIMS Agreement, which contains a New York choice of law provision.  (R&R (Dkt. No. 51) at 10; MSA, § 14.15 (Dkt. No. 1-3) at 14)

modification provisions.  See Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc., 297 A.2d

28, 33 (Del. 1972).

 Applying Delaware law, Judge Parker concludes that Plaintiff has pled facts

sufficient to demonstrate that the Order Form was extended through a course of conduct, in that

Defendant continued to benefit from the Order Form's preferential pricing and billing terms after

the Order Form's "Contract End Date" of December 31, 2015.  (R&R (Dkt. No. 51) at 11-19)

 In its objections, Defendant argues that Judge Parker overlooked the fact that,

after the Order Form expired on December 31, 2015, (1) Plaintiff increased its prices and (2) the

parties entered into "subsequent agreements."  (See Def. Obj. (Dkt. No. 54) at 13-14)  To the

extent that Defendant's objection on this point does not merely "rehash[]" the arguments

presented in Defendant's motion papers, this Court reviews this issue de novo.  Phillips, 955 F.

Supp. at 211.

 As noted above, the Complaint alleges that the parties "continued to operate under

the Order Form's terms" – including its pricing and payment terms – from the Order Form's

effective start date in January 2013 until the filing of the Complaint in December 2019.  (Cmplt.

(Dkt. No. 1) ¶¶ 54-55)  The only exception identified in the Complaint is that Plaintiff agreed to

"split the annual EIM and ePortal bills into two bi-annual payments" in 2019.  (Id. ¶ 117)  While

Defendant contends that "the pricing listed in the . . . Order Form changed after the expiration

date" (Def. Obj. (Dkt. No. 54) at 13), that alleged fact is not pled in the Complaint and thus

cannot be considered by this Court on a motion to dismiss.  And while Defendant points to

various invoices issued in 2018 and 2019 that purportedly show that Plaintiff raised its prices for

ePortal and EIM by 40% and 13%, respectively (see Def. Reply Br. (Dkt. No. 41) at 7),

Defendant does not state whether its calculation accounts for each item listed in the Order Form

– including backup, escrow, and support charges relating to the ePortal and EIM subscriptions.[5] (See Order Form (Dkt. No. 1-2) at 2)  In short, the facts concerning 2018 and 2019 pricing cannot be established as a matter of law at this stage of the proceedings.  As Judge Parker remarks, "[m]ore facts will no doubt be developed in discovery on this issue."  (R&R (Dkt. No. 51) at 14 n.3)

      Defendant's argument that "subsequent agreements" show that the parties were not operating pursuant to the Order Form in 2018 and 2019 fails for similar reasons.  As an initial matter, Defendant's characterization of the ePortal subscription termination as an "agreement" between the parties contradicts the Complaint's allegations that the termination of ePortal was a breach of the party's agreement.  (See Cmplt. (Dkt. No. 1) ¶¶ 111, 130)  On a motion to dismiss, a complaint's factual allegations must be accepted as true.  Defendant also cites the parties' 2019 EIM bi-annual invoicing arrangement as evidence that the parties did not continue to operate under the Order Form's terms.  (Def. Obj. (Dkt. No. 54) at 13-14)  But while Defendant characterizes the bi-annual billing arrangement as an "agree[ment] in writing that [Defendant] would only renew EIM for six months" (id. at 14), the Complaint characterizes the bi-annual billing arrangement as an "agree[ment] only to split the annual EIM and ePortal bills into two bi-annual payments" (Cmplt. (Dkt. No. 1) ¶ 117).  This Court cannot resolve at this stage of the proceedings which side's characterization of this arrangement is correct.

      Defendant also argues that "[t]here was no reference to the . . . Order Form when the Parties agreed to terminate ePortal effective August 1, 2018," and that this shows that the

---

[5]  While the Order Form replaced the License Agreement's lengthy line-item pricing structure, the Order Form continues to list certain items separately from the ePortal and EIM subscription fees.  These items are also billed on an annual basis.  (Compare Order Form (Dkt. No. 1-2) at 2, with License Agreement, Ex. C (Dkt. No. 1-1) at 18-23)

parties did not continue to operate pursuant to the Order Form's terms. (Def. Obj. (Dkt. No. 54) at 13 (citing Hague Decl., Ex. A (Dkt. No. 39-1) (June 2018 email chain))  The fact that the parties did not reference the Order Form when the ePortal subscription was terminated does not demonstrate as a matter of law that the parties had not been operating pursuant to the Order Form's terms.

Accepting as true the Complaint's allegations that the parties continuously abided by the Order Form's preferential pricing terms, and only agreed to limited changes to the Order Form's billing structure, this Court concludes that Plaintiff has sufficiently alleged a course of conduct that could have modified the Order Form's express expiration date. See Pepsi-Cola, Inc., 297 A.2d at 33 (holding that plaintiffs' payment of defendant's invoices over fifteen years constituted course of conduct sufficient to modify written pricing agreement that prohibited non-written amendments). Cf. ING Bank, FSB v. Am. Reporting Co., LLC, 843 F. Supp. 2d 491, 499 (D. Del. 2012) (denying plaintiff summary judgment where defendant alleged that plaintiff had acquiesced to modification of contract terms through past conduct; noting that this issue was "for the jury to decide").

This Court concludes that Plaintiff has plausibly alleged that the Order Form governs the parties' dispute arising out of the ePortal and EIM invoices.

### 3.   EIM First Half Invoice

Plaintiff alleges that Defendant breached the terms of the Order Form by failing to pay the EIM First Half Invoice within ninety days. This invoice was issued on October 25, 2018, in the amount of $348,855, and was not paid until February 19, 2019 – 117 days after issuance of the invoice. (Cmplt. (Dkt. No. 1) ¶¶ 48, 95; Order Form (Dkt. No. 1-2) at 2)  The invoice –

which is attached to Defendant's motion papers – states "Terms:  Net 90 Days."  (Hague Decl., Ex. D (Dkt. No. 39-4))

In her R&R, Judge Parker concludes that Plaintiff has stated a claim for breach of contract based on the untimely payment of this invoice, noting that "the Court accepts [as true] Plaintiff's allegations" that the Order Form and its payment terms govern this invoice.  (R&R (Dkt. No 51) at 21)

In its objections, however, Defendant contends that Purchase Order #A00127818 governs the timeliness of Defendant's payment.  This purchase order – which is attached to Defendant's motion papers – is dated November 12, 2018, lists an amount of $348,855, and states "PAY NET IN 105 DAYS." (Hague Decl., Ex. E (Dkt. No. 39-5) at 1)  But while Defendant asserts that this purchase order was issued by Defendant in response to its receipt of the EIM First Half Invoice and "accepted by Locus without objection" (Def. Obj. (Dkt. No. 54) at 19), this Court cannot accept on a motion to dismiss Defendant's competing version of the facts, where those facts are premised on matters not pled in the Complaint.[6]

Because the Order Form and invoice provide for 90-day payment terms, Plaintiff has plausibly alleged a breach of contract based on Defendant's untimely payment with respect to the EIM First Half Invoice.

### 4.    **EIM Second Half Invoice**

With respect to the unpaid EIM Second Half Invoice, which was issued on April 3, 2019 in the amount of $359,321 (Cmplt. (Dkt. No. 1) ¶ 110), Judge Parker concludes that Plaintiff has plausibly alleged that the Order Form governs this invoice, and that Plaintiff was

---

[6]  Moreover, the purchase order cited by Defendant states that – if the terms of the purchase order conflict with the terms of any controlling contracts – the "contract document signed by both parties" takes "precedence." (Hague Decl., Ex. E, § 1.2 (Dkt. No. 39-5) at 3)

required to pay this invoice even after terminating its EIM subscription.  (See R&R (Dkt. No. 51) at 19-20)

In its objections, Defendant merely repeats arguments raised before Judge Parker and addressed above that the Order Form does not govern this dispute.  (Def. Obj. (Dkt. No. 54) at 17-18)  Because Plaintiff has plausibly alleged that the Order Form governs, Plaintiff has stated a claim for breach of contract arising out of Defendant's failure to pay the EIM Second Half Invoice.

### 5.    **EIM Termination Fee Invoice**

The Complaint alleges that, on May 15, 2019, Plaintiff issued the EIM Termination Fee Invoice for $185,702.40 and that this invoice has not been paid by Defendant. (Cmplt. (Dkt. No. 1) ¶¶ 110, 112-14)  Plaintiff alleges that, pursuant to the Order Form, Defendant was required to pay this fee for the transfer of Defendant's data, but that Defendant instead "engaged its HTS division in India to improperly download large amounts of [its] data from EIM, jeopardizing the performance and stability of all Locus customers."  (Id. ¶ 112)  The Complaint further alleges that "[t]his improper transfer of data violated EIM's Terms of Use Agreement and constituted a separate breach."  (Id. ¶ 113)

Judge Parker finds that Plaintiff has plausibly alleged that the Order Form's termination provision governs this dispute, and that Plaintiff has stated a claim for the non-payment of this invoice.  (See R&R (Dkt. No. 51) at 19-20)

In its objections, Defendant contends that the Order Form's "plain language clearly contemplated a request by [Defendant] to [Plaintiff] for the return of its data on DVD, which never occurred, [and] is not alleged to have occurred."  (Def. Obj. (Dkt. No. 54) at 18)

Because "there is no allegation of performance" by Plaintiff, Defendant argues that Plaintiff's claim based on this invoice must be dismissed as a matter of law.  (Id.)

Paragraph 7 of the Order Form, entitled "Program termination and return of data," provides that

> [p]rogram termination fee is $100 + 0.005 per record for data provided on DVD in comma separated value (.csv) format along with attachments in their native format. Upon request by [Honeywell] made within 30 days after the effective date of termination of a Purchased Services subscription, Locus will make [Honeywell's] data available on DVD.

(Order Form (Dkt. No. 1-2) at 3)

Accordingly, Defendant argues that the transfer of data by DVD was a "condition precedent" to Defendant's obligation to pay any fee associated with that data transfer.  Even assuming that the transfer of data is a condition precedent to Defendant's obligation to pay this fee, however, the Complaint alleges that Defendant "prevented [Plaintiff] from transferring [the] data."  (Cmplt. (Dkt. No. 1) ¶ 114)  Read together with Plaintiff's allegation that the Terms of Use Agreement prohibits Defendant from transferring this data without Plaintiff's consent (id. ¶ 113), this Court concludes that Plaintiff has plausibly alleged a breach of the termination fee provision of the Order Form.  See W & G Seaford Assocs., L.P. v. E. Shore Markets, Inc., 714 F. Supp. 1336, 1341 (D. Del. 1989) ("[A] party may not escape contractual liability by reliance upon failure of [a] condition precedent when [a] party wrongfully prevents performance of condition." (citation omitted)).

### 6.  ePortal Invoice

The Complaint also alleges that Defendant failed to pay the ePortal Invoice, dated June 5, 2019, in violation of the terms of the Order Form.  (Cmplt. (Dkt. No. 1) ¶ 110)  In her R&R, Judge Parker finds that, although this invoice concerns subscription fees arising after

Defendant terminated its ePortal subscription in June 2018, Plaintiff has plausibly alleged a claim because the Order Form's annual subscription fees provision governs.  (See R&R (Dkt. No. 51) at 19-20)

In its objections, Defendant maintains that it is not required to pay this invoice because (1) it timely terminated its ePortal subscription; and (2) Plaintiff "initiate[d] 'closeout procedures.'"  (Def. Obj. (Dkt. No. 54) at 18-19)  Because Defendant's arguments regarding the ePortal Invoice rehash arguments made before Judge Parker (compare Def. Reply Br. (Dkt. No. 41) at 9-10, with Def. Obj. (Dkt. No. 54) at 18-19), this Court reviews the R&R's recommendation concerning this issue for clear error.  Phillips, 955 F. Supp. at 211.

Having reviewed the parties' arguments, this Court finds no error – let alone clear error – in the R&R's recommendation.  Accepting the Complaint's allegations that the Order Form governed the parties' relationship at the time the ePortal subscription was terminated, that subscription was annual and non-cancellable.  Accordingly, Defendant's motion to dismiss that claim will be denied.

### 7.    Unpaid RIMS Invoices

The Complaint alleges that Defendant breached the RIMS Agreement by failing to pay $696,624 in invoices for "professional services" arising out of that contract.  (Cmplt. (Dkt. No. 1) ¶ 97)  In its motion to dismiss, Defendant argues that the parties entered into a settlement regarding these invoices, and Defendant attaches to its moving papers documents purporting to reflect that settlement.  (Def. Br. (Dkt. No. 37) at 24; Hague Decl., Ex. F-G (Dkt. No. 39-6 and 39-7))

In her R&R, Judge Parker concludes that these documents – which are not referenced in the Complaint – cannot be considered on a motion to dismiss.  (R&R (Dkt. No. 51)

at 22 (citing Holowecki v. Fed. Exp. Corp., 440 F.3d 558, 566 (2d Cir. 2006), aff'd, 552 U.S.

389 (2008)); id. ("Waiver and release is an affirmative defense that is only appropriate for

resolution on a motion to dismiss if 'it is clear from the face of the complaint, and matters of

which the court may take judicial notice, that the plaintiff's claims are barred as a matter of

law.'" (quoting Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008)))

Even if these documents could be considered, Judge Parker finds that they "do[] not clearly

demonstrate a settlement of the disputed invoices . . . . [because] [they] do[] not include a

separate settlement agreement or reference specific invoices." (Id. at 22-23)

        In its objections, Defendant argues that the Court can consider the parties' alleged

settlement agreement on a motion dismiss.  (Def. Obj. (Dkt. No. 54) at 21 ("[I]nterpretation of a

settlement and release is a question of law for the court and 'is appropriate for disposition on a

motion to dismiss.'" (quoting Geier v. Mozido, LLC, No. 10931-VCS, 2016 Del. Ch. LEXIS

149, at *7 (Del. Ch. Sept. 29, 2016))))

        This Court concludes that Judge Parker correctly declined to consider the

purported settlement agreement in resolving Defendant's motion, because the purported

settlement agreement is not discussed in the Complaint, is not incorporated by reference in the

Complaint, and is not integral to the Complaint.  See Chambers, 282 F.3d at 153 ("[A] plaintiff's

reliance on the terms and effect of a document in drafting the complaint is a necessary

prerequisite to the court's consideration of the [extrinsic] document on a dismissal motion; mere

notice or possession is not enough." (emphasis and citation omitted)).

        But even if this Court were to consider the purported settlement agreement, this

Court would conclude – as Judge Parker did – that Plaintiff has plausibly stated a claim for relief.

See Mabry v. Neighborhood Def. Serv., 769 F. Supp. 2d 381, 395 (S.D.N.Y. 2011) ("A court

may dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, 'only if the facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" (quoting <u>United States v. Space Hunters, Inc.</u>, 429 F.3d 416, 426 (2d Cir. 2005))). Indeed, while Plaintiff has acknowledged the existence of the settlement in its motion papers, it contends that this settlement was "limited [to] RIMS software subscription fees[,] . . . . [and that] Honeywell and Locus never settled [Time and Materials] billings for RIMS." (Pltf. Opp. (Dkt. No. 40) at 22)  And the purported settlement agreement – which appears to state that the parties settled a total of $561,142 worth of disputed invoices ($314,067 + $153,075 + $94,000) – does not account for the full $696,624 alleged in the Complaint.  (<u>See</u> Cmplt. (Dkt. No. 1) ¶ 97, <u>with</u> Hague Decl., Exs. F-G (Dkt. Nos. 39-6 and 39-7))

    Defendant also complains that Plaintiff "has not identified the purported [RIMS] invoices, not explained any reason for not doing so, not explained when the purportedly unpaid [RIMS] invoices were issued, and not explained when they were due."  (Def. Obj. (Dkt. No. 54) at 23-24 (citing <u>Iqbal</u>, 556 U.S. at 678))  But, as noted above, to state a claim for breach of contract, the complaint must only allege (1) the existence of a contract; (2) plaintiff's performance under that contract; (3) defendant's failure to perform; and (4) damages to plaintiff. <u>See</u> <u>W.B. David</u>, 2004 WL 369147, at *2.  Here, Plaintiff has alleged that Defendant breached the RIMS Agreement by failing to pay "RIMS invoices for professional services, which eventually totaled $696,624."  (Cmplt. (Dkt. No. 1) ¶ 97)  Plaintiff has provided sufficient specificity under <u>Iqbal</u> and <u>Twombly</u> "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  <u>See</u> <u>Port Dock</u>, 507 F.3d at 121.

This Court concludes that Plaintiff has plausibly stated a claim for breach of contract as to the unpaid RIMS Invoices.

### 8.    Untimely Paid RIMS Invoices

The Complaint alleges that Defendant paid a number of the RIMS invoices after the 105-day period specified in the RIMS Agreement. (Cmplt. (Dkt. No. 1) ¶ 95)  These invoices include (1) a March 27, 2018 invoice for which Plaintiff received payment 136 days later on August 10, 2018; (2) a September 20, 2018 invoice for which Plaintiff received payment 131 days later on January 29, 2019; and (3) an October 25, 2018 invoice for which Plaintiff received payment 124 days later on February 26, 2019. (Id.)  These payments were all untimely under the RIMS Agreement. (Id. ¶ 69)

The RIMS Agreement provides, in relevant part, that

> Locus will submit invoices describing the Services, Deliverables and Reimbursable Expenses and the payments due.  **Unless otherwise agreed in a SOW, payment will be monthly in arrears.**  Invoices for Services not compensated on a fixed price basis will be itemized to reflect, as applicable, the number of hours or costs for which Locus seeks reimbursement, and will be supported by time sheets, receipts and other documentation as Honeywell may reasonably require.  The invoice must also include the following information:  (a) name and address of Locus and Honeywell entity purchasing the Services and Deliverables; (b) name of shipper (if different from Locus); and (c) Honeywell's purchase order number(s).  Payment of an invoice does not constitute acceptance of Services, Deliverables or Reimbursable Expenses and such payment is subject to appropriate adjustment should Locus fail to meet the requirements of this Agreement.  **Payment terms are net 105 days from receipt of a correct invoice and conforming Services and Deliverables.  Payment will be scheduled for the first payment cycle following expiration of the net terms period.**  If Honeywell disputes an invoice[,] Honeywell will pay the undisputed portion of the invoice and withhold payment of the disputed portion until the dispute is resolved.

(MSA, § 5.4 (Dkt. No. 1-3) at 5 (emphasis added))

In its motion, Defendant argues that its payments of these RIMS Invoices were timely because the RIMS Agreement states that payments should be made on "'the first payment cycle following expiration of the net terms period.'" (Def. Reply Br. (Dkt. No. 41) at 10

(quoting MSA, § 5.4 (Dkt. No. 1-3) at 5); see also Def. Br. (Dkt. No. 37) at 24 ("The RIMS

Agreement expressly provides payment terms of net 105 days subject to Honeywell's normally

scheduled monthly payment runs.  All of the RIMS invoices identified were paid within a month

of the expiration of the net terms period."))

        In her R&R, Judge Parker concludes that "Honeywell has not shown that Locus's

allegations cannot plausibly give rise to an inference that this late payment constituted a breach

of contract, as the allegations do not specify what Honeywell's payment cycle was."  (R&R (Dkt.

No. 51) at 22)

        Defendant objects to the R&R's recommendation, noting that "the RIMS

Agreement provides that payment will be monthly in arrears," and that the October 25, 2018

RIMS invoice "was paid less than one month after the 105-day term." (Deft. Obj. (Dkt. No. 54)

at 10, 21)  This Court will review Defendant's objection concerning this issue de novo.

        As an initial matter, Defendant has only argued that – under its reading of the

RIMS Agreement – Defendant timely paid one of the three RIMS invoices that Plaintiff alleges

were not timely paid.  While Defendant claims that its payment of "Invoice No. 983108" – the

October 25, 2018 Invoice – was timely (see Def. Obj. (Dkt. No. 54) at 10, 20-21), it has not

addressed the March 27, 2018 and September 20, 2018 invoices.  (See Cmplt. (Dkt. No. 1) ¶ 95)

        Defendant has also not explained how the "monthly in arrears" term applies to

these other invoices, including whether payment must be made within a month of the expiration

of the net terms or within the month that the net terms expire.  For example, Plaintiff asserts that

the March 27, 2018 invoice was paid on August 10, 2018.  (Cmplt. (Dkt. No. 1) ¶ 95)  If

payment on this invoice was due within a month of the expiration of the 105-day net term period,

payment would be timely on or before August 10, 2018 (March 27, 2018 + 105 days + 31 days =

August 10, 2018). However, if payment was due within the month of the expiration of the 105-day net term period, payment would be timely only if submitted before July 31, 2018 (March 27, 2018 + 105 days = July 10, 2018).

In sum, Defendant has not shown as a matter of law that Plaintiff's claim as to the untimely paid RIMS Invoices is foreclosed by the RIMS Agreement. Accordingly, Defendant's motion to dismiss will – as to this claim – be denied.

*        *        *        *

For the reasons stated above, Defendant's objections to the R&R's recommendation concerning Plaintiff's breach of contract claim are overruled, and Defendant's motion to dismiss the breach of contract claim will be denied.

**B.      Account Stated**

Plaintiff's account stated claim is premised on the same invoices that underlie Plaintiff's breach of contract claim. (See Cmplt. (Dkt. No. 1) ¶¶ 139-145) In her R&R, Judge Parker finds that Plaintiff has plausibly alleged a claim for account stated as to the ePortal and EIM invoices, but not as to the RIMS Invoices. (R&R (Dkt. No. 51) at 23-28)

In concluding that Plaintiff has plausibly alleged a claim for account stated as to the ePortal and EIM invoices, Judge Parker rejects Defendant's argument that Plaintiff's account stated claim should be dismissed as duplicative of Plaintiff's breach of contract claim. Judge Parker finds that under NetJets Aviation, Inc. v. LHC Communications, LLC, 537 F.3d 168 (2d Cir. 2008), "an account stated claim is not duplicative of a related breach of contract claim if the

26

contract provides for the recovery of attorneys' fees, which ordinarily are not permitted under an account stated claim." (Id. at 25 (citing NetJets, 537 F.3d at 175)).[7]

In its objections, Defendant argues that Judge Parker misconstrues NetJets, and that courts must dismiss as duplicative an account stated claim that offers a narrower set of remedies than a related breach of contract claim. (Def. Obj. (Dkt. No. 54) at 24-27) This Court reviews this issue de novo.

In NetJets, the district court granted plaintiff summary judgement on its account stated claim, and dismissed plaintiff's breach of contract claim as duplicative. NetJets, 537 F.3d at 173. The Second Circuit reversed the dismissal of the breach of contract claim, reasoning that "when a party has both a claim for account stated and a claim under a contract that provides for an award of attorneys' fees, the claims for breach of contract and account stated are not duplicative." Id. at 175. Defendant argues that NetJets only saves claims that offer additional bases for relief, while claims that offer fewer bases for relief must be dismissed as duplicative. (Def. Obj. (Dkt. No. 54) at 27)

Defendant's reading of NetJets is incorrect. As numerous courts have found, NetJets does not require the dismissal of a claim as duplicative merely because it offers a narrower set of remedies than those available under a related claim. See New Am. Mktg. FSI LLC v. MGA Entm't, Inc., 187 F. Supp. 3d 476, 482 (S.D.N.Y. 2016) (account stated claim found not duplicative of breach of contract claim where plaintiff sought attorneys' fees and prejudgment interest under breach of contract claim); Mediterranean Shipping Co. (USA) Inc. v. Huatai USA LLC, No. 19 CIV. 10756 (AKH), 2020 WL 4750260, at *2 (S.D.N.Y. Aug. 17,

---

[7] The License Agreement authorizes the recovery of attorneys' fees in an action for non-payment of EIM/ePortal invoices. (R&R (Dkt. No. 51) at 26 (citing License Agreement, Ex. E, § IV (Dkt. No. 1-1) at 34))

2020) ("While Plaintiff may not ultimately recover the same damages twice, it may maintain both theories at [the motion to dismiss stage], where the Court has not yet ruled on the validity of any contract." (citing Trend & Style Asia HK Co. Ltd. v. Pac. Worldwide, Inc., No. 14-cv-9992, 2015 WL 4190746, at *5-6 (S.D.N.Y. July 10, 2015))); Firmenich Inc. v. Nat. Flavors, Inc., WL 1816191, at *9 (Del. Super. Ct. Apr. 7, 2020) (since the claims "lacking uniqueness" as to damages are pled in the alternative, the claims "would never co-exist at final judgment and are, therefore, not duplicative" (quotation marks and citations omitted)).[8]

Here, Plaintiff has sought an award of attorneys' fees – which is an available remedy under Plaintiff's ePortal and EIM breach of contract claim, but which is not an available remedy under Plaintiff's related account stated claim.  (Cmplt. (Dkt. No. 1) at 22)  Because Plaintiff "has both a claim for account stated and a claim under a contract that provides for an award of attorneys' fees," NetJets, 537 F3d at 175, Plaintiff's account stated claim for its ePortal and EIM invoices is not duplicative of its related breach of contract claim.  Accordingly, there is no basis for dismissing Plaintiff's account stated claim to the extent it is based on the ePortal and EIM invoices.

Neither side has objected to Judge Parker's finding that Plaintiff's account stated claim for the RIMS Invoices is duplicative of Plaintiff's related breach of contract claim.  (See Def. Obj. (Dkt. No. 54) at 24-27 & 24 n.6; Pltf. Obj. Resp. (Dkt. No. 59) at 13-15)  This Court finds no error in Judge Parker's determination on this point.

---

[8]  The cases cited by Defendant (see Def. Obj. (Dkt. No. 54) at 25) are not to the contrary.  See Centennial El. Indus., Inc. v. New York City Dept. of Citywide Admin. Servs., No. 153706/2015E, 2018 N.Y. Misc. LEXIS 2075, at *20-21 (N.Y. Sup. Ct. May 11, 2018) (summary judgment); Martin H. Bauman Assoc., Inc. v. H&M Int'l Transport, Inc., 171 A.D.2d 479, 485, 567 N.Y.S.2d 404 (1st Dep't 1991) (same).

Accordingly, this Court will adopt Judge Parker's recommendation that Plaintiff's account stated claim be dismissed only as to the RIMS Invoices.

### C.   Misappropriation of Trade Secrets

The Complaint alleges that Defendant "disclosed [intellectual property and confidential information] in violation of its contractual obligations to Locus and in violation of [DUTSA]." (Cmplt. (Dkt. No. 1) ¶ 150; id. ¶¶ 146-153)  After Defendant expressed interest in acquiring Plaintiff, and pursuant to a non-disclosure agreement, Plaintiff disclosed proprietary information to Defendant concerning Plaintiff's software – including methods, software architecture and workflows, and screenshots of software – and details regarding Plaintiff's costs and pricing.  (Id. ¶¶ 76-78, 118-23)  Plaintiff claims that Defendant later improperly disclosed Plaintiff's confidential and proprietary information in a Request for Proposal.  (Id.)

In its motion to dismiss, Defendant argues, inter alia, that the Complaint fails to state a claim under DUTSA, because Section 11 of the License Agreement precludes recovery for "consequential, indirect, incidental, punitive, or special damages," and Plaintiff has not sufficiently alleged the existence of direct damages that are recoverable under the agreement. (See Def. Br. (Dkt. No. 37) at 28-30 (citing License Agreement, § 11 (Dkt. No. 1-1) at 9))  In her R&R, Judge Parker rejects this argument, concluding that Plaintiff "has pleaded facts supporting its argument that the RFP disclosed trade secrets to its major competitors, giving rise to a plausible inference of harm, and Section 11 of the License Agreement does not unambiguously show Locus is barred from seeking its requested relief." (R&R (Dkt. No. 51) at 30 n.12)  Judge Parker also notes that Plaintiff's claim "pertains to conduct that was not just in breach of the License Agreement, but also in alleged breach of the NDA" – for which there is no limit on liability.  (Id. at 32-33)

In its objections, Defendant contends that Plaintiff has not sufficiently identified the damages it suffered, and that Judge Parker erred in finding otherwise.  (Def. Obj. (Dkt. No. 54) at 27-28)  In response, Plaintiff argues that, "[n]o court has held that DUTSA requires proof of damages at the pleading stage.  Instead, courts have properly held that DUTSA claims may proceed so long as the defendant is fairly apprised of the claim, as Honeywell has been."  (Pltf. Reply Br. (Dkt. No. 59) at 17)  Because Defendant's objections on this issue appear to "rehash[]" the arguments raised in Defendant's motion papers, Judge Parker's recommendation will be reviewed for clear error.  See Phillips, 955 F. Supp. at 211.  (Compare Def. Br. (Dkt. No. 37) at 28-30 and Def. Reply Br. (Dkt. No. 41) at 13-14, with Def. Obj. (Dkt. No. 54) at 27-28)

This Court finds no error in Judge Parker's recommendation.  As Judge Parker notes, to plead a claim for misappropriation of trade secrets under DUTSA, a plaintiff must allege "'(1) that a trade secret exists; (2) that plaintiff communicated the trade secret to defendant; (3) that the communication occurred with the understanding that defendant would protect the secrecy of the information; and (4) that the defendant improperly used or disclosed the trade secret.'"  (R&R (Dkt. No. 51) at 28 (quoting ELENZA, Inc. v. Alcon Labs. Holding Corp., No. N14C-03-185 (MMJ) (CCLD), 2017 WL 2651716, at *2 (Del. Super. Ct. Apr. 20, 2017)))  Here, Plaintiff alleges, inter alia, that, in connection with Defendant's possible acquisition of Locus in March 2018, the parties entered into an NDA that allowed Defendant "full access to Locus['s] confidential engineering and financial information [in exchange for agreeing to] protect[] Locus['s] confidential information."  (Cmplt. (Dkt. No. 1) ¶ 77; NDA (Dkt. No. 1-5))  Plaintiff further alleges that, in connection with Defendant's December 2018 request for proposal, Defendant "expos[ed] [Plaintiff's] confidential information and intellectual property to [Plaintiff's] competitors," and that such information "could be used by these

competitors . . . to [Plaintiff's] detriment," because "none of [these] competitors possessed software similar to EIM." (Cmplt. (Dkt. No. 1) ¶ 120)  Plaintiff describes in detail the types of proprietary information allegedly disclosed (id. ¶ 119), and asserts that Plaintiff was "directly damaged" through this disclosure (id. ¶ 17).

This Court finds the Complaint's allegations sufficient to plead a claim under DUTSA.  Accordingly, Defendant's objections are overruled, and Defendant's motion to dismiss Plaintiff's misappropriation of trade secrets claim will be denied.[9]

## CONCLUSION

For the reasons set forth above, Defendant's objections to the R&R are overruled, and the R&R (Dkt. No. 54) is adopted in its entirety.  Plaintiff's motion to dismiss is denied, except as to the RIMS Invoices referenced in Plaintiff's account stated claim.

A conference in this matter will take place on **November 10, 2022 at 10:45 a.m.** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.

Dated: New York, New York
        September 30, 2022

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[9] Defendant does not object to Judge Parker's remaining findings concerning the misappropriation of trade secrets count, and this Court sees no clear error in her conclusions.